# SEALED

1 | Roland Tellis (SBN 186269)
rtellis@baronbudd.com
2 | Mark Pifko (SBN 228412)
mpifko@baronbudd.com
3 | **BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
4 | Encino, California 91436
Telephone: 818.839.2333
5 | Facsimile: 214.520.1181

6 | W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com
7 | Noah M. Rich (*pro hac vice* pending)
nrich@baronbudd.com
8 | **BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
9 | Washington, DC 20037
Telephone:  202.333.7352
10 | Facsimile:  202.337.1039

11 | *Attorneys for Relator*

## FILED

### AUG 0 1 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

2:19-CV-1472-JAM-DB

12 | **UNITED STATES DISTRICT COURT**

13 | **EASTERN DISTRICT OF CALIFORNIA**

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

| | |
|---|---|
| 1 | UNITED STATES OF AMERICA *ex rel.* |
| 2 | VYVANSE LITIGATION PARTNERSHIP LLP and on behalf of the |
| 3 | STATES of CALIFORNIA, COLORADO, CONNECTICUT, |
| 4 | DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, |
| 5 | LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, |
| 6 | MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH |
| 7 | CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, |
| 8 | VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, |
| 9 | the Commonwealth of VIRGINIA, the Commonwealth of PUERTO RICO, the |
| 10 | DISTRICT OF COLUMBIA, the City of CHICAGO, the City of HALLANDALE |
| 11 | BEACH, BROWARD COUNTY, MIAMI-DADE COUNTY, the PEOPLE |
| 12 | OF CALIFORNIA, and the PEOPLE OF ILLINOIS, |

Case Number:

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, LOCAL LAW COUNTERPARTS, THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**

**JURY TRIAL DEMANDED**

Plaintiff-Relator,

vs.

TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS, U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., SHIRE NORTH AMERICAN GROUP, INC., SHIRE PHARMACEUTICALS, LLC, SHIRE U.S., INC., SHIRE DEVELOPMENT LLC, SHIRE LLC, and SHIRE PLC,

Defendants.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 3

II.     JURISDICTION AND VENUE........................................................ 6

III.    PARTIES .......................................................................................... 7

        A.    Plaintiff/Relator Vyvanse Litigation Partnership, LLP..................... 7

        B.    Defendants Takeda and Shire........................................................ 8

IV.     NATURE OF FALSE CLAIMS ACT AND PARALLEL STATE AND
        LOCALITY LAWS ........................................................................ 11

        A.    The False Claims Act .................................................................. 11

        B.    Background on FDA Drug Approvals and Unapproved and Unsafe
              Promotion .................................................................................. 11

        C.    The Limited Enforcement Capability of the FDA in Curbing Unapproved
              and Unsafe Promotion of Drugs.................................................. 18

              1.    The FDA relies on information provided by drug manufacturers for
                    new drug approvals. ........................................................... 18

              2.    The FDA has limited resources to enforce regulations pertaining to
                    drug marketing and promotion............................................ 19

        D.    Prescription Drug Payment under Government Health Care Programs ....... 20

              1.    Medicaid............................................................................ 20

              2.    Medicare............................................................................ 21

              3.    Reimbursement under other Government Programs ........................ 23

V.      SOURCES OF INFORMATION ABOUT PRESCRIPTION DRUGS RELIED
        UPON BY HEALTHCARE PROFESSIONALS .................................... 24

        A.    Pharmaceutical Companies' Promotion of Drugs to Physicians ................. 25

        B.    CME Courses Funded by Pharmaceutical Companies ....................... 26

VI.     BACKGROUND ALLEGATIONS ................................................ 30

        A.    Background on Vyvanse ............................................................. 30

        B.    Abuse of Vyvanse and Other Stimulant Drugs............................. 33

        C.    Binge-Eating Disorder................................................................ 35

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

D.   Selling Sickness.................................................................36

E.   FDA Approval of Vyvanse for the Treatment of BED ................39

VII.  DEFENDANTS' FRAUDULENT MARKETING SCHEME ...............41

A.   Defendants' Unapproved and Unsafe Promotion of Vyvanse for Weight Loss.........................................................................41

1.   Shire and Takeda's Neuroscience Sales Specialists promote Vyvanse for weight loss, an unapproved and unsafe use. ...............42

2.   "Sell the Screener, not the diagnosis.".................................44

3.   Shire's 2015 "Going Beyond" campaign encouraged Sales Specialists to "go beyond" promoting Vyvanse merely for BED and instead to target weight-loss clinics throughout the country...............48

4.   Shire's "Change in Mindset" campaign encouraged Sales Specialists to promote Vyvanse in weight-loss clinics.........................53

5.   Shire and Takeda recklessly permit Sales Specialists to add providers to call panels and willfully ignore evidence of unlawful marketing ..60

B.   Shire and Takeda's Use of CME Programs to Promote Vyvanse for Unapproved and Unsafe Uses ................................................67

1.   2014 Doctor's Channel CME:  "Binge Eating Disorder:  Out of the Closet and Into a New Era of Diagnosis and Treatment"...................71

2.   2015 CME at the AAFP: "The ABCs of Binge Eating Disorder:  What Every Practicing Family Physician Should Know"...........................72

C.   Shire Instructed Providers to Report False Diagnoses to Expedite Coverage for Vyvanse .............................................................75

D.   Shire Instructed Providers to Prescribe Mydayis to Adolescents at Adult Doses ............................................................................77

VIII.  DEFENDANTS CAUSED THE PRESENTATION OF FALSE CLAIMS TO THE UNITED STATES..................................................................81

IX.   TAKEDA CAUSED GOVERNMENT PROGRAM PROVIDERS TO FALSELY CERTIFY COMPLIANCE WITH THE LAW ......................................86

X.   SHIRE'S VIOLATION OF ITS SEPTEMBER 12, 2014 CORPORATE INTEGRITY AGREEMENT ........................................................88

A.   Shire Submitted False Reports to the OIG That Either Materially Misrepresented the Facts Concerning Its Illegal Conduct or Concealed Such Conduct Altogether .......................................................88

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

B.   The Corporate Integrity Agreement Signed by Shire in 2014 Required That Shire Establish Policies and Procedures for Conducting Promotion in Compliance with the FCA ............................................................... 89

C.   The CIA Is an Express Contract between Shire, the United States Department of Health and Human Services, and the United States Government ................................................................................................ 91

D.   The CIA Established an Obligation to Pay Stipulated Penalties, Which Arise from Shire's Contractually-Binding Requirement to Report Instances of Fraudulent Conduct ...................................................................... 92

XI.   FRAUD AGAINST CALIFORNIA AND ILLINOIS COMMERCIAL PAYORS ................................................................................................... 93

A.   The California Insurance Frauds Prevention Act (CIFPA) ........................... 93

B.   The Illinois Insurance Claims Fraud Prevention Act (IICFPA) .................. 95

C.   Shire and Takeda Use Coupons to Induce Patients to Use Vyvanse, Mydayis, and Xiidra ........................................................................................... 99

1.   The Vyvanse Savings Card .............................................................. 100

2.   The Mydayis Savings Card .............................................................. 111

3.   The Xiidra Iinsider Card ................................................................... 114

D.   DEFENDANTS CAUSED THE PRESENTATION OF FALSE CLAIMS TO CALIFORNIA AND ILLINOIS INSURANCE PROVIDERS ........... 117

XII.   CAUSES OF ACTION ........................................................................... 118

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ............... 118

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ............. 118

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ............ 119

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ............ 119

COUNT V (Violation of California False Claims Act) ......................................... 120

COUNT VI (Violation of Colorado Medicaid False Claims Act) ........................ 121

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance Programs) .................................................................................................. 122

COUNT VIII (Violation of Delaware False Claims and Reporting Act) ............. 123

COUNT IX (Violation of District of Columbia False Claims Act) ...................... 124

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

COUNT X (Violation of Florida False Claims Act) ............................................ 125

COUNT XI (Violation of Georgia False Medicaid Claims Act) ........................ 127

COUNT XII (Violation of Hawaii False Claims Act) ........................................ 128

COUNT XIII (Violation of Illinois False Claims Act) ....................................... 129

COUNT XIV (Violation of Indiana False Claims and Whistleblower Protection
Act) .................................................................................................................... 130

COUNT XV (Violation of Iowa False Claims Act) ........................................... 131

COUNT XVI (Violation of Louisiana Medical Assistance Programs Integrity
Law) ................................................................................................................... 132

COUNT XVII (Violation of Maryland False Health Claims Act) ..................... 133

COUNT XVIII (Violation of Massachusetts False Claims Act) ........................ 134

COUNT XIX (Violation of Michigan Medicaid False Claims Act) .................. 135

COUNT XX (Violation of Minnesota False Claims Act) .................................. 137

COUNT XXI (Violation of Montana False Claims Act) ................................... 138

COUNT XXII (Violation of Nevada False Claims Act) .................................... 139

COUNT XXIII (Violation of New Jersey False Claims Act) ............................. 140

COUNT XXIV (Violation of New Mexico Medicaid False Claims Act and  Fraud
Against Taxpayers Act) ..................................................................................... 141

COUNT XXV (Violation of New York False Claim Act) .................................. 142

COUNT XXVI (Violation of North Carolina False Claims Act) ....................... 143

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act) ............. 144

COUNT XXVIII (Violation of Rhode Island False Claims Act) ....................... 146

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act) ............... 147

COUNT XXX (Violation of Texas Medical Assistance Program, Damages, and
Penalties Act) .................................................................................................... 148

COUNT XXXI (Violation of Vermont False Claims Act) ................................. 149

COUNT XXXII (Violation of Virginia Fraud Against Taxpayers Act) ............. 151

COUNT XXXIII (Violation of Washington Medicaid False Claims Act) .......... 152

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

COUNT XXXIV (Violation of Puerto Rico False Claims Act)............................153
COUNT XXXV (Violation of Chicago False Claims Ordinance).......................154
COUNT XXXVI (Violation of Hallandale Beach False Claims Ordinance) .......155
COUNT XXXVII (Violation of Broward County False Claims Ordinance) .......156
COUNT XXXVIII (Violation of Miami-Dade False Claims Ordinance).............157
COUNT XXXIX (Violation of CIFPA) ................................................................157
COUNT XXXX (Violation of IICFPA) ................................................................159
XIII. PRAYER FOR RELIEF ......................................................................................161

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

2

3

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, LOCAL LAW COUNTERPARTS, THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On behalf of the United States of America ("United States"); twenty-six States, the District of Columbia, and the Commonwealths of Massachusetts, Puerto Rico, and Virginia (collectively, the "Whistleblower States"); the City of Chicago, the City of Hallandale Beach, Miami-Dade County, and Broward County (collectively, the "Whistleblower Localities"); the People of California; and the People of Illinois, Plaintiff-Relator Vyvanse Litigation Partnership, LLP ("Relator") hereby files this Complaint against Defendants Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals America, Inc., Shire North American Group, Inc.; Shire Pharmaceuticals, LLC; Shire U.S., Inc.; Shire Development LLC; Shire LLC; and Shire PLC (collectively, "Defendants"), pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; the Maryland False Health

Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Texas Medical Assistance Program, Damages, and Penalties Act, Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; the Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.*; and the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act, 2018 P.R. Act 154 (H.B. 1627) (the aforementioned statutes referred to collectively as the "state Whistleblower Statutes"); pursuant to the Chicago False Claims Ordinance, Chicago Mun. Code §§ 1-21-010 to -060, the City of Hallandale Beach False Claims Ordinance, Hallandale Beach Code of Ordinances §§ 8-201 to -210, the Broward County False Claims Ordinance, Broward Cnty. Code of Ordinances §§ 1-276 to -287, and the Miami-Dade County False Claims Ordinance, Miami-Dade Cty. Code §§ 21-255 to -266 (the aforementioned ordinances referred to collectively as the "locality Whistleblower Ordinances"); and pursuant to the

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871.7 ("CIFPA"), and
2  the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §§ 92/1 *et*
3  *seq.* ("IICFPA").

4  **I.      INTRODUCTION**

5       1.      Relator brings this action on behalf of the United States, the
6  Whistleblower States, the Whistleblower Localities, and the People of California
7  and Illinois to recover damages and civil penalties under the FCA, the state
8  Whistleblower Statutes, the locality Whistleblower Ordinances, the CIFPA, and the
9  IICFPA against Defendants for causing the submission of false or fraudulent claims;
10  for making, using, or causing to be made or used false records or statements material
11  to false or fraudulent claims; and for conspiring to do all of the same.

12       2.      For years, Defendants have put profits above patient safety. Seeking to
13  expand the market for Vyvanse, one of their most lucrative drugs, Defendants
14  fraudulently induced health care providers to prescribe the drug for the unapproved
15  and unsafe treatment of obesity that carried deadly health risks.

16       3.      Vyvanse is the brand name for lisdexamfetamine dimesylate, an
17  amphetamine product of the ilk that was once widely prescribed for weight loss, to
18  deadly effect.

19       4.      However, amphetamines have proven effective in treating Attention
20  Deficit/Hyperactivity Disorder ("ADHD"). Thus, for most of its life, Vyvanse was
21  approved by the FDA only for the treatment of ADHD. It is currently approved to
22  treat ADHD in both adults and children.

23       5.      Vyvanse has become a blockbuster drug, exceeding $2 billion in annual
24  sales since 2016.

25       6.      On January 30, 2015, Vyvanse was approved as the first approved drug
26  to treat moderate to severe Binge-Eating Disorder ("BED") in adults only.

27

28

3

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

7.     BED had not received official recognition as a distinct eating disorder until 2013, and it is still considered relatively rare among psychiatric disorders. Nevertheless, seeking an opportunity to increase profits at the expense of patient safety, Shire and its successor, Takeda, have fraudulently promoted Vyvanse for unapproved and unsafe uses—that is, for an indication that has not been approved by the FDA.

8.     Specifically, Shire and Takeda have promoted the use of Vyvanse for the treatment of obesity.  This unapproved and unsafe promotion is especially pernicious, as not only has Vyvanse not been approved for weight loss, but the FDA has specifically warned that Vyvanse might be harmful if used for weight loss.

9.     This is not the first time that Shire has knowingly and willfully violated the law.  Twice before, in 2014 and in 2017, Shire was forced to admit it had violated the law and entered into a Corporate Integrity Agreement, agreeing it would adopt stringent compliance mandates for a period of five years.

10.     The initiative for Sales Specialists to promote Vyvanse for weight loss was initially in 2015 called the "Going Beyond" campaign.  In 2018, Shire launched a new marketing campaign called "Change in Mindset."  Under both campaigns, Shire directed its Sales Specialists to knowingly and willfully promote Vyvanse for an unapproved and unsafe use, and to violate the limits placed on the company by the Corporate Integrity Agreements.

11.     In addition, for a period of several months, Shire knowingly provided health care providers with misleading promotional materials concerning Mydayis, an ADHD drug.  Specifically, Shire gave providers materials that encouraged them to prescribe Mydayis to pediatric patients at adult doses, which were significantly higher than the doses the FDA had approved for children.

4

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    12.    Furthermore, Shire and Takeda have used "copay coupons" to induce
2  commercially-insured patients to use their products.  In addition to Vyvanse, Shire
3  and Takeda's fraudulent copay coupon program extends to Mydayis and Xiidra, a
4  drug approved for the treatment of dry eye.  This scheme has harmed California and
5  Illinois private payors in several ways:

6              • Shire and Takeda have induced providers to prescribe, and patients to
7                pay, for prescriptions of Vyvanse for the unsafe and unapproved use of
                 weight loss.

8              • Shire and Takeda have induced providers to prescribe, and patients to
9                pay, for prescriptions of Vyvanse and Mydayis for the treatment of
                 ADHD rather than cheaper competitor drugs, including generic drugs.

10             • Shire and Takeda have induced providers to prescribe, and patients to
11               pay, for prescriptions of Xiidra rather than cheaper competitor drugs.

12   13.    Additionally, these coupon programs have operated as unlicensed
13  secondary insurance.

14   14.    Shire and Takeda's fraudulent scheme has had a material effect on
15  Government Programs' and private insurers' decisions to pay for prescriptions for
16  Vyvanse, Mydayis, and Xiidra.  Had these payors known that claims for the drug
17  were submitted as the result of Defendants' fraud, they would not have made those
18  reimbursements.

19   15.    The United States, the Whistleblower States, the Whistleblower
20  Localities, and the People of Illinois and California have suffered substantial harm
21  because of Defendants' false and misleading promotion.

22   16.    Defendants have violated the federal FCA, the state Whistleblower
23  Statutes, the locality Whistleblower Ordinances, the CIFPA, and the IICFPA, and in
24  so doing, have deceived the federal Government, the Whistleblower States, the
25  Whistleblower Localities, and private payors in Illinois and California into paying

26

27

28
                                            5

1  hundreds of millions of dollars in Vyvanse claims that were not eligible for
2  reimbursement.

3      17.    The aforementioned conduct is ongoing.

4  **II.    JURISDICTION AND VENUE**

5      18.    According to 28 U.S.C. §§ 1331 & 1345, this District Court has original
6  jurisdiction over the subject matter of this civil action since it arises under the laws
7  of the United States—in particular, the FCA.  In addition, the FCA specifically
8  confers jurisdiction upon the United States District Court. 31 U.S.C. § 3732(b).

9      19.    Pursuant to 28 U.S.C. § 1367, this District Court has supplemental
10 jurisdiction over the subject matter of the claims brought pursuant to the state
11 Whistleblower Statutes, the locality Whistleblower Ordinances, and the California
12 and Illinois Insurance Fraud Statutes, because the claims are so related to the claims
13 within this Court's original jurisdiction that they form part of the same case or
14 controversy under Article III of the United States Constitution.

15     20.    This District Court has personal jurisdiction over Defendants pursuant
16 to 31 U.S.C. § 3732(a) because Defendants transact business in this district and
17 engaged in wrongdoing in this district.  Likewise, the FCA authorizes nationwide
18 service of process and the Defendants have sufficient minimum contacts with the
19 United States of America.

20     21.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28
21 U.S.C. § 1391(b).  Defendants have transacted business within this District, and acts
22 proscribed by 31 U.S.C. § 3729 occurred in this District.

23     22.    Relator is unaware of any public disclosure of the information or
24 allegations that are the basis of the Complaint.  If there has been a public disclosure,
25 Relator is the original source of the information and allegations contained in this
26 Complaint.  Prior to the filing of this action, Relator voluntarily provided the United

27

28                                              6

1  States Government with information regarding the false claims that are the subject
2  of this Complaint.

3      23.    The causes of action alleged herein are timely brought because of,
4  among other things, efforts by the Defendants to conceal from the United States their
5  wrongdoing in connection with the allegations made herein.

6  **III.    PARTIES**

7      **A.    Plaintiff/Relator Vyvanse Litigation Partnership, LLP**

8      24.    Relator VYVANSE LITIGATION PARTNERSHIP, LLP (hereinafter
9  "Relator"), a Delaware limited liability partnership, brings this action on behalf of
10 itself, the United States of America, the Whistleblower States, and the People of
11 California. The registered office of Relator is located at 1925 Lovering Avenue,
12 Wilmington, Delaware 19806, and the name of the registered agent at such address
13 is The First State Registered Agent Company.

14     25.    Pursuant to Section 15-201(a) of the Delaware Revised Uniform
15 Partnership Act, Relator is not distinct from its partners, who, by virtue of their
16 employment with Shire and Takeda, at all times material hereto have had firsthand,
17 personal knowledge of the false claims, statements, and concealments alleged
18 herein. The two partners/owners of the partnership are "Partner A" and "Partner B."

19     26.    Partner A was employed by Shire from 2002 to 2019.  From 2011 to
20 2019, Partner A served as a Senior Executive Sales Representative in Shire's
21 Neuroscience Business Unit, where Partner A was responsible for conducting sales
22 presentations for several drugs, including Vyvanse and Mydayis.  Partner A has
23 extensive personal knowledge and experience regarding Shire and Takeda's
24 fraudulent scheme described in this Complaint, including personal contact with the
25 employees and executives who have committed violations of law alleged herein.

26
27
28
7
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

27.     Partner B has been employed by Shire and Takeda from 2000 through the present.   Since 2006, Partner B has served as a Senior Executive Sales Representative in Shire's Neuroscience Business Unit, where Partner B has been responsible for conducting sales presentations for several drugs, including Vyvanse and Mydayis.  Partner B has extensive personal knowledge and experience regarding Shire and Takeda's fraudulent scheme described in this Complaint, including personal contact with the employees and executives who have committed violations of law alleged herein.

28.     Relator and its partners have direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation to uncover false claims submitted to the United States and the Whistleblower States. Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint within the meaning of the federal FCA and the state false claims acts.

**B.     Defendants Takeda and Shire**

29.     Defendant SHIRE U.S., INC. is a New Jersey corporation with a registered agent located in West Trenton, New Jersey 08628 and its principal place of business and headquarters at 300 Shire Way, Lexington, Massachusetts 02421.

30.     Defendant SHIRE NORTH AMERICAN GROUP, INC. is a Delaware corporation with its principal place of business and headquarters at 300 Shire Way, Lexington, Massachusetts 02421.  Shire NA is a signatory to a September 12, 2014 Corporate Integrity Agreement ("Shire CIA") between Shire NA and the Office of the Inspector General of the Department of Health and Human Services ("OIG-HHS").

31.     Defendant SHIRE PHARMACEUTICALS, LLC is a Delaware limited liability company with its principal place of business and headquarters at 300 Shire

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  Way, Lexington, Massachusetts 02421.  Shire Pharmaceuticals is a party to the Shire
2  CIA between Shire and OIG-HHS.

3     32.     Defendant SHIRE DEVELOPMENT LLC is a limited liability
4  company organized and existing under the laws of the State of Delaware, and its
5  principal place of business is located at 300 Shire Way, Lexington, Massachusetts
6  02421.

7     33.     Defendant SHIRE LLC is a limited liability company organized and
8  existing under the laws of the State of Kentucky, and its principal place of business
9  is located at 9200 Brookfield Ct., Suite 108, Florence, Kentucky 41042.

10    34.     Defendant SHIRE PLC is a company organized and existing under the
11 laws of Jersey, Channel Islands, United Kingdom.  Shire PLC is the corporate parent
12 of Shire US, Shire NA, Shire Pharmaceuticals, Shire Development LLC and Shire
13 LLC.  Shire PLC, acting through its board of directors, authorized Shire NA and
14 Shire Pharmaceuticals to enter into the Shire CIA between Shire and the OIG-HHS.

15    35.     Collectively, the Shire entities shall be referred to as "Shire."

16    36.     Defendant TAKEDA PHARMACEUTICAL COMPANY LIMITED is
17 a Japanese corporation, having a principal place of business at 1-1, Doshomachi 4-
18 chome, Chuo-ku, Osaka, Japan.  As part of its business, Takeda Japan is involved in
19 the research, development, and marketing of pharmaceutical products.  On January
20 8, 2019, Takeda acquired Shire in a $62 billion deal.

21    37.     Defendant TAKEDA PHARMACEUTICALS U.S.A., INC. is a
22 Delaware corporation, having a principal place of business at One Takeda Parkway,
23 Deerfield, Illinois 60015.  As part of its business, Takeda U.S.A. is involved in the
24 research, development, and marketing of pharmaceutical products.

25    38.     Defendant TAKEDA PHARMACEUTICALS AMERICA, INC. is a
26 Delaware corporation, having its principal place of business at One Takeda Parkway,
27
28                                         9
       COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 Deerfield, Illinois 60015. As part of its business, Takeda America is involved in the
2 purchase, sale, and marketing of pharmaceutical products.

3          39.     Collectively, the Takeda entities shall be referred to as "Takeda."

4          40.     A substantial percentage of the Takeda drugs Vyvanse and Mydayis
5 sold in the United States was paid for and/or reimbursed by various Government
6 Health Care Programs, including health benefit carriers offering benefits under the
7 federal Employees Health Benefits Program ("FEHBP") under a prime contract with
8 the Blue Cross Blue Shield Association; the Health Insurance Program for the
9 Elderly and Disabled, more commonly referred to as the Medicare Program, 42
10 U.S.C. §§ 1395 et seq.; Medicare Part B; Medicare Part C (also known as
11 Medicare+Choice); Medicare Advantage; Medicare Part D; the Indian Health
12 Service; Medicaid; the Mail Handler's Health Benefit Plan; the U.S. Secret Service
13 Employees Health Association Health Benefit Plan; and TRICARE and the
14 Veteran's Health Administration ("VHA"); as well as various state and local health
15 benefit plans (collectively, the "Government Health Care Programs").

16          41.     Takeda and Shire publicly hold themselves out as committed to high
17 ethical standards, as well as being in compliance with laws enacted to safeguard the
18 health and safety of Government Health Care Program beneficiaries and to prevent
19 fraud, overutilization, and over-billing.[1]

[1] *See generally The Shire Code of Ethics* (May 2018), *available at* https://perma.cc/NY4U-7DAC; *Takeda Code of Conduct* (Feb. 2015), *available at* https://www.takeda.com/siteassets/en-us/home/corporate-responsibility/code-of-conduct_v11_february-2015.pdf.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## IV.   NATURE OF FALSE CLAIMS ACT AND PARALLEL STATE AND LOCALITY LAWS

### A.   The False Claims Act

42.   The FCA prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.[2]

43.   The FCA prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.[3]

44.   The FCA further imposes liability upon any person who conspires to commit a violation of the FCA.[4]

45.   The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.[5]   Any claim submitted by a Medicare or a Medicaid provider for a payment constitutes a claim under the FCA. Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

### B.   Background on FDA Drug Approvals and Unapproved and Unsafe Promotion

46.   Under the Food, Drug and Cosmetics Act ("FDCA"),[6] new drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its

---

[2] 31 U.S.C § 3729(a)(1)(A).

[3] *Id.* § 3729(a)(1)(B).

[4] *Id.* § 3729(a)(1)(C).

[5] *Id.* § 3729(b)(2)(A).

[6] 21 U.S.C. §§ 301-397.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

intended uses.[7]  Approval of the drug by the FDA is the final step in a multi-year process of study and testing.  The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices, and guidance documents.

47.    To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself.  Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use."[8]

48.    The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness.[9]  The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use.[10]

49.    The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" requires that a clinical study have (i) clear objectives; (ii) adequate design to permit a valid comparison with a control group; (iii) adequate selection of study subjects; (iv) adequate measures to minimize bias; and (v) well defined and reliable methods of assessing subjects' responses to treatment.[11]

---

[7] *Id.* § 355(a), (d).
[8] *Id.* § 355(b)(1)(A).
[9] *See id.* § 355(d)(7).
[10] *See id.* § 355(d)(5).
[11] *See* 21 C.F.R. § 314.26.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    50.    After a drug is approved, the FDA continues to exercise control over
2    the product labeling.  To ensure or promote safety, the FDA may require a label
3    change to reflect the increased risk of various side effects or interactions, restrict a
4    drug's indications, or, in extreme cases, force a withdrawal from the market.[12]

5    51.    The FDA determines the requirements for package inserts or
6    prescribing information that is provided with a prescription medication, which
7    provide information about that drug.

8    52.    The FDCA and FDA regulations restrict how drug companies may
9    market and promote approved drugs.[13] The drug labeling regulatory regime protects
10    patients and consumers by ensuring that drug companies do not promote drugs for
11    uses other than those found to be safe and effective by the FDA.  Moreover, this
12    regime protects patients and consumers by ensuring that the prescription and use of
13    approved drugs is not based on misleading marketing tactics.

14    53.    Drug labels—including all marketing and promotional materials
15    relating to the drug—may not describe intended uses for the drug that have not been
16    approved by the FDA.[14]  Illegal "misbranding" can result in criminal penalties.[15]
17    Drug companies can rely only on "substantial clinical evidence" in promoting their
18    drugs.  "Substantial clinical evidence" is "experience adequately documented in
19    medical literature or by other data ... on the basis of which it can fairly and
20    responsibly be concluded by qualified experts that the drug is safe and effective for
21    such uses."[16]  Generally, "substantial evidence" requires support from at least two

22    _____
23    [12] *See id.* § 201.57(3).
     [13] *See id.* §§ 331, 352, 314.81.
24    [14] 21 U.S.C. §§ 331, 352.
25    [15] *See id.* § 333.
26    [16] 21 CFR 202.1(e)(4)(ii)(c).

27

28
                                    13

1 adequate and well-controlled studies, each convincing on its own to establish
2 effectiveness.[17]   Moreover, FDA regulations prohibit unapproved and unsafe
3 advertising,[18] and unapproved and unsafe promotion by way of oral or written
4 statements.[19]

5      54.   The same general requirements about the promotion of prescription
6 drugs apply to both professional and consumer-oriented marketing. Promotional
7 materials may only make claims that are supported by "substantial" scientific
8 evidence (according to strict scientific procedures) and that are not false or
9 misleading. Federal regulations require that the risks as well as the benefits be
10 clearly identified and given appropriate prominence. Promotional materials must be
11 consistent with the FDA-approved product labeling. This restriction pertains to the
12 clinical indications for which the drug has been approved, as well as the dosing
13 regimen that is supported by the clinical trials that were undertaken to establish
14 safety and efficacy.

15      55.   A manufacturer wishing to market or otherwise promote an approved
16 drug for uses other than those listed on the approved label must resubmit the drug
17 for a series of clinical trials similar to those required for the initial FDA approval.[20]
18 The manufacturer must also file a supplemental NDA. Unless and until an additional
19 indication is approved by the FDA, the unapproved use is considered to be
20 "unapproved and unsafe."

21

22 [17] Food & Drug Admin., *Guidance for Industry:  Providing Clinical Evidence of*
23 *Effectiveness for Human Drug and Biological Products* 3 (1998), *available at*
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformatio
n/Guidances/ucm072008.pdf.

24 [18] 21 C.F.R. §§ 202.1(e)(6)(i), 202.1(e)(4)(i)(a).

25 [19] *See id.* § 201.5(a).

26 [20] *See id.* § 314.54 (outlining the administrative procedure for filing an application
for a new indication).

27

28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    56.    "Off-label" refers to the use of an approved drug for any purpose, or in
2    any manner, other than what is described in the drug's labeling.   Off-label use
3    includes treating a condition not indicated on the label, treating the indicated
4    condition at a different dose or frequency than specified on the label, or treating a
5    different patient population—*e.g.*, treating a child when the drug is approved only
6    to treat adults.

7    57.    Although the FDA is responsible for ensuring that a drug is safe and
8    effective for the specific approved indication, the FDA does not regulate the practice
9    of medicine.  Once a drug is approved for a particular use, the FDA does not prohibit
10   physicians from prescribing the drug for uses that are different than those approved
11   by the FDA.

12   58.    When considering unapproved and unsafe prescribing, physicians
13   depend on the patient-specific evidence available to them.   This includes the
14   particular patient, the severity of his or her problems, the successfulness of prior
15   treatment, and the risks of not treating.  Whether contemplating on- or unapproved
16   and unsafe use, physicians also rely on personal experience, recommendations from
17   colleagues and academics, educational seminars, and clinical trials evidence.
18   Physicians rely largely on information (or misinformation) provided by sales
19   personnel from drug makers, drug-company-sponsored continuing medical
20   education ("CME") courses and speaker programs, and drug-company-sponsored
21   clinical trials.

22   59.    Although physicians may prescribe drugs for unapproved and unsafe
23   usage, the law prohibits drug manufacturers from marketing or promoting a drug for
24   a use that the FDA has not approved, or for a patient group that is unapproved.
25   Specifically, a manufacturer illegally "misbrands" a drug if the drug's labeling
26   (which includes all marketing and promotional materials relating to the drug)

27
28

15

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

describes intended uses for the drug that have not been approved by the FDA.[21]  In addition, the FDCA[22] and its implementing regulations prohibit any advertising that recommends or suggests an unapproved and unsafe use for an approved drug.

60.    The FDA has interpreted "advertising" to include any "information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product."[23] Thus, drug labeling requirements apply to any material accompanying or explaining a drug product that is supplied and disseminated by the manufacturer, packer, or distributor of the drug.[24]

61.    Any drug manufacturer speech explaining one of its products is also subject to the FDA's "fair balance" requirements, which prohibit, among other things, advertisements that "contain[] a representation or suggestion that a drug is better, more effective, useful in a broader range of conditions or patients . . . , safer, has fewer, or less incidence of, or less serious side effects or contraindications than has been demonstrated by substantial evidence or substantial clinical experience,"[25] as well as advertisements that "contain[] a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial

---

[21] 21 U.S.C. §§ 331, 352.

[22] *Id.* § 331(d).

[23] *See Final Guidance on Industry-Supported Scientific and Educational Activities*, 62 Fed. Reg. 64074, 64076 (Dec. 3, 1997).

[24] *See* 21 U.S.C. § 352(f) (requiring labeling to include "adequate directions for use"); 21 C.F.R. § 201.5(a) (stating that "oral, written, printed or graphic advertising" that suggests unapproved and unsafe use constitutes inadequate directions for use); 21 C.F.R. § 202.1(e)(4)(i)(a) ("An advertisement for a prescription drug . . . shall not recommend or suggest any use that is not in the labeling accepted in such approved new drug application or supplement . . . ."); 21 C.F.R. § 202.1(e)(6)(xi) (prohibiting the use of "literature, quotations, or references for the purpose of recommending or suggesting conditions of drug use that are not approved or permitted in the drug package labeling").

[25] 21 C.F.R. § 202.1(e)(6)(i).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

clinical experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated."[26]

62.     FDA regulations further require drug companies to present a "true statement" of information relating to the side effects, contraindications and effectiveness of the drug use.[27]  A company violates this regulation if it presents "false or misleading" information about a drug's side effects or does not "fair[ly] balance" information relating to the safety and efficacy of the drug use against information about its side effects and contraindications.[28]

63.     Moreover, FDA regulations require labeling to be "informative and accurate and neither promotional in tone nor false and misleading in any particular" and to "contain a summary of the essential scientific information needed for the safe and effective use of the drug,"[29] and they prohibit "implied claims or suggestions of drug use if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness."[30]

64.     A manufacturer may disseminate written information regarding unapproved or new uses of marketed drugs only under certain circumstances.  This material must be in the form of an unabridged reprint or copy of a published, peer-reviewed article—or an unabridged reference publication that includes information about a clinical investigation—that is considered "scientifically sound" by experts

---

[26] *Id.* § 202.1(e)(6)(iv).

[27] *See id.* §§ 202.1(e)(5) *et seq.*

[28] *Id.* § 202.1(e)(5)(i)-(ii).

[29] *Id.* § 201.56(a)(1)-(2).

[30] *Id.* § 201.56(a)(3).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

qualified to evaluate the safety or effectiveness of the drug involved.[31]   The FDA does not consider abstracts of publications to be "scientifically sound."[32] Unabridged reprints or copies of articles may not be disseminated with any information that is promotional in nature.[33]

65.   The violation of any of the aforementioned requirements or prohibitions renders a drug "misbranded" and no longer eligible for reimbursement by Government Programs, including Medicaid.

## C. The Limited Enforcement Capability of the FDA in Curbing Unapproved and Unsafe Promotion of Drugs

### 1. *The FDA relies on information provided by drug manufacturers for new drug approvals.*

66.   FDA approval of prescription drugs is wholly dependent on the accuracy of information provided by drug manufacturers.[34]

67.   FDA approval does not require that a new drug be more effective or safer than other drugs approved to treat the same condition, or that the new drug be cost-effective.   A drug need only be shown to be more effective than a placebo in treating a particular condition, without any statistically significant safety findings. Comparative data showing performance as compared to existing drugs is not required; the FDA has no basis for determining that one drug is better than another drug.

68.   Because short-term studies are accepted, drug applications often do not contain long-term data on the safety or efficacy of the drug.   Approval of a new drug generally contains a requirement that the manufacturers pursue further long-term

---

[31] *See id.* § 99.101(a)(2).

[32] *Id.* § 99.101(b)(1)(ii).

[33] *Id.* § 99.101(b)(2).

[34] *See generally* Wayne A. Ray & Michael Stein, *Reform of Drug Regulation— Beyond an Independent Drug-Safety Board*, 354 New Eng. J. Med. 194 (2006).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  studies, but two-thirds of the promised studies never materialize, and the FDA lacks
2  any enforcement authority to require the manufacturer to complete these studies.

3      69.     Many of the effects of newly approved drugs could not possibly be
4  known at the time of FDA approval—particularly the long-term effects of taking a
5  medication, given the short length of, and relatively few participants in, the clinical
6  trials conducted for approval.   There is no systematic provision requiring drug
7  companies to conduct, or provide results from, post-marketing studies.

8      70.     The FDA often finds itself in a quandary: "Safety and speed are the yin
9  and yang of drug regulation.   Patients want immediate access to breakthrough
10 medicines but also want to believe the drugs are safe.   These goals can be
11 incompatible."[35]

12         **2.    *The FDA has limited resources to enforce regulations
               pertaining to drug marketing and promotion***
13

14      71.     The FDA's Office of Prescription Drug Promotion, or "OPDP," is
15 charged with overseeing the marketing and promotion of approved drugs to ensure
16 that advertisements are not false or misleading, provide a fair balance between the
17 benefits and risks of the drug, and do not include unapproved and unsafe uses.

18      72.     OPDP's ability to enforce unapproved and unsafe promotion
19 regulations is limited.   In 2003, the entire staff consisted of forty members, with
20 twenty-five reviewers responsible for reviewing all drug advertisements and
21 promotional materials.

22      73.     FDA's lack of resources to police unapproved and unsafe promotion
23 was confirmed in a 2008 Government Accountability Office report, which found that
24 the FDA took, on average, seven (7) months to issue letters in response to

25 _____
[35] Gardiner Harris, *Potentially Incompatible Goals at F.D.A.:   Critics Say a Push to
26 Approve Drugs Is Compromising Safety*, N.Y. Times, June 11, 2007, at A14.

27

28                                    19

unapproved and unsafe promotions.[36]  Among the Report's findings:  (i) FDA does not have separate oversight capability sufficient to capture unapproved and unsafe promotion; (ii) FDA is unable to review all promotional submissions because of the volume of materials it receives, and must prioritize its reviews in order to attempt to examine those with the greatest potential impact on human health; (iii) FDA is hampered by the lack of a system to consistently track the receipt and review of submitted materials; (iv) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material—for instance, discussions between doctors and sales representatives; and (v) from 2003 through 2007, FDA issued forty-two regulatory letters requesting that drug companies stop dissemination of promotional material promoting off-label uses of their pharmaceutical products.[37]

### D.   Prescription Drug Payment under Government Health Care Programs

74.    There is an array of health care programs operated and funded by the United States and the *Qui Tam* States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries.  Several of these Government Programs are described below.

#### 1.   *Medicaid*

75.    Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients.  Funding for Medicaid is shared between the federal Government and state governments.  Prior

---

[36] *See* Gov't Accountability Office, *Prescription Drugs:  FDA's Oversight of the Promotion of Drugs for Unapproved and Unsafe Uses* 6 (2008), *available at* http://www.gao.gov/new.items/d08835.pdf.

[37] *Id*. at 5-6.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

to the advent of Medicare Part D in 2006, the Medicaid program subsidized the purchase of more prescription drugs than any other program in the United States.

76.    Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."[38]  Covered outpatient drugs are drugs that are used for "a medically accepted indication."[39]

77.    A medically-accepted indication, in turn, is a use that is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute.[40]  The three statutorily named compendia are the American Hospital Service Formulary Drug Information ("AHFS"), United States Pharmacopeia-Drug Information or its successor publications ("USP-DI"), and the DRUGDEX Information System ("Drugdex").[41]

### 2.    *Medicare*

78.    Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases.   The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

---

[38] 42 U.S.C. §§ 1396b(I)(10), 1396r-8(k)(2)-(3).

[39] *Id*. § 1396r-8(k)(3).

[40] *Id*. § 1396r-8(k)(6).

[41] *See id*. § 1396r-8(g)(1)(B)(i).  The USP-DI ceased publication in 2007 and has no successor publication recognized by CMS.

21

1    79.    The first stage of the Medicare program, from May 2004 through
2    December 2005, permitted Medicare beneficiaries to enroll in a Medicare-approved
3    drug discount card program.

4    80.    In addition, low-income beneficiaries, defined as those whose incomes
5    were not more than 135 percent of the poverty line (those with incomes of no more
6    than $12,569 for a single person or $16,862 for a married couple in 2004) qualified
7    for a $600 credit (funded by Medicare) on their drug discount card for 2004, and
8    again for 2005.

9    81.    Starting in January 2006, Part D of the Medicare Program provided
10   subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries,
11   with low-income individuals receiving the greatest subsidies.  However, a "covered
12   Part D drug" be used for a "medically accepted indication (as defined in paragraph
13   (4)."[42]  Paragraph 4, in turn, refers to the Medicaid definition of medically accepted
14   indication under 42 U.S.C. § 1396r8(k)(6), which specifies that medically accepted
15   unapproved and unsafe uses are those "supported by one or more citations included
16   or approved for inclusion in" AHFS, Drugdex, or USP-DI.  Thus, to be reimbursable
17   by Medicare Part D, the unapproved and unsafe use of a drug must be supported by
18   one or more of AHFS, Drugdex, or USP-DI.

19   82.    Medicare's Prescription Drug Program, known as Part D, provides
20   optional drug benefits to Medicare beneficiaries.  CMS contracts with private
21   insurance companies, called sponsors, to provide Part D prescription drug coverage
22   to beneficiaries who choose to enroll.  Sponsors offer drug coverage to beneficiaries
23   through Part D prescription drug plans.  These Part D programs are subsidized by
24   the federal Government, which covers the cost of drug payments.

25

26   _____
     [42] *Id.* § 1395w-102(e)(1).
27

28                                    22
              COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    83.    During the period relevant to this Complaint, Shire and Takeda have

2    caused the submission of claims for unapproved and unsafe uses of Vyvanse that

3    were ineligible for Medicare reimbursement, including for use in the treatment of

4    obesity, a use which is not  FDA-approved, nor supported by the only applicable

5    compendium, DrugDex.

### 3.    *Reimbursement under other Government Programs*

7    84.    In addition to Medicaid and Medicare, the federal Government

8    reimburses a portion of the cost of prescription drugs under several other

9    Government Programs.  For example:

- CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependents affiliated with the armed forces;

- CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities; and

- The Federal Employee Health Benefit Program ("FEHBP") is a health care program administered by the Office of Personnel Management that provides health insurance for federal employees, retirees, and survivors.

17   85.    Coverage of unapproved and unsafe drug use under these programs is

18   similar to the coverage provided by the Medicaid program.

19   86.    Neither the FDA nor any of the statutorily named compendia have

20   recommended Vyvanse for any unapproved uses.[43]

21   87.    Claims for Vyvanse prescriptions for the treatment of obesity are not

22   FDA-approved nor supported by the applicable compendia.  These claims were

---

[43] *See, e.g., TRICARE Policy Manual 6010.57-M*, Chapter 8, Section 9.1(2.2.5.1) (Dec. 3, 2015), *available at* http://manuals.tricare.osd.mil/pages/DisplayManual.aspx?SeriesId=POLICY; *CHAMPVA Policy Manual*, Chapter 2, Section 22.1(I)(A)(2) (Dec. 23, 2011), *available at* https://www.vha.cc.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001036/content/554400000009157/02.22.01-PHARMACY.

23

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  ineligible for reimbursement and were therefore false at all times relevant to this
2  Complaint.

3  **V.  SOURCES OF INFORMATION ABOUT PRESCRIPTION DRUGS**
4  **RELIED UPON BY HEALTHCARE PROFESSIONALS**

5      88.    The standard upon which doctors are expected to rely when making
6  treatment decisions for their patients is "evidence-based medicine." The Center for
7  Evidence-Based Medicine ("CEBM") provides the following definition: "Evidence
8  based medicine is the conscientious, explicit, and judicious use of current best
9  evidence in making decisions about the care of individual patients."[44]

10     89.    Further, physicians are counseled that the gold standard methodology
11  for producing such evidence is randomized trials rather than from "non-experimental
12  approaches." When deciding whether a given treatment is in their patients' best
13  interest, physicians are advised "to avoid the non-experimental approaches, since
14  these routinely lead to false positive conclusions about efficacy. Because the
15  randomized trial, and especially the systematic review of several randomized trials,
16  is much more likely to inform physicians and so much less likely to mislead them,
17  it has become the "gold standard" for judging whether a treatment does more good
18  than harm.[45]

19     90.    Physicians' primary sources of the evidence for their evidence-based
20  decisions are the results of gold standard double-blind randomized controlled
21  clinical trials ("RCTs") and systematic reviews of RCTs published in peer-reviewed
22  journals. The medical "literature" thus defines the scientific evidence that provides
23  the foundation for "evidence-based medicine." These same sources of information

24

25  [44] David L. Sackett *et al.*, *Evidence Based Medicine: What It Is and What It Isn't*,
26  312 Brit. Med. J. 71, 71 (2006).
    [45] *Id.* at 72.
27

28                                        24
    COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  are used by TPP decision makers in determining which drugs to include on payer
2  formularies, the list of drugs available for their members.

3      91.    Pharmaceutical companies have both in-house and third-party
4  marketing firms to assist them in the branding and product placement of prescription
5  drugs.  Marketing, of which sales or drug representatives are only one aspect,
6  generally includes the oversight of all printed material concerning a prescription
7  drug, the look and feel of all advertisements, the pictures and colors used, the product
8  message and the way that the risks and benefits of the product are described.

9              **A. Pharmaceutical Companies' Promotion of Drugs to Physicians**

10     92.    Sales or drug representatives act as a source of information for
11 physicians. In late 2017, there were approximately 70,000 pharmaceutical sales
12 representatives in the United States[46] pursuing some 830,000 pharmaceutical
13 prescribers, or a sales representative for every 12 prescribers in the country.  A
14 pharmaceutical representative will often try to see a given physician every few
15 weeks. Shire and Takeda's Sales Specialists have a list of approximately 120-150
16 "targeted providers" on whom they are expected to call regularly.

17     93.    At all times material hereto, the doctors to whom Shire and Takeda's
18 Neuroscience Sales Specialists promoted Vyvanse reasonably believed that the
19 knowledge that informed their clinical decisions and standards of care derived from
20 the scientific evidence published in medical journals, presented in review articles,
21 and endorsed by thought leaders and trusted organizations at speaker programs and
22 Continuing Medical Education ("CME") events.  Shire and Takeda's documents
23 show, however, that they engaged in a carefully orchestrated and comprehensive
24 program to exploit physicians' trust in this process of knowledge creation and

25 _____
26 [46] *Sales Rep Count Holds Relatively Steady at 70,000, Says ZS*, Pharm. Commerce
   (Nov.  13,  2017),  https://pharmaceuticalcommerce.com/brand-marketing-
27 communications/sales-rep-count-holds-relatively-steady-70000-says-zs/.

28                                    25

1  dissemination. Rather than being the product of unbiased scientific inquiry, the
2  "scientific evidence" supporting unapproved and unsafe use of the Vyvanse derived
3  from Shire and Takeda's carefully designed and orchestrated campaign, in which
4  pre-determined, readily marketable messages formed the basis for the scientific
5  evidence, and not the other way around.

6      94.    Health care providers' independent clinical judgment concerning the
7  safety and efficacy of prescribing Vyvanse for the unapproved and unsafe use of
8  weight loss was compromised by their interactions with Shire and Takeda's Sales
9  Specialists.

10     **B.    CME Courses Funded by Pharmaceutical Companies**

11     95.    Another key source of drug information for medical decision makers is
12  CME courses.  CME, according to the American Medical Association, consists of
13  "educational activities that serve to maintain, develop, or increase the knowledge,
14  skills, and professional performance and relationships a physician uses to provide
15  service for patients, the public, or the profession."[47]  As such, ongoing participation
16  in CME plays a major role in doctors' fulfillment of the responsibility to their
17  patients to stay current with new medical knowledge.

18     96.    CME courses usually comprise medical lectures held locally featuring
19  Key Opinion Leaders ("KOLs")—providers who are well-known in a particular area
20  of treatment and who are usually paid by pharmaceutical companies to speak at
21  events.   Required to maintain medical licenses and to stay current with new
22  developments to give patients the best medical care, many doctors attend these CME
23
24
25  [47] Richard Van Harrison, *The Uncertain Future of Continuing Medical Education: Commercialism and Shifts in Funding*, 23 J. Continuing Educ. in the Health
26  Professions 198, 199 (2003).
27
28                                        26

1
2

courses because they provide expert syntheses of clinical trial information and help providers keep abreast of developments in their field.[48]

3
4
5
6

97.     The majority of states require ongoing participation in CME activities, typically fifty hours per year, in order to maintain medical licensure. CME activities provide information about new drugs, tests, and procedures, as well as optimal care for medical conditions.

7
8
9
10
11
12
13
14
15
16
17
18
19
20

98.     In addition to original scientific evidence and systematic reviews, CME is one of most important sources, if not the most important source, of information about evolving therapies for practicing physicians. Physicians are busy and want to learn as efficiently as possible about new therapies that will allow them to provide the best possible care to their patients. Physicians are taught during their many years of training to trust and learn from the hierarchy of medical authority. CME activities are typically provided by recognized clinical experts, often recognized and virtually always respected by practicing physicians. Therapeutic recommendations made by such authoritative clinical experts have a major impact on attendees' beliefs about optimal therapy for their patients. When physicians attend CME activities, they are in a receptive mode, poised to learn new material from trusted authorities. Physicians should be able to rely on the information shared during CME programs without needing to verify whether the information that was presented by the expert was an accurate and balanced review of the best available scientific evidence.

21
22
23
24
25

99.     For all these reasons, the content of medical education is not expected to be driven by commercial concerns, especially when trusted authorities provide reviews of data that lead to clinical recommendations. But, as shown below, this is exactly what Shire did: provide ostensibly unbiased medical education that actually promoted the false message that Vyvanse is safe and effective for weight loss.

26

[48] *Id.* at 199-200.

27
28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    100.   Although some physicians pay the full expense of CME programs,
2  more often the programs are either fully or partially subsidized by sponsors that
3  provide educational grants and other funding to CME providers.  Frequently, these
4  sponsors are manufacturers of drugs, biologics, or medical devices related to the
5  topic of the CME program.[49]

6    101.   The content of the CME programs is intended to be independent of drug
7  companies.    According to ACCME standards and FDA guidance, independent
8  educational grants cannot be tied to the purchase, sale, prescription, or
9  recommendation of the company's products.  There cannot be price concessions to
10  help offset a customer's purchase or reimbursement of drugs, and there cannot be
11  any payment to ensure that the grant recipient markets the company's drugs during
12  the educational program.   Responsibility for and control over the selection of
13  content, faculty, educational methods, materials, and venue belong solely to the
14  CME provider in accordance with their guidelines.

15    102.   Nevertheless, drug companies exert widespread influence over the
16  medical education activities they sponsor.  According to a report by the American
17  Medical Association Council on Ethical and Judicial Affairs, industry-supported
18  CME programs tend to focus on drug therapies and give more favorable treatment
19  to sponsors' products than do programs that are not funded by commercial
20  sponsors.[50]  One study of the return on investment for pharmaceutical promotional

---

23  [49] See generally Testimony before the Senate Special Committee on Aging:
Commercial Sponsorship of Continuing Medical Education: Testimony of Lewis
24  Morris, Chief Counsel, Office of Inspector General, Dep't of Health & Human
Servs.   (July    29,    2009),     https://www.oig.hhs.gov/testimony/docs/2009/
25  07292009_oig_testimony.pdf.

26  [50] *Id.*

28

1  strategies indicates that spending $1 on physician events and meetings, including
2  CME, generated an average of $3.56 in increased revenue.[51]

3      103.   Although it is illegal for a manufacturer to promote a product for an
4  off-label use, manufacturers often use CME programs to discuss off-label uses of
5  their products in a manner that would be obviously illegal if the manufacturers
6  delivered such messages directly.   When a manufacturer misuses CME for the
7  purpose of off-label promotion, the FDCA may be implicated.   The greater the
8  manufacturer's involvement in the delivery of the off-label message, the greater the
9  risk of a violation.[52]

10     104.   Shire regularly violated the FDA guidance and its own funding
11  guidelines governing CME events in that, although the programs offered through
12  CME vendors could ostensibly present only educational information, it manipulated
13  the CME programs into events it controlled in order to promote the unapproved and
14  unsafe uses of Vyvanse to treat weight loss.   Therefore, even though the events
15  highlighting the unapproved and unsafe use of Vyvanse to treat weight loss were run
16  through the CME vendors, they were, in fact, part of a well-disguised marketing
17  message mimicking Shire's illegal promotion that encouraged the unsafe and
18  unapproved use of Vyvanse for weight loss.

19     105.   The purpose of using CME vendors was to provide the appearance of
20  an "arm's length" transaction between Shire and the educational programs it was
21  funding.   The CME vendor was to be the "independent" third party so that any
22  discussion of unsafe and unapproved indications during the CME would appear to
23  be unrelated to Shire.

24
25  _____
26  [51] *Id.* at 2.
    [52] *Id.* at 4.
27
28                          29
      COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  VI.   **BACKGROUND ALLEGATIONS**

2      A.   **Background on Vyvanse**

3      106.   Vyvanse is a stimulant medication, meaning that it speeds up brain

4  activity.   Additionally, stimulant use results in physical effects.   These include

5  elevated heart rate, increased blood pressure, constriction of blood vessels, and

6  increased body temperature. Vyvanse can improve attention and focus in individuals

7  with ADHD, but it can also produce euphoria, increase energy, and suppress

8  appetite. Many people abuse prescription stimulants like Vyvanse for recreational,

9  academic, or weight loss reasons.[53]

10     107.   In the United States, the wholesale cost per month for Vyvanse is about

11 $264.   In 2016, it was the 99th-most prescribed medication in the United States, with

12 more than 7 million prescriptions.

13     108.   In 2013, CMS reported that total spending on Vyvanse for Medicaid

14 was $559,256,431.77 on 93,033,305 dosage units for 3,078,059 claims.   That year,

15 the average spending per dosage unit was $6.01, with an average cost per claim of

16 $181.69.   By 2017, the total spending had risen to $968,760,243.12 on 109,170,176

17 dosage units for 3,645,656 claims.   That year, the average spending per dosage unit

18 was $8.87, with an average cost per claim of $265.73.   In 2017, Vyvanse resulted in

19 the fourth-highest Medicare expenditures among all drugs.

20     109.   In 2013, CMS reported that total spending on Vyvanse for Medicare

21 Part D was $19,695,320.19 on 3,256,089 dosage units for 97,222 claims.   In 2014,

22 the average spending per dosage unit was $6.05 with an average cost per claim of

23 $202.58, or an average of $1,260.66 per beneficiary.   By 2017, the total spending

24 had risen to $46,738,944 on 5,618,750 dosage units for 169,156 claims.   That year,

25 ───────────────
[53] Nat'l Inst. on Drug Abuse, *Stimulant ADHD Medications: Methylphenidate and*
26 *Amphetamines* 1 (2016). https://www.drugabuse.gov/sites/default/files/drugfacts_
stimulantadhd_1.pdf (last visited July 8, 2019).
27

28                                   30

the average spending per dosage unit was $8.32 with an average cost per claim of $276.31, or an average of $1,768.94 per beneficiary.  In 2017, Vyvanse resulted in the 435th-highest Medicare Part D drug expenditures among all drugs.

110.  Vyvanse is a Schedule II controlled substance in the United States. Use of prescription stimulant drugs, including Vyvanse, for non-medical purposes is a serious and growing health problem in the United States:[54]

- In 2014, an estimated 1.6 million people aged 12 or older (0.6 percent of the population) used prescription stimulants for non-medical reasons.

- About 406,000 people (1.2 percent of the population) between the ages of 18 and 25 abused prescription stimulants in 2014.

- Approximately 5 percent to 10 percent of high school students and 5 percent to 35 percent of college students misuse or abuse prescription stimulants.

These statistics reveal that prescription stimulant misuse and abuse are common in the United States and that the number of people misusing and abusing stimulants has been increasing in recent years.

111.  Vyvanse is not a new drug. It was first approved by the FDA in 2007 to treat ADHD.  But its latest indication to treat BED actually represents something of a return to its roots: before they became ADHD drugs, amphetamines, of course, were diet drugs.

112.  First patented in the 1920s, and marketed as the first anti-depressants starting in the '30s and '40s, amphetamines found popularity as a weight loss drug

---

[54] Substance Abuse & Mental Health Servs. Admin., *Behavioral Health Trends in the United States: Results from the 2014 National Survey on Drug Use and Health* 8-10 (2015), *available at* https://www.samhsa.gov/data/sites/default/files/NSDUH-FRR1-2014/NSDUH-FRR1-2014.pdf; David B. Clemow & David J. Walker, *The Potential for Misuse and Abuse of Medications in ADHD: A Review*, 126 Postgraduate Med. 64, 64-81 (2015).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

by mid-century.  By 1945, close to half a million American civilians were taking amphetamines for both psychiatric indications and for weight loss.

113.  Doctors began prescribing "rainbow pills," amphetamines named for their bright colors, in the 1940s and '50s to help people lose weight.  By the late '60s, at the peak of the drugs' use, an estimated one in ten American women were consuming amphetamines.

114.  After numerous exposes on "Mother's Little Helper" and "speed freaks" in *Ladies Home Journal* and elsewhere—as well as a study finding that nearly half of the amphetamine users took the pills for nonmedical reasons—the Bureau of Narcotics and Dangerous Drugs (the precursor to today's Drug Enforcement Agency) stepped in.

115.  Amphetamine products were categorized as federally controlled substances with strict regulation of when and how they could be prescribed.  The FDA prohibited doctors from selling the drugs for weight loss; the only approved usages were for narcolepsy and "hyperkinetic disorder of childhood"—today recognized as ADHD.  By the end of the '70s, production and use of amphetamines had plummeted.

116.  Despite all the changes, Vyvanse is a variation on a familiar theme of amphetamines.   Vyvanse draws its lineage to Obetrol: after pharmaceutical executives saw potential in Obetrol—without the methamphetamine—to treat ADD, it was rebranded as Adderall (a variation of "ADD for all").  The FDA approved the drug for ADD treatment in 1996; Shire bought the company producing it a year later.  Vyvanse, in turn, was developed as a less easily abused version of a key Adderall ingredient and acquired by Shire in 2007.

117.  The amphetamines of the '60s and '70s were a different breed from the amphetamines of today.   Drugs like Vyvanse and Adderall do not contain

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    methamphetamine, which was responsible for making the pills particularly addictive
2    and rush-inducing.  In addition, Vyvanse is a prodrug, meaning it does not take effect
3    until it is digested, thus slowing down its onset and making it ineffective to snort.
4    However, like any amphetamine product, Vyvanse carries serious health risks and
5    potential for abuse.  Therefore, it is essential that Vyvanse be prescribed only in
6    accordance with the FDA's instructions.

7        **B.    Abuse of Vyvanse and Other Stimulant Drugs**

8        118.   Between 2014 and 2016, the FDA received 19,000 reports of
9    complications from stimulant drugs, including Adderall, Concerta, Ritalin, and
10   Vyvanse.[55]

11       119.   In emergency departments around the country, the number of cases
12   involving these common stimulant drugs quintupled over seven years from 2008 to
13   2014.  In Florida, a bellwether state for drug abuse problems, overdose deaths
14   involving stimulants increased more than 450 percent.  Taken together, the data
15   show the stimulant drugs—which have been heavily promoted by the
16   pharmaceutical industry—left a trail of misuse, addiction, and death.[56]

17       120.   A surprisingly large number of 8th graders (5.7 percent) say they have
18   tried prescription-type amphetamines without medical instruction; 1.7 percent say
19   they have used them in the prior 30 days.[57]  Lifetime prevalence for amphetamines

---

[55] John Fauber *et al.*, *Lowering the Bar: Adult ADHD, a Risky Diagnosis?*, MedPage Today (Sept. 10, 2016), https://www.medpagetoday.com/special-reports/loweringthebar/60136.

[56] *Id.*

[57] John E. Schulenberg *et al.*, *Monitoring the Future: National Survey Results on Drug Use 1975-2017, Volume II, College Students and Adults Ages 19-55*, at 25 (2017), *available at* http://www.monitoringthefuture.org//pubs/monographs/mtf-vol2_2017.pdf.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

used without a doctor's orders is much higher, increasing from 17 percent at ages 21-22 to 30 percent at ages 29-30, and to 50 percent at age 55.[58]

121.   Eleven percent of 8th grade students report that it is "very easy" or "fairly easy" to obtain amphetamines for nonmedical use.[59]  By the 10th grade, the percentage climbs sharply, to 24.2 percent,[60] and by the 12th grade, it reaches 38 percent.[61]

122.   At high schools across the United States, pressure over grades and competition for college admissions are encouraging students to abuse prescription stimulants, according to interviews with students, parents and doctors.  Pills that have been a staple in some college and graduate school circles are going from rare to routine in many academically competitive high schools, where teenagers say they get them from friends, buy them from student dealers or fake symptoms to their parents and doctors to get prescriptions.

123.   The number of prescriptions for ADHD medications dispensed for young people ages 10 to 19 rose 26 percent from 2007 to 2012, to almost 21 million yearly—a number that corresponds to more than two million individuals.  Doctors and students from schools across the nation estimate that 15 percent to 40 percent of students use prescription stimulants as a study aid.[62]

---

[58] *Id.* at 85.

[59] John E. Schulenberg *et al.*, *Monitoring the Future: National Survey Results on Drug Use 1975-2017, 2017 Overview, Key Findings on Adolescent Drug Use* 111, *available at* http://www.monitoringthefuture.org/pubs/monographs/mtf-overview2017.pdf.

[60] *Id.* at 113.

[61] *Id.* at 116.

[62] Alan Schwarz, *Risky Rise of the Good-Grade Pill*, N.Y. Times (June 9, 2012), https://www.nytimes.com/2012/06/10/education/seeking-academic-edge-teenagers-abuse-stimulants.html.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   124.  According to the Center on Young Adult Health and Development,
2   nearly one-third of college students have participated in the misuse of stimulant
3   prescription drugs at least once while attending college.[63]

4       **C.   Binge-Eating Disorder**

5   125.  BED was first described in 1990 by a psychiatrist named Robert
6   Spitzer.  At a meeting to discuss which diagnoses should be included in the fourth
7   edition of the Diagnostic Statistical Manual of Mental Disorders ("DSM-IV"), the
8   bible of the mental health field that classifies each recognized mental illness and its
9   symptoms, he noted that some patients regularly binged but did not fall into the
10  category of bulimia because they did not purge.  Over the next two years, Spitzer led
11  a landmark study finding the practice of uncontrollable, distress-inducing binges to
12  be a common, untreated problem among individuals participating in weight loss
13  programs—one that some binge eaters likened to an addiction.  The evidence led the
14  DSM committee to include BED, defined as binges featuring "impaired control" at
15  least twice a week for at least six months, as a disorder that was "not otherwise
16  specified."  Mental health practitioners were to be aware of its symptoms, but the
17  disorder necessitated more study before it became a full-fledged diagnosis.

18  126.  This classification in 1994 served as a rallying call of sorts among
19  eating disorder researchers.  Between the release of the DSM-IV and the DSM-5, in
20  2013, more than 1,000 studies were published on the prevalence, epidemiology, and
21  treatments of BED.

22
23

24  ---
    [63] Colleen Brennan, *Popping Pills: Examining the Use of 'Study Drugs' During*
25  *Finals*, USA Today (Dec. 16, 2015, 4:23 p.m.), https://www.usatoday.com/
    story/college/2015/12/16/popping-pills-examining-the-use-of-study-drugs-during-
26  finals/37409989/.

27
28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    127.   Some of the DSM Task Force were skeptical.  Allen Frances, Chair of
2    the DSM-IV Task Force, was very outspoken:  "Excessive eating 12 times in 3
3    months is no longer just a manifestation of gluttony and the easy availability of really
4    great tasting food. DSM-5 has instead turned it into a psychiatric illness called Binge
5    Eating Disorder."[64]  "BED is being offered as psychiatry's answer to the obesity
6    epidemic (which is rapidly overtaking smoking as our most deadly public health
7    threat).  Unfortunately psychiatry has no answers here—no cure for binge eating or
8    for obesity . . . .   Mental disorder is not causing the obesity epidemic.  And treating
9    a fake mental disorder can't fix it . . . .   Phony psychiatric labels won't held.  BED
10   has the familiar three-strikes-you're-out combination of inaccurate diagnosis, no
11   effective treatment, and drug side effects.  Making BED focuses attention on the
12   wrong culprit; it is not the individual who is sick, it is the public policy."[65]

13   128.   Others have questioned the close ties that task force members had with
14   the pharmaceutical industry.  Sixty-nine percent of the DSM-5 task force members
15   reported ties to the pharmaceutical industry.[66]

16   **D.   Selling Sickness**

17   129.   In 2011, Shire researchers had begun studying the company's top-
18   selling drug, Vyvanse, as a treatment for BED.   The first large trial showed
19   promising results: after about three months, those on high doses of Vyvanse binged
20

---

21   [64] Allen J. Frances, *DSM 5 Is Guide Not Bible—Ignore Its Ten Worst Changes*,
22   Psych. Today (Dec. 2, 2012), https://www.psychologytoday.com/us/blog/dsm5-in-
     distress/201212/dsm-5-is-guide-not-bible-ignore-its-ten-worst-changes.

23   [65] Allen J. Frances, *Saving Normal:  An Insider's Revolt against Out-of-Control
     Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary
24   Life* 183-84 (Harper Collins 2013).

25   [66] Lisa Cosgrove & Sheldon Krimsky, *A Comparison of DSM-IV and DSM-5 Panel
     Members' Financial Associations with Industry: A Pernicious Problem Persists*, 9
26   PLoS  Med.  e1001190,  1  (2012),  *available  at*  https://journals.plos.org/
     plosmedicine/article?id=10.1371/journal.pmed.1001190.
27

28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 | about half as much as those on a placebo. By the time of the 2013 release of the
2 | DSM-5—which, with universal support from the DSM committee, included BED—
3 | Shire had already laid the groundwork for its awareness campaign around the
4 | condition.

5 | 130. Shire's financial records reveal that in mid-2013, the bulk of its funding
6 | for educational purposes transitioned from teaching doctors how to recognize
7 | ADHD—a market that was slowly being eroded by generic drugs—to awareness of
8 | BED.

9 | 131. In the year and a half before gaining FDA approval, Shire spent about
10 | $4 million dollars on "medical awareness" of BED, including grants to the American
11 | Academy of Continuing Medical Education for a program called "the ABC's of
12 | BED" and to the Johns Hopkins University School of Medicine, to teach doctors
13 | about "missed opportunities in the recognition of binge eating disorder." The
14 | company also donated to patient advocacy groups, including a total of $450,000 to
15 | the Binge Eating Disorder Association (BEDA) and the National Eating Disorders
16 | Association (NEDA) to fund awareness activities.

17 | 132. This is not the first time Shire has focused on selling a disease. The
18 | company has faced criticism in the past for spending heavily to promote "awareness"
19 | of ADHD in order to promote sales of Adderall XR, Vyvanse, and Daytrana, Shire-
20 | owned drugs approved to treat ADHD.[67] The campaign was wildly successful: by
21 | 2013, the number of children on medication for ADHD reached over 3.5 million,
22 | more than five times the number of children taking drugs for the condition in 1990.[68]

23 |

24 | [67] Alan Schwarz, *The Selling of Attention Deficit Disorder*, N.Y. Times (Dec. 14,
2013), http://www.nytimes.com/2013/12/15/health/the-selling-of-attention-deficit-
25 | disorder.html.

26 | [68] *Id.*

27 |

28 |

37

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  Shire's own ADHD drugs achieved blockbuster status, with Vyvanse alone bringing
2  in close to $1.5 billion in sales by 2014.[69]

3  133.   Shire's strategy for promoting awareness of BED included hiring tennis
4  star Monica Seles to draw attention to the disease.  Seles told audiences she engaged
5  in guilty, secretive binges for years as a professional athlete.[70]  The tennis star was
6  paid by Shire to tour television talk shows, including "The Dr. Oz Show" and "Good
7  Morning America," in the month following the FDA's approval of Vyvanse.[71]

8  134.   Seles encouraged viewers to visit BingeEatingDisorder.com, a website
9  owned by Shire, for more information.  Research has shown that receiving a medical
10 diagnosis for a condition makes it more likely that a patient (or their caregiver) will
11 choose drug treatment.[72]   Shire's campaign took advantage of this likelihood by
12 promoting binge eating as a medical disorder: "B.E.D. is a real medical condition,"
13 reads the main page of BingeEatingDisorder.com, which also offers detailed
14 instructions to patients on how to draw attention to their condition during a doctor's
15 visit.

16 135.   The website urges potential sufferers of BED to see a doctor, "bring up
17 BED early in the appointment" because time may be limited, and prepare the doctor
18 by sending a "Binge Eating Disorder Education Kit."   The website further
19 encourages visitors to complete a questionnaire designed to produce false diagnoses
20

21 [69] *Id.*

22 [70] Katie Thomas, *Shire, Maker of Binge-Eating Drug Vyvanse, First Marketed the*
   *Disease*, N.Y. Times (Feb. 24, 2015), https://www.nytimes.com/2015/02/25/
23 business/shire-maker-of-binge-eating-drug-vyvanse-first-marketed-the-
   disease.html.

24 [71] *Id.*

25 [72] Aaron E. Carroll, *Calling an Ordinary Health Problem a Disease Leads to Bigger*
   *Problems*, N.Y. Times (June 2, 2014), https://www.nytimes.com/2014/06/03/
26 upshot/calling-an-ordinary-health-problem-a-disease-leads-to-bigger-
   problems.html.

27

28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   of BED.  This questionnaire, which is almost identical to the BEDS-7 Screener
2   described *infra* ¶¶ 155-65, misstates certain criteria for a BED diagnosis and entirely
3   omits other criteria.  As such, it is worse than useless as a diagnostic tool; it is
4   affirmatively harmful to patients who seek and receive unnecessary treatment with
5   amphetamines for a disorder they do not have.

6          **E.     FDA Approval of Vyvanse for the Treatment of BED**

7          136.   The FDA approved Vyvanse, a drug widely used for attention deficit
8   hyperactivity disorder, in 2015 to help curtail binge eating in adults.

9          137.   Because there was not another FDA-approved drug treatment for binge-
10  eating, the agency agreed to fast-track Vyvanse through the approval process.  And,
11  although the agency often asks an independent panel of experts to review evidence
12  on older products put to new use, it opted to skip that step in this case, noting that
13  Vyvanse's safety record as an ADHD drug was sufficiently reassuring.

14         138.   Ultimately, the agency approved the drug based on two 12-week
15  clinical trials involving a total of 724 people with the disorder.  Those studies showed
16  that, on average, people were binging less by the end of the study—regardless of
17  whether they took the drug or a placebo (sugar pill).  However, people who took a
18  50- or 70-milligram dose of Vyvanse reduced the number of binge episodes more
19  than those who took a 30-mg dose or a placebo.

20         139.   Had Shire sought to have Vyvanse approved as a weight-loss drug
21  instead of a "cure" for binge eating, it would have faced significant challenges.  The
22  FDA has become particularly cautious about approving new weight loss treatments
23  after the weight loss drugs fenfluramine, dexfenfluramine, and sibutramine were
24  linked to increased risk of cardiovascular problems (such as heart attack, stroke and

25
26
27
28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   heart valve disease) and removed from the market.[73]  To address potential risks for
2   new weight loss products, the FDA now generally requires long-term studies of
3   safety and effectiveness.

4       140.  Vyvanse is a dangerous drug that has been linked to sudden death,
5   stroke and heart attack in adults and children.[74]  Given these risks:

6       [T]he drug would likely have fared poorly in long-term cardiovascular safety
        studies.  Rather than attempt to overcome these high hurdles, Shire chose to
7       develop Vyvanse for BED rather than for weight loss.  This choice paid off:
        despite the fact that binge eating, like obesity, is a long-term condition that
8       requires long-term treatment, the FDA approved Vyvanse based on just
        twelve weeks of testing in placebo-controlled trials.  Patients with existing
9       cardiovascular problems, which are common among obese patients, were
        excluded from clinical testing.  This omission made it even less likely that
10      high numbers of cardiovascular side effects would occur during clinical
        testing and potentially prevent the new indication from being approved.[75]
11

12      141.  Even with these omissions, clinical studies demonstrated that Vyvanse
13  "significantly increased blood pressure and heart rate, indicators of potential
14  increased cardiovascular risk.  Subjects taking the drug also experienced fainting
15  and a certain pattern of tingling sensations, which are both side effects related to the
16  cardiovascular system."[76]  Although these symptoms troubled FDA officials, the
17  lack of serious adverse events during testing—likely attributable to the studies' short
18  duration and inclusion only of healthy patients—convinced the FDA to grant
19  approval to Vyvanse.[77]

20  [73] George A. Bray, *Medical Treatment of Obesity: The Past, the Present and the
    Future*, 28 Best Practice & Res. Clinical Gastroengerology 668-69, 680 (2014);
21  *Medications Target Long-Term Weight Control*, U.S. Food & Drug Admin. (June
22  17, 2012), http://www.fda.gov/forconsumers/consumerupdates/ucm312380.htm.

23  [74] *Vyvanse Label* 1, Food & Drug Admin., https://www.accessdata.fda.gov/
    drugsatfda_docs/label/2017/208510lbl.pdf (last visited July 3, 2019).

24  [75] Sarah Sorscher, *Vyvanse for Binge Eating: Old Pill, New 'Disease,'* Pub. Citizen
    (July 21, 2015), https://www.citizen.org/news/vyvanse-for-binge-eating-old-pill-
25  new-disease.

26  [76] *Id.*
    [77] *Id.*

27

28                                        40

142.   While stimulants were once popular diet aids, over time it became apparent that that type of drug harmed dieters more than they helped.  The drugs proved addicting and increased the dieters' risk for heart attack and stroke.

143.   Vyvanse carries many of those same risks. The drug is classified as a Schedule II controlled substance because it has a high potential for abuse and people can become physically dependent on it.  Like other stimulants, it can raise blood pressure and heart rate and increases the risk of heart attack or stroke and even sudden death in people who have heart problems or heart defects.  The drug can also trigger psychiatric problems, including hallucinations, delusions, or mania, even in people with no history of psychotic illness.

## VII.   DEFENDANTS' FRAUDULENT MARKETING SCHEME

144.   It was against the foregoing backdrop that Shire and Takeda developed and deployed the fraudulent scheme described below, which was characterized by false and misleading statements at every turn, to induce physicians to prescribe Vyvanse and thereby cause false claims for reimbursement to be submitted to (and paid by) Government Programs and private payors.

### A.   Defendants' Unapproved and Unsafe Promotion of Vyvanse for Weight Loss

145.   Vyvanse is indicated for the treatment of ADHD in pediatric and adult patients, as well as moderate to severe BED in adults.  It is not indicated for weight loss.  Indeed, Vyvanse's label warns:

> Limitation of Use: VYVANSE is not indicated for weight loss.  Use of other sympathomimetic drugs for weight loss has been associated with serious cardiovascular adverse events.  The safety and effectiveness of VYVANSE for the treatment of obesity have not been established.

41

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

146.   In addition, Vyvanse's label contains a black box warning—the most serious warning assessed by the FDA—pertaining to the drug's high potential for abuse:

> **WARNING: ABUSE AND DEPENDENCE**
> *See full prescribing information for complete boxed warning.*
>
> - **CNS stimulants (amphetamines and methylphenidate-containing products), including VYVANSE, have a high potential for abuse and dependence (5.1, 9.2, 9.3)**
> - **Assess the risk of abuse prior to prescribing and monitor for signs of abuse and dependence while on therapy (5.1, 9.2)**

147.   Shire and Takeda have engaged in a massive fraudulent scheme to promote Vyvanse for the treatment of obesity despite these FDA-mandated warnings and the cardiovascular risks associated with such treatment.

### 1.   *Shire and Takeda's Neuroscience Sales Specialists promote Vyvanse for weight loss, an unapproved and unsafe use*

148.   BED is a relatively rare disorder.  In 2016, the Office of Women's Health in the U.S. Department of Health and Human Services estimated that four million Americans suffered from BED.[78]

149.   Nevertheless, seeking to take advantage of Vyvanse's new indication for BED, Shire sought to inflate these prevalence data in an attempt to convince patients and practitioners that BED is more common than it actually is.  For instance, a 2014 CME program funded by Shire claimed that 8.5 million Americans suffered from BED.[79]

---

[78] John Fauber *et al.*, *From 'Gluttony' to the Medical Mainstream: Is Binge Eating a Disorder or Simply an Unhealthy Habit?*, Milwaukee J. Sent. (May 21, 2016), http://archive.jsonline.com/watchdog/watchdogreports/from-gluttony-to-the-medical-mainstream-is-binge-eating-a-disorder-or-simply-an-unhealthy-habit-b997-380004701.html; *accord Binge Eating Disorder*, Cleveland Clinic (Feb. 5, 2019); https://my.clevelandclinic.org/health/diseases/17652-binge-eating-disorder.

[79] Fauber *et al.*, *supra* n. 78.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

150.    These inflated prevalence estimates facilitated Shire and Takeda's marketing scheme for Vyvanse as a weight-loss product, under the guise of uncovering additional BED diagnoses.

151.    Shire and Takeda's Neuroscience Sales Specialists were and are instructed to target "promotionally responsive" health care providers who focused on earning additional money for their practices.  According to Shire and Takeda management, a "promotionally responsive" provider generally is unaffiliated with a hospital and often provides ancillary treatments or services, such as selling cosmetic lotions or weight-loss shakes.  Many providers focusing on weight loss are seen as archetypal "promotionally responsive" providers.   Shire and Takeda believed, rightly, that these providers would prescribe Vyvanse at high rates, notwithstanding the clinical appropriateness of such prescriptions.

152.    The dangerous effects of Vyvanse become more pronounced at higher doses.  Thus, Vyvanse's label mandates that patients be given an initial dose of 30 mg daily.  Providers are permitted to "titrate"—that is, adjust—the dose upward by 20 mg weekly, up to a maximum daily dose of 70 mg.

153.    Shire and Takeda's Sales Specialists, however, are trained to, and do, instruct health care providers to increase their patients' doses to 70 mg daily as quickly as possible, regardless of the medical necessity for such a high dose.  Such high doses of an amphetamine product such as Vyvanse are particularly dangerous to persons suffering from obesity, who tend to have comorbid cardiovascular conditions that can be exacerbated by amphetamines.

154.    Thus, Shire and Takeda's marketing of Vyvanse at the highest permissible dose to obese patients, as treatment for their obesity, makes the already dangerous drug even more dangerous.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

## 2. *"Sell the Screener, not the diagnosis"*

2     155.   Perhaps the most important tool in Shire and Takeda's arsenal is their
3   "BEDS-7 Screener," a questionnaire developed by Shire to mislead patients into
4   believing they have BED when they do not, and to induce physicians into over-
5   diagnosing BED and prescribing Vyvanse when it is not medically indicated.  Shire
6   and Takeda's Sales Specialists have used the BEDS-7 Screener with thousands of
7   providers throughout the United States.

8     156.   The BEDS-7 Screener intentionally misrepresents the signs and
9   symptoms associated with BED and is designed to elicit false diagnoses of BED.

10    157.   Shire and Takeda train their Sales Specialists to "sell the Screener, not
11   the diagnosis." In other words, Shire and Takeda instruct their Sales Specialists not
12   to focus on the actual DSM-5 criteria for BED, but on the Screener.  Shire and
13   Takeda know that many physicians will make a diagnosis and prescribe Vyvanse
14   based only on the Screener, which is engineered to generate false positives.

15    158.   Shire's promotional materials, including the example reproduced
16   below, encourage physicians to "rule it out"—that is, when presented with a patient
17   who suffers from obesity, depressive disorders, or bulimia nervosa, be sure to screen
18   the patient for BED, as well:[80]

19

20

21

22

23

24

25

26   _____
[80] *See* Ex. B3 to Relator's Pre-Filing Disclosure statement.
27

28                                   44



159.    As part of the process of "ruling out" BED, Shire and Takeda instruct physicians to ask their patients to complete the Screener, which intentionally distorts, through misrepresentation and omission, the actual clinical criteria for a diagnosis of BED:[81]

---

[81] *See* Ex. B1 to Relator's Pre-Filing Disclosure statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

The following questions ask about your eating patterns and
behaviors within the last 3 months. For each question, choose
the answer that best applies to you.

| **1. During the last 3 months**, did you have any episodes of excessive overeating (i.e., eating significantly more than what most people would eat in a similar period of time)? | Yes | No |
|---|---|---|

*NOTE: IF YOU ANSWERED "NO" TO QUESTION 1, YOU MAY STOP.
THE REMAINING QUESTIONS DO NOT APPLY TO YOU.*

| **2.** Do you feel distressed about your episodes of excessive overeating? | Yes | No |
|---|---|---|

| **Within the past 3 months...** | Never or Rarely | Sometimes | Often | Always |
|---|---|---|---|---|
| **3. During your episodes of excessive overeating**, how often did you feel like you had no control over your eating (e.g., not being able to stop eating, feel compelled to eat, or going back and forth for more food)? | | | | |
| **4. During your episodes of excessive overeating**, how often did you continue eating even though you were not hungry? | | | | |
| **5. During your episodes of excessive overeating**, how often were you embarrassed by how much you ate? | | | | |
| **6. During your episodes of excessive overeating**, how often did you feel disgusted with yourself or guilty afterward? | | | | |
| **7. During the last 3 months**, how often did you make yourself vomit as a means to control your weight or shape? | | | | |

160.   Shire and Takeda's Sales Specialists instruct physicians that, if a patient answers yes to question 1, he or she should complete the remainder of the Screener. Shire and Takeda further instruct that if a patient answers yes to question 2 and checks one of the shaded boxes for the remainder of the questions, that the patient likely has BED and should be prescribed Vyvanse.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

161. The screener is only loosely connected to the actual clinical criteria for a BED diagnosis:[82]

**Table A. DSM-IV and DSM-5 diagnostic criteria for binge-eating disorder**

| Criteria Set and Severity Grading | Specific Definitions for Each Criterion |
|---|---|
| Criterion 1 | Recurrent episodes of binge eating. An episode of binge eating is characterized by both of the following:<br>  a.  Eating, in a discrete period of time (e.g., within any 2-hour period), an amount of food that is definitely larger than most people would eat in a similar period of time under similar circumstances<br>  b.  The sense of lack of control over eating during the episode (e.g., a feeling that one cannot stop eating or control what or how much one is eating) |
| Criterion 2 | Binge-eating episodes are associated with 3 or more of the following:<br>  a.  Eating much more rapidly than normal<br>  b.  Eating until feeling uncomfortably full<br>  c.  Eating large amounts of food when not feeling physically hungry<br>  d.  Eating alone because of being embarrassed by how much one is eating<br>  e.  Feeling disgusted with oneself, depressed, or very guilty after overeating |
| Criterion 3 | Marked distress regarding binge eating is present. |
| Criterion 4 | The binge eating occurs, on average—<br>  a.  At least 2 days a week for 6 months (DSM-IV frequency and duration criteria)<br>  b.  At least 1 day a week for 3 months (DSM-5 frequency and duration criteria) |
| Criterion 5 | The binge eating is not associated with the regular use of inappropriate compensatory behavior (e.g., purging, fasting, excessive exercise) and does not occur exclusively during the course of anorexia nervosa or bulimia nervosa. |
| Severity Grading | DSM-IV does not include a BED severity grading scale.<br>Applicable to DSM-5 only, BED severity is graded as follows:<br>      Mild: 1 to 3 episodes per week<br>      Moderate: 4 to 7 episodes per week<br>      Severe: 8 to 13 episodes per week<br>      Extreme: 14 or more episodes per week |

BED = binge-eating disorder; DSM = Diagnostic and Statistical Manual of Mental Disorders

162. Contrary to the Screener's suggestion, in order to be diagnosed with BED, according to the DSM-5, binge eating must occur at least once *a week* for three months, not just once at all during the last three months. Binge eating episodes must be associated with three or more of five additional enumerated criteria: eating much more rapidly than normal, eating until uncomfortably full, eating large amounts of food while not feeling hungry, eating alone because of embarrassment, and feeling disgusted with oneself, depressed, or very guilty after overeating. In addition, a

[82] Nancy D. Berkman *et al.*, *Management and Outcomes of Binge-Eating Disorder* ES-1 (2015), *available at* https://www.ncbi.nlm.nih.gov/books/NBK338312/pdf/Bookshelf_NBK338312.pdf.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

sense of loss of control during binge episodes "is a core feature of BED," not merely "sometimes" associated with bingeing episodes.[83]   And persons who suffer from BED must feel "[m]arked distress regarding binge eating," not just sometimes feel embarrassed, disgusted, or guilty.[84]

163.   Additionally, because Vyvanse is approved only for the treatment of moderate to severe BED, a patient must suffer from four to thirteen episodes of bingeing per week for Vyvanse to be an appropriate treatment.   This criterion is omitted altogether from the Screener, increasing the likelihood that a physician will prescribe Vyvanse for unapproved and unsafe uses.

164.   By misstating key diagnostic criteria and entirely omitting others, the Screener guides, encourages, and induces providers to over-diagnose BED and over-prescribe Vyvanse.

165.   In reality, the Screener is merely a thinly-veiled mechanism by which Shire promotes Vyvanse for the unapproved and unsafe treatment of obesity, not the narrowly circumscribed condition of BED.

**3.      *Shire's 2015 "Going Beyond" campaign encouraged Sales Specialists to "go beyond" promoting Vyvanse merely for BED and instead to target weight-loss clinics throughout the country***

166.   In 2015, shortly after Vyvanse received FDA approval for the treatment of BED, Shire management introduced its "Going Beyond" campaign, which established the strategy of selling Vyvanse for weight loss in spite of the FDA's clear directives that such use was unapproved and unsafe.

---

[83] *Id.*

[84] *Id.*

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

167.   Partner A and Partner B, along with their colleagues, attended a Plan of Action ("POA") meeting in October 2015 led by Regional Director Jack Duelks, at which the "Going Beyond" campaign was introduced to various Sales Specialists.

168.   At the POA meeting, Duelks instructed the Sales Specialists to provide several messages to providers that were designed to promote Vyvanse for weight loss, not BED:

   a. Sales specialists were instructed to tell providers to ask their patients what is keeping them from getting to their goal weight.

   b. Sales specialists were instructed to tell psychiatrists to ask their patients if they are still depressed even after taking antidepressants—and, if so, to ask the patients if they are emotionally eating.

   c. Sales specialists were instructed to tell providers to ask how often their patients are so uncomfortable before they are weighed that they remove all of their clothing before stepping on the scale.

   d. Sales specialists were instructed to ask providers what kinds of conversations they have with their patients after hearing that the patients "feel fat" and are "stressed out." Sales specialists were instructed to tell providers that if they hear such statements, they should administer the BEDS-7 Screener.

   e. Sales specialists were instructed to tell providers that if a patient has a Body Mass Index (BMI) of over 25, screen the patient for BED.[85]

All of these messages were intended to, and did, conflate the conditions of depression, obesity, BED, and mere overeating—and induce the use of Vyvanse for the unapproved and unsafe use of weight loss.

169.   Duelks also instructed the Sales Specialists to ask providers who prescribed weight loss drugs about their patient's retention rates.[86] Duelks instructed the Sales Specialists to compare Vyvanse to these weight loss drugs, touting the relatively high retention rate that providers could expect when prescribing Vyvanse.

---

[85] In the BMI scale, 25 is the threshold for being considered overweight.

[86] A retention rate refers to the rate at which patients continue to seek care from a provider. Higher retention rates are preferable because they provide a steadier stream of income to a provider and reduce the need to seek out new patients.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Not only was such a comparison relevant only if Sales Specialists were promoting Vyvanse for the unapproved and unsafe use of weight loss, but Shire had no head-to-head clinical trial data supporting these claims.

170.   Duelks did not invent the messages he delivered at the POA meeting on his own.  Rather, Shire management trained Duelks and other managers to deliver standardized messages.  Accordingly, the messages Duelks delivered at this POA meeting were also delivered by other managers to Shire's entire Neuroscience Business Unit Sales Specialists across the country.

171.   Shire's printed marketing materials contained similar statements designed to induce providers to prescribe Vyvanse for the unapproved and unsafe use of weight loss.

172.   For instance, Shire's Sales Specialists were provided with a tablet containing software to be used in sales presentations with providers.  One portion of these digital marketing materials listed many symptoms, some of which are associated with BED and some of which are not:[87]

---

[87] *See* Ex. B8 to Relator's Pre-Filing Disclosure statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT



173.   By tapping on a symptom, a user would be informed whether or not that symptom was actually associated with BED.  Some of the symptoms enumerated in the digital marketing piece are not associated BED:[88]

---

[88] *Id.*

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT



174.   However, Shire's Sales Specialists rarely had time to discuss every symptom—or even any of these symptoms—with a provider, leaving the false impression that every symptom enumerated in the digital marketing piece was indicative of BED.

175.   In July 2016, Partner A and Partner B attended a national sales meeting in Dallas, Texas.  Shire's entire sales force attended the meeting.

176.   Periodically throughout the meeting, there were "breakout sessions" for each zone or region.  Prior to these breakout meetings, the Zone Director or Regional Director is trained to give a message to his or her sales team.  Accordingly, each Zone Director or Regional Director within a particular business unit delivers—and each Sales Specialist receives—the same, standardized message.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

177.   At one point, Regional Director Duelks led a breakout session which Partner A attended.  At the breakout session, Duelks encouraged Sales Specialists to stress the importance of BED by delivering the following messages to health care providers:

- You care about diabetes and cholesterol—why not BED?

- What is stopping your patients from getting to their normal BMI?

- Do you have other disease states that you treat, where BED may be hiding?

Duelks further instructed Sales Specialists to stress the importance of using the BEDS-7 Screener and to compare the cost of Vyvanse with and without the Vyvanse Savings Card.[89]

178.   Duelks instructed Sales Specialists to tell providers to focus on "4 'S's": speed, stuffed, secret, and shame—ostensibly corresponding to criterion 2 of the DSM-5 criteria for BED.  This shorthand mnemonic, however, fails to address several key criteria essential for a BED diagnosis, including the definition of a binge, frequency of binges, marked distress, and lack of compensatory behaviors.

179.   These standardized messages, which were delivered to all Sales Specialists in Shire's Neuroscience Business Unit, were designed to induce providers to over-diagnose BED and over-prescribe Vyvanse, especially for the unapproved and unsafe use of weight loss.

**4.   *Shire's "Change in Mindset" campaign encouraged Sales Specialists to promote Vyvanse in weight-loss clinics***

180.   By 2018, three years after Vyvanse was approved for the treatment of BED, Shire had not achieved the sales figures it had hoped for.  Faced with stagnant ADHD sales due to generic competition, Shire sought additional ways to monetize

---

[89] *See infra* ¶¶ 330-57.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    Vyvanse's BED indication.  Shire's management sought to find "new-to-brand"
2    business—patients who had not taken Vyvanse before, but might in the future, with
3    the right marketing efforts.

4        181.   Shire became aware that certain sales representatives were having great
5    success marketing Vyvanse to weight-loss clinics and selling Vyvanse for the
6    unapproved and unsafe use of weight loss.  Recognizing that these marketing efforts,
7    though fraudulent, could result in substantially more revenue for the company, Shire
8    determined to roll them out company-wide through a new marketing initiative titled
9    "Change in Mindset."

10       182.   This title ostensibly referred to a particular change that Shire wanted to
11   instill in the mindset of providers: essentially, that BED was more prevalent than
12   commonly thought.  In reality, however, "change in mindset" was a code that
13   referred to the promotion of Vyvanse for weight loss.  Shire's managers and Sales
14   Specialists all understood the true meaning of the phrase, and Shire's managers
15   regularly made sure the Sales Specialists understood what was expected of them.

16       183.   The Change in Mindset campaign coincided with the formation of a
17   weight-loss task force helmed by Chad Webb, a particularly successful Sales
18   Specialist.  Webb was hand-picked by Shire management to share his strategies with
19   managers and Sales Specialists throughout the country.  Although Webb himself was
20   not a manager, his conduct was ratified by Shire management, which featured his
21   success as a role model for the rest of the sales force.

22       184.   Shire management knew that Webb's success was attributable to his
23   aggressive marketing of Vyvanse for weight loss.

24       185.   Shire's weight-loss task force included twenty Sales Specialists from
25   around the country.  They had weekly conference calls discussing how they could

26
27
28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  sell to weight-loss clinics.  The goal of the weight-loss task force was to implement
2  Webb's strategies nationwide.

3  186.  Webb presented the Change in Mindset initiative in mid-2018 to
4  various Shire managers, including Duelks.  Those managers then instructed Sales
5  Specialists about the new initiative.

6  187.  Duelks, who was correctly under the impression that Shire desired to
7  market Vyvanse for the unapproved and unsafe use of weight loss, explicitly
8  instructed his Sales Specialists to call on weight-loss clinics.

9  188.  After receiving or hearing about this instruction, one or more Shire
10  employees filed an internal report with Shire's compliance department complaining
11  of Duelks' behavior.  Shire's compliance department determined that Duelks'
12  instruction was noncompliant with Shire's duties to lawfully market Vyvanse.

13  189.  However, Shire's management knew that Duelks had accurately, if
14  clumsily, delivered the message it intended to send to Sales Specialists.  Therefore,
15  rather than terminate Duelks for noncompliance—which would, per company
16  policy, not entitle Duelks to a severance package—Shire terminated Duelks'
17  employment for the pretextual reason of colluding with Sales Specialists during the
18  investigation.  Shire gave Duelks a handsome severance package conditioned on his
19  not reporting Shire's fraudulent marketing tactics with regard to Vyvanse.

20  190.  Duelks confirmed this state of events in a March 29, 2019 conversation
21  with Partner A, during which he stated that the marketing of Vyvanse for the
22  unapproved and unsafe use of weight loss was widespread at Shire, and the stated
23  reason for his dismissal was pretextual:

24  Duelks:        I would love—I—I—I don't know if I would love to know
25                 or not to know, but I would love to know if somebody
26                 would ever—if [Regional Zone Director] Brandy
                   [Peckham] was ever able to divulge and, like, somebody
27

28                                          55

|  |  |
|---|---|
|  | say, you know: "What happened with Jack? Why didn't you protect him?" |
| Partner A: | Yeah, right? |
| Duelks: | I would love to know that reason. And you know what? If she [Peckham] was honest—if she was a hundred percent honest, her comeback probably should be: "Listen, ultimately, Jack didn't do anything wrong. He got caught up with a compliance violation that—it was probably a compliance violation, but we were all doing it, and, at the time, a—a lot more people potentially could have lost their jobs, so I had—you know, Jack had to be sacrificed for that." You got to think of it, we got Chad f------ Webb on conference calls, going: "Go into weight-loss clinics." |
| Partner A: | Right. Did he— |
| Duelks: | Chad could have lost— |
| Partner A: | Did he—did he tell you that—guys that, to do that? Like, did he say: "Go call on weight-loss clinics?" |
| Duelks: | Yes. In my—on the managers' meeting call. Like, it could've—it could've—it could've blown up. |
| Partner A: | Yeah. |
| Duelks: | But one—you know, but Brandy had one thing in mind: protect her ass. |
| Partner A: | Right. |
| Duelks: | And—and—and do it quickly. |

191.   Shire failed to report Duelks' behavior to the government as required by its Corporate Integrity Agreement.

192.   Following Duelks' departure from Shire, Shire's managers and Sales Specialists were careful not to explicitly discuss calling on weight-loss clinics and

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

marketing Vyvanse for the unapproved and unsafe use of weight loss. Rather, "Change in Mindset" was used as a sort of code—a shorthand way of discussing marketing Vyvanse for the unapproved and unsafe use of weight loss.

193. Indeed, Webb and Shire management often told Shire's Sales Specialists, at least facially, not to call on weight-loss clinics. This instruction, however, was intended solely to circumvent any consequences from Shire's compliance department, which would have been forced to punish any blatantly fraudulent behavior. Shire's Sales Specialists understood that they were free to disregard this instruction.

194. "Change in Mindset" became a common theme on conference calls among Shire's managers and Sales Specialists. The following excerpts of conference calls provide examples of the coded language Webb and others would use to encourage Sales Specialists to call on weight-loss clinics and to promote Vyvanse for weight loss generally:

- On a conference call on January 29, 2019 conducted by Webb, Webb instructed Shire's Sales Specialists to "completely . . . change your mindset on how you run your business," warning them not to "fall back into what you were doing." The participants of the conference call understood that Webb was using a coded message to encourage them to gain new business by marketing Vyvanse for weight loss, though Webb was careful not to explicitly instruct the Sales Specialists to do so.

- On the same call, Webb congratulated Sales Specialist Lauren Schuder on successfully convincing a provider at a weight-loss clinic to prescribe Vyvanse, stating that "she would've never been in that call and made that huge binge call had she not shifted her mindset and taken some calls away from those other people. She just wouldn't have made that call. Like that person would've never been called on. So that's what we're talking about." The participants of the conference call understood that Webb was using a coded message to praise Schuder for shifting her sales efforts from providers who treat BED or ADHD to providers who treat obesity and would prescribe Vyvanse for weight loss.

- On a conference call in mid-February 2019 conducted by Webb, with help from his supervisor, Charlotte, NC Regional Director Lauren Hudson, Webb encouraged Sales Specialists to sell Vyvanse to

57

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

"promotionally responsive" health care professionals who "are willing to do things different." Webb instructed the Sales Specialists to seek providers who are providing cosmetic treatments such as Botox and selling nutritional products such as weight-loss shakes: "So if they're selling that type of food in the office, what kind of patient do you think that are coming into those offices?" The participants of the conference call understood that Webb was using a coded message to encourage them to market Vyvanse to providers whose patients are obese or merely desire cosmetic treatment.

- On the same call, Webb discussed marketing Vyvanse for patients who want to lose weight, and explicitly Compared Vyvanse to two weight-loss drugs, Adipex and Phentermine: "So—and a lot of these offices, if they are truly treating what they call weight loss, they are using—typically they're using a product called Adipex or Phentermine or something of that nature, right? And those products are very short term, short—short-lived, right, so they only work about a month, two months. So if that's really—if there's more to the problem than that, and that's what I'm getting at, that's not going to work for the patient for very long."

- At a lunch meeting on February 20, 2019 involving Regional Zone Director Brandy Peckham, Sales Specialist Kim Reynaud, and Partner B, Peckham explained that, because Shire's compliance department would not permit it, the company could not explicitly tell its Sales Specialists to market Vyvanse for weight loss: "And not—it's not easy. It's not a quick thing and to get everybody—and it doesn't—it's not something they can hand deliver. Like a corporate office can't necessarily hand deliver you this."

- At the same meeting, Peckham explained that Sales Specialists have broad latitude in choosing which providers to market to, because "no one treats BED," so Sales Specialists should look for providers who are "interested in just treating anything extra": "Yeah, which people struggle with BED. I remember BED, we'd give them targets we thought would write and people would hear well, I walked in and they don't treat BED. Well, no one treats BED. You're looking for someone who's interested in just treating anything extra right now, you know, or who's interested in hearing from you or who is interested to know more. They're—maybe they're not treating now, but they want to give you some time to talk about . . . . I can't tell you what that—who that person is on paper. You're gonna have to tell me once you walk in the door if they—if they are interested or not."

195.    Armed with the strategies from the weight-loss task force, this strategy for selling Vyvanse was then rolled out nationwide, including by Regional Zone Directors Peckham and Lauren Hudson. They told the Sales Specialists they were

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  to promote Vyvanse to weight-loss clinics using the tagline: "When what you're
2  doing isn't working with phentermine, try Vyvanse."

3      196.   Shire and Takeda's fraudulent conduct is exemplified by a February 20,
4  2019 sales call made by Partner B, during which Partner B was accompanied by
5  Partner B's Regional Zone Director, Brandy Peckham.  Partner B was visiting Dr.
6  Henry Traylor, a family practice physician in Whiteville, NC.

7      197.   Prior to entering the provider's office, Partner B discussed the prospects
8  for the visit with Peckham.  Partner B remarked that Dr. Traylor might be responsive
9  to a sales pitch for Vyvanse because he appeared to treat cosmetic issues.  Peckham
10  agreed:

11      Partner B:   Yeah. Like with this guy, like I knew—just, I don't even
12                   know—just like hearing his name and stuff, like he does a
                     lot of—does a lot of, like, Botox parties—
13
14      Peckham:     Yes.

15      Partner B:   —all this stuff—

16      Peckham:     Yes. Entrepreneurial.  He's trying to make—the end of
17                   the day and I always . . . Chad [Webb] and Billy [Lang, a
                     successful Sales Specialist] used to freak out about it.
18                   Compliance.   I'm like, "No. It's just—they're just
19                   promotionally responsive."

20      Partner B:   Right.

21      Peckham:     But I used to call them, "They're your entrepreneurial
22                   doctor."  They're your doctor that is trying to stay afloat
                     and they're incorporating—it's not a weight-loss clinic.
23                   Maybe they have a way [to lose weight] they sell there,
                     like supplements.  They sell Botox.  They do skin care.
24                   They probably have a weight-loss program they're
25                   running.  Why are they doing that?

26      Partner B:   Right.

27
28
                                        59

| Peckham: | Because they need to make money. |
|---|---|
| Partner B: | Make revenue, profits— |
| Peckham: | Because they're not making the money 'cause people aren't going in for their appointments on time— |
| Partner B: | And he owns his practice. |
| Peckham: | He owns his practice. So they're—they're—you mean you got a disorder where the patient has to come back every month to check in on their script? I mean, you can't—you don't need to even spell it out. |

198. This conversation exemplifies Shire and Takeda's prioritizing profit over patient safety. The ultimate goal of any Vyvanse sales call is to convince the provider to prescribe the drug, notwithstanding issues of safety or clinical appropriateness.

     **5.**    ***Shire and Takeda recklessly permit Sales Specialists to add providers to call panels and willfully ignore evidence of unlawful marketing***

199. Pharmaceutical companies, including Shire and Takeda, provide marketing assignments to their sales representatives using "call panels." A call panel is a software system containing information about providers and their prescribing habits, as well as guidance for how often a sales representative should contact the provider to try to sell a particular drug.

200. Shire and Takeda's Sales Specialists use a call panel program developed by the software company Veeva. The Veeva call panel program permits Sales Specialists to add providers to their own call panels, rather than waiting for providers to be assigned by their managers. Shire and Takeda have taken advantage of this feature to permit Sales Specialists to market Vyvanse for the unapproved and

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

unsafe use of weight loss, while attempting to maintain plausible deniability regarding their Sales Specialists' behavior.

201.    During the weight-loss task force calls, Sales Specialists discussed how to locate and then add weight-loss clinics to their call panels.  To add a provider to the call panel, Sales Specialists are required to identify the provider's specialty.  However, Shire and Takeda management does not monitor this aspect of the call panels and does not enforce this requirement.

202.    During weight-loss task force calls, Webb told his colleagues that in his experience, the call panel had never rejected a weight-loss provider.  If the provider was added without any specialty, the system would accept the provider, notwithstanding the ostensible requirement to list a specialty.  If the provider specialized in weight loss, Webb instructed the Sales Specialists to list the provider's specialty as "family physician."  These tactics, which Defendants' management was aware of and at least tacitly ratified, permitted Sales Specialists to add weight-loss physicians to their call panels with impunity.

203.    The call panel system helps to amplify and perpetuate Shire and Takeda's fraudulent scheme.   The call panel software uses an algorithm that identifies providers who prescribe Vyvanse at high rates as high-value targets.  Thus, once a provider is added to the call panel and begins to prescribe Vyvanse at high rates, the call panel software will instruct the Sales Specialists to target that provider more and more—regardless of whether the provider is prescribing Vyvanse for its approved indications.  In the call panel software, this instruction is called "Full Quarter Guidance": the number of times a Sales Specialist should call on a provider during each quarter.

204.    Once the weight-loss clinics and doctors were added to their call panels, Sales Specialists were instructed to, and did, compare Vyvanse to the diet drug

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Phentermine in their sales pitches to these health care providers. Despite no head-to-head comparative trials supporting such claims, they were to tell these healthcare professionals that Vyvanse had long-term data showing how it helped patients with weight loss and that it was superior to Phentermine. No such data exists. In addition, comparisons to Phentermine, a weight-loss drug, are relevant only to the extent Vyvanse is marketed for weight loss.

205. Shire's Sales Specialists were instructed to target "promotionally responsive" physicians who were looking for ways to grow their medical practices, including physicians who ran weight-loss clinics. The development of call panels had little or input or direction from Shire and Takeda's compliance department. Shire management instead told Sales Specialists that, even though managers were not allowed by company compliance policies to add weight-loss clinics and doctors to the call panels, Sales Specialists should nonetheless find those doctors and add them to their call panels. Shire management believed that this instruction permitted the company to maintain plausible deniability with regard to Shire's fraudulent marketing scheme while continuing to secretly guide and ratify the unlawful conduct of their sales staff, who added thousands of health care providers specializing in weight loss to their call panels.

206. The call panel system provides a dashboard for each provider containing information related to Shire and Takeda's business, including how many prescriptions of each Shire/Takeda drug the provider has written, the number of calls a Sales Specialist has made for that provider, and the provider's Full Quarter Guidance. The dashboard further indicates whether it is appropriate to call on the provider and whether a Sales Specialist is eligible to receive incentive compensation ("IC") for calling on that provider. The dashboard also provides an "opportunity decile" for each provider ranging from 1 to 10, with 10 representing the highest

business opportunity. The opportunity decile is an estimate of how valuable a provider might be to Shire and Takeda based on how many prescriptions for Shire and Takeda's drugs the provider is willing to write.

207. The call panel dashboards for numerous prescribers specializing in weight loss demonstrate suspiciously high numbers of prescriptions for Vyvanse. For instance, the dashboard for Bradford Lawrence, a Physician Assistant at NexSlim, a weight-loss clinic in Hickory, North Carolina, shows that, for the fourth quarter of 2018, Lawrence wrote 157 prescriptions for Vyvanse:[90]



208. Although these prescriptions are almost certainly for the unapproved and unsafe use of weight loss, the call panel's algorithm nevertheless assigns

[90] See Ex. D3 to Relator's Pre-Filing Disclosure statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Lawrence an opportunity decile of 9 and Full Quarter Guidance of 16, meaning that Shire and Takeda's Sales Specialists should call on Lawrence 16 times per quarter. The categories "Call Plan Indicator" and "IC Eligibility" state "yes," meaning Lawrence is an appropriate target for sales calls and Sales Specialists are eligible to receive incentive compensation for sales to Lawrence.

209.   Additional examples of health care providers specializing in weight loss, yet included on Shire and Takeda's call panels, abound.   These providers include:[91]

- Tanya Dyer, FNP-C, also at NexSlim. Dyer wrote 342 Vyvanse prescriptions, has an opportunity decile of 10, and is listed as "growing" in terms of Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation. Schmidt's Full Quarter Guidance is 16, meaning that Shire and Takeda's Sales Specialists should call on Schmidt 16 times per quarter

- Alyssa Jastrzebski, NP, at Total Woman Care in Elkin, North Carolina, "specializing in Medical Weight Loss."[92]   Jastrzebski wrote 67 Vyvanse prescriptions and is listed as a "growing" customer for Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation.

- Jennifer Schmidt, DO, at Doctor's Weight Loss Center in Cary, North Carolina, a practice specializing in "medical weight loss."[93]   Schmidt wrote 112 Vyvanse prescriptions, has an opportunity decile of 10, and is listed as "growing" in terms of Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation.   Schmidt's Full Quarter Guidance is 16, meaning that Shire and Takeda's Sales Specialists should call on Schmidt 16 times per quarter.

- Julia Diane Moon, DNP, at North Carolina Weight & Wellness in Elkin, North Carolina, specializing in "weight loss management."[94]   Moon wrote 152

---

[91] All examples contain data corresponding to the fourth quarter of 2018.

[92] *Alyssa Jastrzebski, FNP-BC*, Total Woman Care Obstetrics & Gynecology, https://www.totalwomancare.net/provider/alyssa-jastrzebski-fnp-bc   (last visited July 12, 2019).

[93] *What Is Medical Weight Loss?*, Doctors Weight Loss Ctr. of Cary, https://doctorsweightlosscenterofcary.com/weight-loss-programs/what-is-medical-weight-loss/ (last visited July 18, 2019).

[94] *Diane Moon, WHNP, DNP*, N. Car. Weight & Wellness,

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Vyvanse prescriptions, has an opportunity decile of 10, and is listed as "growing" in terms of Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation. Moon's Full Quarter Guidance is 16, meaning that Shire and Takeda's Sales Specialists should call on Moon 16 times per quarter.

- Peter F. McIlveen, MD, Medical Director of North Carolina Weight & Wellness, specializing in providing "treatments for obesity."[95] McIlveen wrote 40 Vyvanse prescriptions, has an opportunity decile of 10, and is listed as "growing" in terms of Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation. McIlveen's Full Quarter Guidance is 16, meaning that Shire and Takeda's Sales Specialists should call on McIlveen 16 times per quarter.

- Walter Ezeigbo, MD, at The Center for Medical Weight Loss, part of Advance Family & Sports Medicine Center in Winston-Salem, North Carolina, specializing in weight loss.[96] Ezeigbo wrote 117 Vyvanse prescriptions, has an opportunity decile of 10, and is listed as "growing" in terms of Vyvanse sales, an appropriate health care provider for sales calls, and a provider for whom Sales Specialists could receive incentive compensation. Ezeigbo's Full Quarter Guidance is 16, meaning that Shire and Takeda's Sales Specialists should call on Ezeigbo 16 times per quarter.

- Sarah R. "Becky" Stephens, NP, at Lexington Medical Center in Columbia, South Carolina, a practice specializing in weight loss.[97] Stephens wrote 81 Vyvanse prescriptions, has an opportunity decile of 9, and is listed as an appropriate health care provider for sales calls and a provider for whom Sales Specialists could receive incentive compensation.

- Chene Smith, MD, at Baylor Scott & White Family Medical Center in Garland, Texas, specializing in weight loss. Smith wrote 81 Vyvanse prescriptions, has an opportunity decile of 9, and is listed as an appropriate health care provider for sales calls and a provider for whom Sales Specialists could receive incentive compensation. Smith's Full Quarter Guidance is 16,

https://www.ncweight.com/pages/diane-moon (last visited July 18, 2019).

[95] *Peter F. McIlveen, MD, FACOG, ABOM*, N. Car. Weight & Wellness, https://www.ncweight.com/pages/dr-peter-mcilveen (last visited July 18, 2019).

[96] Carolyn Peterson, *Advance Family & Sports Medicine Center – A Different Approach to Wellness & Weight Loss*, Forsyth Woman (Nov. 1, 2016), https://www.forsythwoman.com/advance-family-sports-medicine-center-different-approach-wellness-weight-loss/.

[97] *Patient Care*, Spring Valley Family Practice, https://www.springvalleyfamilypractice.com/patient-care (last visited July 18, 2019).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

meaning that Shire and Takeda's Sales Specialists should call on Smith 16 times per quarter.

- Marie Lightbourne, MD, at Emory at Snellville Primary Care in Snellville, Georgia, specializing in treating obesity.[98]   Lightbourne wrote 17 Vyvanse prescriptions, has an opportunity decile of 5, and is listed as an appropriate health care provider for sales calls and a provider for whom Sales Specialists could receive incentive compensation.

- Jacob Webster, MD, at Diagnostic & Medical Clinic in Mobile, Alabama, specializing in weight loss.   Webster wrote 18 Vyvanse prescriptions, has an opportunity decile of 5, and is listed as an appropriate health care provider for sales calls and a provider for whom Sales Specialists could receive incentive compensation.

210.   Shire and Takeda's Vyvanse sales strategy includes quota and bonus programs that motivate the sales force to sell to clinics and physicians specializing in weight loss.   These programs create an environment that directs Sales Specialists to promote Vyvanse for the treatment of obesity.   Shire's quota system strongly incentivizes Vyvanse Sales Specialists to market Vyvanse to any physician on their call panels, and awards them with bonuses based on sales of Vyvanse.   The only way the sales force could meet the increasingly onerous quotas that were set for them was by promoting the Vyvanse for the unapproved and unsafe treatment of obesity.

211.   Furthermore, Shire and Takeda's management explicitly instructs Sales Specialists to disregard the few safeguards built into the call panel system.

212.   The call panel system sometimes notes that Sales Specialists are ineligible to receive incentive compensation for selling to a particular provider because that provider is "therapeutically excluded" (meaning the provider uses Vyvanse off-label) or is "specialty excluded" (meaning the provider's specialty is ineligible for incentive compensation, generally because the provider would likely prescribe Vyvanse off-label).

---

[98] *Services*, Dekalb Med., https://www.dekalbmedical.org/physician-groups/emory-at-snellville-primary-care-lenora-church-rd/general-health-care-screenings-physicals (last visited July 18, 2019).

213. Shire and Takeda's Sales Specialists are, per company policy, not permitted to call on providers who are therapeutically excluded or specialty excluded.

214. Nevertheless, Shire and Takeda management encourage Sales Specialists to violate this policy. For example, in a mid-February 2019 conference call, Regional Director Lauren Hudson instructed several Sales Specialists that they should not hesitate to call on providers who are therapeutically excluded or specialty excluded as long as it makes "good business sense" to do so.

215. Not only does Shire and Takeda's compliance department provide no oversight of the call panel administration, its enforcement of the companies' compliance obligations during field sales ride-alongs is easily circumvented. Indeed, when compliance personnel would schedule a ride-along with Sales Specialists to ensure they were selling Vyvanse only for approved uses, Sales Specialists were directed by management that they should not market Vyvanse for BED that day—instead, they should only call on physicians treating ADHD, avoiding any chance that compliance personnel would observe illegal marketing for weight loss.

**B.    Shire and Takeda's Use of CME Programs to Promote Vyvanse for Unapproved and Unsafe Uses**

216. One of the key ways in which Shire and Takeda marketed the use of Vyvanse was through CME programs. Shire and Takeda used these programs to promote the unapproved and unsafe use of the drug for weight loss. Shire provided enormous amounts of money to fund CME presentations on BED and Vyvanse:

| Year | Organization | Title of Presentation | Amount |
|------|--------------|----------------------|--------|
| 2013 | American Academy of CME | Binge Eating Disorder in 2014 and Beyond | $214,980 |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

| 2013 | American Academy of CME | The ABC's of BED: A Primer for Primary Care Practice | $233,475 |
|---|---|---|---|
| 2013 | Omnia-Prova Education Collaborative | Optimizing the Diagnosis and Management of Binge Eating Disorder: The Critical Role of Primary Care Physicians | $460,000 |
| 2013 | Medscape, LLC | Recent Advances in the Treatment of Binge Eating Disorder | $293,500 |
| 2014 | Omnia-Prova Educ. Collaborative | Binge Eating Disorder: Optimizing its Diagnosis and Management | $282,500 |
| 2014 | Johns Hopkins Univ. Sch. of Med. | Missed Opportunities in the Recognition of Binge Eating Disorder | $237,015 |
| 2014 | Physicians Postgraduate Press | Controlling and Coping with Binge Eating Disorder | $225,460 |
| 2014 | Robert Michael Educational Inst. | Binge Eating Disorder: Are We Missing It? | $225,460 |
| 2014 | Medscape, LLC | Improving Management of Binge Eating Disorder | $389,500 |
| 2014 | Robert Michael Educational Inst. | Binge Eating Disorder: What, When, Why, and How | $389,610 |
| 2014 | Vindico Medical Education | Binge Eating Disorder: Out of the Closet and into a New Era of Diagnosis and Treatment | $294,327 |
| 2015 | Robert Michael Educational Inst. | Binge Eating Disorder: Are We Missing It? | $43,775 |
| 2015 | Medical Learning Institute | PeerView Video inReview, An Update on the Diagnosis and Treatment of BED: Implications for Clinical Practice | $139,750 |
| 2015 | Robert Michael Educational Inst. | Clinical Convergence: Patient and Provider Perspectives in Binge Eating Disorder | $43,775 |
| 2015 | Medscape, LLC | New Developments in BED: How opening the lines of communication between clinicians and patients can improve patient outcomes | $438,500 |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

| 2015 | American Association of Nurse Practitioners | BED: What Every Nurse Practitioner Should Know | $267,280 |
|------|---------------------------------------------|------------------------------------------------|----------|
| 2015 | Pharmaceutical Educ. Consultants | BED – A Small but Significant Change in DSM-5 | $19,900 |
| 2015 | American Academy of CME | The ABCs of Binge Eating Disorder: What Every Practicing Family Physician Should Know AAFP Family Medicine Experience (FMX) 2015: Live Symposium | $408,763 |
| 2015 | College of Psychiatric and Neurologic Pharmacists | Developing a First-Line Binge Eating Disorder Treatment Plan | $43,775 |
| 2016 | Physicians Postgraduate Press | Challenges in the Recognition and Treatment of Binge Eating Disorder | $242,251 |
| 2016 | Dannemiller, Inc. | Diagnostic and Therapeutic Options in Binge Eating Disorder: The Role of the Nurse Practitioner | $51,500 |
| 2016 | College of Psychiatric and Neurologic Pharmacists | Developing a Treatment Plan for Binge-Eating Disorder When First-Line Options Fail | $38,850 |
| | | **TOTAL: $4,983,946** | |

217.   Takeda's Standard Operating Procedure 4.4.1 on Medical Education Grants specifically requires they must be non-promotional and be developed by an independent healthcare education vendor: "**Medical Education Grants**. Takeda may provide funding in the form of Grants to support Medical education programs. These programs must be non-promotional and developed independently by an HCE [Healthcare Entity] or a legitimate provider of medical education to address legitimate educational needs of HCPs [Healthcare Professionals]."

218.   Shire and Takeda have regularly violated their own standards by funding and manipulating CME programs into events promoting the use of Vyvanse for weight loss.  Shire and Takeda did so by funding the CME programs themselves

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  and by paying the practitioners who led the programs. Although these CME
2  programs purported to provide independent, unbiased information pertaining to
3  eating disorders in general and BED in particular, in fact, they were merely a well-
4  disguised Shire and Takeda marketing ploy that encouraged the unapproved and
5  unsafe use of Vyvanse for weight loss.

6      219.  In several CME modules, Shire presented or caused to be presented the
7  following messages:

8      • Children with BED are stigmatized for being overweight and have poor
         quality of life.

9
10     • Non-pharmacological treatments such as psychotherapy may be
         effective in treating BED, but they do not result in weight loss as
         Vyvanse does.

11
12     • Pharmacological treatments such as anti-depressants appear to be
         somewhat effective in treating BED, but they do not result in weight
         loss as Vyvanse does.

13
       • Vyvanse is effective in treating weight loss.

14

15     220.  Throughout the CME programs funded by Shire, there is an obvious
16  positive bias toward Vyvanse. Industry-funded "Key Opinion Leaders" promote
17  Vyvanse as an effective treatment for BED while criticizing other forms of
18  treatment, including topiramate, SSRIs, anti-obesity medication, zonisamide, and
19  duloxetine. Sometimes, these therapies are criticized for the legitimate reason that
20  they do not improve binge-eating frequencies. However, most of these
21  pharmacotherapy options show improvements in binge eating frequencies. Thus,
22  these drugs are also criticized for lack of weight loss improvement, high
23  discontinuation rates, and adverse effects.

24     221.  On the other hand, Vyvanse is routinely praised by CME presenters for
25  its effectiveness in treating binge eating disorder and weight management. For
26  example, one presenter, Tracy Cummings, gave glowing praise to the drug in her

27
28                                    70

1   CME presentation shortly before Vyvanse had been approved by the FDA to treat
2   BED: "lisdexamfetamine has more recently been studied with very positive results .
3   . . . [T]he result has been so positive. It's moved on in positive phase 2 studies [and]
4   has been reported in 2012 to meet the primary endpoint, which is very exciting for
5   those of us in realms of treating BED."

6       222.   Throughout the CME programs sponsored by Shire, many nearly
7   identical slides are used.  These repeated slides suggest that Shire authored a
8   promotional slide deck in order to get across certain messages and distributed that
9   slide deck to certain speakers. Most of these repeated slides focus on exploring pros
10  and cons of specific drugs and comparing pharmacotherapy and psychotherapy.  If
11  the slides do not focus on treatment options, they focus on promoting a high
12  frequency of BED diagnoses.

13      223.   The topics in these repeated slides favor the use of Vyvanse.  Urging
14  the physicians to diagnose more patients with BED would lead to a high number of
15  prescriptions for Vyvanse, the only drug approved to treat BED.    Comparing
16  treatment options to favor Vyvanse is also designed to increase Vyvanse sales.

17      224.   These messages in the CMEs sponsored by grants from Shire were
18  presented in slightly different forms and with only slightly different wording, but the
19  ultimate message remained consistent: providers should prescribe Vyvanse to help
20  their patients lose weight.

21          **1.   *2014 Doctor's Channel CME: "Binge Eating Disorder:  Out
22              of the Closet and Into a New Era of Diagnosis and
                Treatment"***

23      225.   In 2014, Shire paid $294,327.74 to Vindico Medical Education, an
24  online CME vendor, to sponsor a CME program titled: "Binge Eating Disorder:  Out
25  of the Closet and Into a New Era of Diagnosis and Treatment." This program was
26  released on September 30, 2014 and provided one hour of free CME credit.   The

27

28
                                    71

1  program is still available online today through The Doctor's Channel, a media outlet
2  for physicians and medical professionals.[99]

3      226.   This program includes a series of interviews conducted by Dr. Leslie
4  Citrome, a paid Shire consultant, in which he asks other physicians questions
5  concerning the diagnosis and treatment of BED.   Three of the participants in the
6  program are paid Shire consultants.

7      227.   In one interview, Citrome asks questions of Dr. Susan Kornstein, a paid
8  Shire consultant.   The slides shown in the background during the portion of the
9  interview in which Dr. Kornstein discusses Vyvanse feature the feet of a patient
10  standing on a scale, sending the message that Vyvanse is effective for weight loss.

11     228.   During her interview, Dr. Kornstein reviews the various treatment
12  options for BED, and eventually settles on Vyvanse, which had yet to receive FDA
13  approval for the condition.   Nonetheless, Dr. Kornstein is effusive in praising the
14  results of lisamfedamine clinical trials, saying the results were "very positive," to
15  which Citrome responds that the information is "very useful."   Dr. Kornstein
16  mentions that one of the secondary effects of the use of Vyvanse is weight loss.

17     229.   When she is asked by Dr. Citrome about what happens when patients
18  stop taking their medication, even though she admits there is no evidence yet, Dr.
19  Korstein suggests that patients tend to relapse.

20     230.   This CME program was intended to, and did, present the message that
21  providers should prescribe Vyvanse for weight loss.

22          **2.    *2015 CME at the AAFP: "The ABCs of Binge Eating
23          Disorder:  What Every Practicing Family Physician Should
          Know"***

---

[99] *Binge Eating Disorder: Out of the Closet and Into a New Era of Diagnosis and
Treatment*, The Doctor's Channel, https://www.thedoctorschannel.com/view/binge-
eating-disorder-cme-part-4/ (last visited July 18, 2019).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

231.   Shortly after Vyvanse had received FDA approval to treat BED in 2015, Shire paid the American Academy of CME $408,763 to sponsor a CME program titled: "The ABCs of BED: What Every Practicing Family Physician Should Know" ("ABC").   This program was released on November 25, 2015 and provided 1.5 hours of free CME credit.      The program is still available online today through myCME.com.[100]

232.   This program comprises videotaped BED presentations given at the American Academy of Family Physicians ("AAFP") Family Medicine Experience 2015 live symposium.   The ABC videos include a series of lectures concerning the diagnosis and treatment of BED.   Two of the three participants are paid Shire consultants.

233.   One ABC video shows, Dr. Paul Keck, a paid Shire consultant, discussing the treatment of BED.   During the ABC presentation, Keck discusses the various treatment options for treating BED, and eventually settles on Vyvanse, which had recently received FDA approval to treat the condition.   In one slide, Keck summarizes the pharmacotherapy options for treating BED, including Vyvanse. Although the bottom of the slide says using Vyvanse to treat weight loss is "not recommended . . . as efficacy and safety for obesity are not known," both the printed material in the slide presentation and Keck's oral presentation nonetheless made sure to tell attendees that Vyvanse (described in this slide generically as "amphetamine prodrug") is effective to treat "weight loss":

---

[100] *The ABCs of BED: What Every Practicing Family Physician Should Know*, myCME,   https://www.mycme.com/the-abcs-of-bed-what-every-practicing-family-physician-should-know/preexam/3471/13479/ (last visited July 18, 2019).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

234.   Likewise, later in his presentation, Keck summarizes the "Key Points" concerning the treatment of BED and states:  "The amphetamine prodrug LDX [Vyvanse] is effective for the reduction of binge frequency and body weight":



74

235.   This CME program was intended to, and did, present the message that providers should prescribe Vyvanse for weight loss.

**C.   Shire Instructed Providers to Report False Diagnoses to Expedite Coverage for Vyvanse**

236.   Drug manufacturers like Shire and Takeda know that, in order to successfully launch a new drug product—or a product with a new indication, such as Vyvanse and BED—and increase utilization, it is critical to get patients on the new drug as soon as possible.

237.   Much of Shire and Takeda's success in increasing sales of Vyvanse is attributable to an unlawful Prior Authorization ("PA") scheme undertaken by providers around the country at the behest of Shire.

238.   PA, in the context of a health care plan, including Government Health Care Program plans, refers to the process of obtaining prior approval from a third-party prescription insurer regarding the correctness, suitability, and coverage of a service or medication that allows the physician and patient to thus know in advance about whether a procedure, treatment, or service will be covered under his or her health plan.  The PA process involves access to patient records, the completion of forms, follow-up with insurance programs, appeal letters, and related reimbursement services.

239.   PA requirements are particularly important for drugs like Vyvanse.  By FDA mandate, Vyvanse's label carries several warnings:

> CNS stimulants (amphetamines and methylphenidate-containing products), including VYVANSE, have a high potential for abuse and dependence[.]
>
> *Serious Cardiovascular Reactions*: Sudden death has been reported in association with CNS stimulant treatment at recommended doses in pediatric patients with structural cardiac abnormalities or other serious heart problems. In adults, sudden death, stroke, and myocardial infarction have been reported[.]

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

*Blood Pressure and Heart Rate Increases*: Monitor blood pressure and pulse. Consider benefits and risks before use in patients for whom blood pressure increases may be problematic[.]

*Psychiatric Adverse Reactions*: May cause psychotic or manic symptoms in patients with no prior history, or exacerbation of symptoms in patients with pre-existing psychosis.

Limitation of Use: VYVANSE is not indicated for weight loss. Use of other sympathomimetic drugs for weight loss has been associated with serious cardiovascular adverse events. The safety and effectiveness of VYVANSE for the treatment of obesity have not been established.

240.   These warnings demonstrate that Vyvanse is a potentially dangerous drug for any patient.   When administered to an obese patient with various comorbidities and heightened cardiovascular risks, Vyvanse becomes even more dangerous. And it is unsafe to use Vyvanse to *treat* obesity by inducing weight loss.

241.   For these reasons, many payors (including Government Programs) implemented PA requirements for Vyvanse following the FDA's approval of its new indication for the treatment of BED. These PA requirements are designed to ensure that Vyvanse is not over-prescribed, and that it is used only for safe, approved uses.

242.   In addition, Vyvanse is an expensive drug. Payors have implemented PA requirements for Vyvanse in part to curb excessive prescribing and excessive spending.

243.   However, these PA requirements can be burdensome to overcome, and in some instances, insurers will deny coverage for Vyvanse for the treatment of BED.

244.   These requirements do not apply equally across diagnoses. Because Vyvanse had long been approved for the treatment of ADHD, and because the ADHD patient population generally does not carry the same cardiovascular risks and comorbidities as the BED patient population, payors generally do not apply PA requirements when Vyvanse is used to treat ADHD.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

245.   In order to bypass these PA requirements and facilitate as many Vyvanse prescriptions as possible, Defendants' Sales Specialists tell providers to provide false diagnoses when submitting claims to insurers, including Government Health Care Programs.   Specifically, Sales Specialists instruct providers to falsely report that the patient is being treated for ADHD, not BED, because insurers are more likely to pay for Vyvanse to treat ADHD instead of BED.

246.   Although, to Relator's knowledge, Shire and Takeda's management has not explicitly instructed its sales force to instruct providers to provide false diagnoses when submitting claims to insurers, Shire and Takeda's management is aware that this behavior is widespread among its sales force.   Despite this knowledge, Shire and Takeda's management has not acted to curb these fraudulent tactics, tacitly ratifying the behavior of these Sales Specialists.

**D.   Shire Instructed Providers to Prescribe Mydayis to Adolescents at Adult Doses**

247.   On June 20, 2017, the FDA approved Mydayis (mixed salts of a single-entity amphetamine product) for the treatment of ADHD in adolescents (ages 13-17) and adults (ages 18 and over).

248.   As an amphetamine product, Mydayis carries many of the same risks as Vyvanse.   By FDA mandate, Mydayis's label carries several warnings:

*Serious Cardiovascular Reactions*: Sudden death has been reported in association with CNS stimulant treatment at recommended doses in pediatric patients with structural cardiac abnormalities or other serious heart problems. In adults, sudden death, stroke, and myocardial infarction have been reported.

*Blood Pressure and Heart Rate Increases*: Monitor blood pressure and pulse. Consider benefits and risks before use in patients for whom blood pressure increases may be problematic.

*Psychiatric Adverse Reactions*: May cause psychotic or manic symptoms in patients with no prior history, or exacerbation of symptoms in patients with pre-existing psychosis.

77

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

*Long-Term Suppression of Growth*: Monitor height and weight in pediatric patients during treatment.

*Seizures*: May lower the convulsive threshold.

249.  In addition, Mydayis's label contains a black box warning—the most serious warning assessed by the FDA—pertaining to the drug's high potential for abuse:

> **WARNING: ABUSE AND DEPENDENCE**
> *See full prescribing information for complete boxed warning.*
>
> - **CNS stimulants, including MYDAYIS, other amphetamine - containing products, and methylphenidate, have a high potential for abuse and dependence (5.1, 9.3)**
> - **Assess the risk of abuse prior to prescribing and monitor for signs of abuse and dependence while on therapy (9.2, 9.3)**

250.  These risks are especially prominent with regard to adolescent patients. According to the label for Mydayis, "a single dose MYDAYIS capsule administered to pediatric patients age 13 to 17 years . . . would produce about 21-31% higher $C_{max}$ [maximum concentration of the drug in blood serum] for $d$- and $l$-amphetamine and 21-31% higher AUC [area under the curve, a measure of concentration of the drug in blood serum] . . . compared to the same dose of MYDAYIS capsule administered to adults."[101]

251.  Overdoses with amphetamines can lead to tremors, agitation, combative behavior, confusion, hallucinations, delirium, anxiety, paranoia, movement disorders, seizures, coma, intracerebral hemorrhage, rhabdomyolysis (a breakdown of muscle tissues), renal failure, tachycardia, hypertension,

---

[101] *Mydayis Label* 16, Food & Drug Admin., https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022063s000lbl.pdf (last visited July 22, 2019.)

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  dysrhythmias, aortic dissection, vasospasm, cerebral vasculitis, heart attack, and
2  death.[102]

3      252.  Accordingly, it is essential that adolescent patients be prescribed
4  Mydayis at an appropriate dose.

5      253.  The FDA recommends that both adults and adolescents begin with a
6  12.5 mg dose of Mydayis daily.  Adults may take a maximum daily dose of 50 mg,
7  but adolescents are limited to a maximum daily dose of 25 mg, half the adult limit.

8      254.  When Mydayis was launched, Shire produced adolescent-specific
9  marketing materials meant to be left with health care providers.  Shire had already
10  produced marketing materials corresponding to adult patients that included adult
11  dosing information.  Rather than revise this dosing information, Shire merely
12  reproduced the adult dosing information in a handout included with the adolescent
13  marketing materials:[103]

---

[102] Henry A. Spiller et al., Overdose of Drugs for Attention-Deficit Hyperactivity Disorder: Clinical Presentation, Mechanisms of Toxicity, and Management, 27 CNS Drugs 531, 533 (2013).

[103] See Ex. G to Relator's Pre-Filing Disclosure statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT



255. This dosing information was misleading, as it did not include the pediatric dosing limit of 25 mg, half the adult limit.

256. When Shire introduced this handout, several Sales Specialists, including Partner A and Partner B, objected to their misleading content. These Sales Specialists raised their concerns at a launch meeting involving Shire management, questioning how long it would take for Shire to produce new marketing materials containing the proper pediatric dosing limits.

257. Shire management disregarded these concerns, telling the Sales Specialists that new marketing materials would be produced as soon as the company could get them. In the meantime, however, Shire still mandated that the misleading

1   adult dosing handout be left with every health care provider visited by Sales
2   Specialists, including those who treated adolescents.

3       258.   This handout has induced many health care providers to prescribe
4   Mydayis to adolescents at the unapproved and unsafe doses of 37.5 mg and 50 mg
5   per day.  In one instance, Dr. Eric Jackson of Wilmington, North Carolina phoned
6   Shire Sales Specialist Kim Reynaud, who had left the adult dosing handout at his
7   office.  Dr. Jackson was extremely upset, as he had prescribed a pediatric patient a
8   37.5 mg dose of Mydayis and was informed by a pharmacist that such a dose would
9   not be covered by the patient's insurance, as it was unapproved by the FDA.

10      259.   Although this particular dosing error was caught and corrected before
11  the patient received the prescription, many other errors went uncorrected, leading to
12  many pediatric patients taking an unapproved and unsafe dose of Mydayis.

13      260.   Approximately six months after the launch of Mydayis, Shire provided
14  its Sales Specialists with a new visual aid, one page of which included pediatric
15  dosing information.  However, Shire never updated the misleading handout that
16  included only adult dosing information.

17  **VIII. DEFENDANTS CAUSED THE PRESENTATION OF FALSE CLAIMS**
18  **TO THE UNITED STATES**

19      261.   Through Medicare and Medicaid, the United States Government and
20  the States reimburse a large percentage of all Vyvanse and Mydayis prescriptions.
21  Medicare not only covers individuals over age 65, but also provides medical
22  coverage for many individuals who are permanently disabled under the Social
23  Security Act.

24      262.   Medicaid, a joint program between the states and the federal
25  Government, also routinely pays for Vyvanse and Mydayis prescriptions.  Medicaid
26  provides health coverage to millions of non-elderly low-income non-disabled adults,
27
28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

particularly those with families. Medicaid also provides coverage to several million low-income seniors and non-elderly people with disabilities. The federal Government pays more than half of the funding for the Medicaid program.

263. The United States also pays for Vyvanse and Mydayis prescriptions through the Veteran's Administration, through the FEHB Program, and through TRICARE, its insurance program for Department of Defense personnel and their families.

264. The federal Government and the States have spent a substantial amount of money on Vyvanse.

265. Every time a physician seeks reimbursement from Medicare, Medicaid, or some other federal health care program for the administration of Vyvanse or Mydayis, a claim is presented for payment for the purposes of the FCA. Similarly, every time a Medicare or Medicaid patient obtains Vyvanse or Mydayis from a pharmacy, the pharmacy presents a claim for payment.

266. Shire and Takeda closely tracked the various third-party payers that reimbursed their drug products. These sources included Government payers such as Medicaid and Medicare. Vyvanse and Mydayis are reimbursed by Government Programs under retail and/or mail pharmacy benefit programs, and the unlawful schemes alleged in this Complaint resulted in misbranded or tainted prescriptions that were presented to these pharmacies. These pharmacies then submitted fraudulent prescription claims to the federal or state program responsible for approving and facilitating reimbursement of the false claims.

267. As to Medicaid claims, pharmacies periodically (*e.g.*, once per day) submit their Medicaid claims for reimbursement by "batching them" and submitting them electronically to the *Qui Tam* States (or in some cases, claims are initially submitted to Medicaid Managed Care plans). The pharmacies unwittingly make

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  false certifications and false claims directly to the *Qui Tam* States concerning
2  Medicaid reimbursement on a daily (or periodic) basis.

3      268.  As part of each electronic claim, the pharmacies affix their unique
4  Medicaid provider identification numbers, which serve as electronic stamps
5  indicating that (as Medicaid providers) they are in compliance with all applicable
6  federal and State laws.  The pharmacies are then reimbursed monthly by the *Qui*
7  *Tam* States for all approved claims.

8      269.  The *Qui Tam* States are not financially responsible for paying one-
9  hundred percent of the pharmacies' claims for reimbursement.  Medicaid is a joint
10  federal-state program that provides health care benefits for certain groups, primarily
11  low-income and disabled persons.

12      270.  The federal involvement in Medicaid includes providing matching
13  funds and ensuring that the states comply with minimum standards in the
14  administration of the program.  The federal share of states' Medicaid payments,
15  known as the federal Medical Assistance Percentage ("FMAP"), is based on each
16  state's per capita income compared to the national average.  Among the states, the
17  FMAP is at least 50 percent and as high as 76.39 percent.  Through the FMAP
18  process, state Medicaid administrators obtain the federal Government's share of the
19  pharmacies' reimbursements by submitting a quarterly Form 64 to CMS.  For this
20  reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam*
21  States, are presented to the federal Government within the meaning of the FCA.

22      271.  The federal Government pays Medicaid claims through a continuing
23  line of credit certified by the Secretary of the Treasury in favor of the state payee.
24  42 C.F.R. § 430.30(d)(3), (4).  The federal Government authorizes the state payee
25  "to draw federal funds as needed to pay the federal share of disbursements."  42
26  C.F.R. § 430.30(d)(3).  The state can draw down on those funds only to pay the

27
28

1  Medicaid claims of physicians. 42 C.F.R. § 430.30(d). The funds made available
2  to the state thus remain federal funds, in a Federal Reserve account, until they are
3  drawn by the state and used to pay the pharmacies' claims.

4      272. The federal Government also "approves," within the meaning of the
5  FCA, the claims submitted and paid through the Medicaid program. When a state
6  presents its Form 64 (the quarterly report of actual expenditures) to CMS, the
7  amounts of any fraudulent claims the state paid is included in the report. Based on
8  the information in the report, CMS determines and approves whether the claims that
9  the state paid with federal funds were appropriate. If CMS determines that certain
10  claims paid by the state were improper, CMS may recoup the amount of the
11  erroneously expended funds by reducing the amount of money provided to the state
12  during the next quarter. Because the Form 64 constitutes the United States' means
13  for approving and paying the amount of federal funds expended by the state, these
14  reports overstate the amount of federal funds to which the state was entitled by the
15  amount fraudulently paid.

16      273. These are, therefore, false records or statements knowingly caused to
17  be made or used by Shire and Takeda to get false claims paid and approved by the
18  United States in connection with the Medicaid program.

19      274. In the case of Medicare, specialty pharmacies provide pharmaceutical
20  products to Medicare Part D recipients throughout the United States. Many of the
21  retail pharmaceutical products are provided under contractual agreements with
22  Medicare Part D contractors, whereby the pharmacies agree to provide
23  pharmaceuticals to Medicare-eligible patients, and the Part D contractors reimburse
24  the pharmacies their costs plus a fixed dispensing fee meant to provide the
25  pharmacies with a profit for providing pharmaceutical products to Medicare patients.

26
27
28

84

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

275.   Under Medicare Part D, for beneficiaries dually eligible for both Medicaid and Medicare programs, the pharmacies' false claims for reimbursement were submitted to contractors designated by and under contract with the United States as Medicare Prescription Drug Plans ("PDPs") and Medicare Advantage Prescription Drug Plans ("MA-PDPs"). Shire and Takeda's schemes inflated MA-PDP and PDP drug costs, thereby causing increased Medicare Part D drug costs.

276.   Medicare Part D prescription drug coverage for eligible senior enrollees is provided through MA-PDPs and stand-alone PDPs administered by private companies, usually health insurers or pharmacy benefit managers.  These Part D programs are subsidized by the federal Government, which cover the cost of drug payments.  The false or fraudulent drug claims were then included in drug utilization data submitted by plan sponsors to CMS through Prescription Drug Event ("PDE") records.

277.   These false claims embedded within the PDE records are then paid or approved by CMS pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  CMS makes payments to plan sponsors monthly through estimated subsidy payments and, where needed, at year-end as a result of the payment reconciliation process.  The reconciliation process compares estimated subsidy payments made to plan sponsors throughout the year with the cost data submitted by plan sponsors through PDE records to determine any additional residual payments required by CMS to be paid to MA-PDPs and PDPs.

278.   CMS payments made through the Part D subsidy process, or as a result of additional residual payments to MA-PDPs and PDPs, included payments for false claims that were knowingly caused to be submitted because of Shire and Takeda's unlawful schemes.

85

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    279.   Shire and Takeda knew that their unlawful schemes would cause third
2   parties to create materially false records, statements, or claims which would be used
3   to improperly obtain reimbursement or payment from Government Programs,
4   including Medicaid and Medicare.

5   **IX.   TAKEDA CAUSED GOVERNMENT PROGRAM PROVIDERS TO
        FALSELY CERTIFY COMPLIANCE WITH THE LAW**
6

7    280.   Shire and Takeda not only caused pharmacies to submit false claims,
8   they also caused physicians and pharmacies to falsely certify their compliance with
9   applicable laws which require express and/or implied certifications of compliance
10   with conditions of payment.

11    281.   Shire and Takeda also caused providers to falsely certify their
12   compliance, including in connection with Shire and Takeda's promotion of Vyvanse
13   and Mydayis.

14    282.   As to Medicaid, State Medicaid provider agreements include
15   requirements that participating pharmacies and providers will comply with all laws,
16   rules, and regulations governing the Medicaid program.   These agreements also
17   include provisions that the pharmacies agree that the submittal of any claim by or on
18   behalf of the pharmacy will constitute a certification that the pharmaceutical
19   products for which payment is claimed were furnished in accordance with the
20   requirements of Medicaid, and that the information submitted in, with, or in support
21   of the claim is true, accurate, and complete.

22    283.   Shire and Takeda's illegal schemes caused the Medicaid-participating
23   pharmacies and/or providers to falsely certify their compliance with all laws, rules,
24   and regulations governing the Medicaid program. These certifications were express,
25   were a condition of payment or reimbursement by Government Programs, and were
26
27
28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  material to the Government's decision to pay or reimburse for the drugs Vyvanse
2  and Mydayis.

3  284.  As to Medicare, providers must sign agreements in which they agree to
4  abide by all applicable Medicare laws and regulations.  These certifications are also
5  included in the claim forms themselves.[104]

6  285.  As to Medicare (for pharmacies and Medicare Part D contractors),
7  providers are required to abide by and certify compliance with all laws, rules, and
8  regulations governing the Medicare program.[105]  When submitting claims data to
9  CMS for payment, Part D plans (and their subcontractors) must certify that the
10  claims data is true and accurate to the best of their knowledge and belief, which
11  includes the absence of any false claims, such as those prohibited by the FCA.

12  286.  Shire and Takeda's illegal schemes caused the Medicare Part D plans
13  to falsely certify their compliance with all laws, rules, and regulations governing the
14  Medicare program, including the FCA.  These certifications were express, were a
15  condition of payment or reimbursement by Government Programs, and were
16  material to the Government's decision to pay or reimburse for the drugs Vyvanse
17  and Mydayis.

18  287.  Shire and Takeda knowingly caused pharmacies and Part D plans to
19  falsely certify compliance with applicable laws, rules, and regulations, which caused
20  state and federal Government Programs to issue reimbursements or pay claims for

---

[104] *See, e.g.*, Dep't of Health & Human Servs., *Medicare Enrollment Application, Institutional Providers* (*Form CMS-855A*), Ctrs. For Medicare & Medicaid Servs, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855a.pdf (last visited July 30, 2019); Dep't of Health & Human Servs., *Medicare Enrollment Application, Physicians & Non-Physician Practitioners* (*Form CMS-855I*), Ctrs. For Medicare & Medicaid Servs, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf (last visited July 30, 2019).

[105] *See, e.g.*, 42 C.F.R. § 423.505(k)(3).

87
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  the drugs Vyvanse and Mydayis that were not eligible for reimbursement or
2  payment.

3  **X.    SHIRE'S VIOLATION OF ITS SEPTEMBER 12, 2014 CORPORATE
4          INTEGRITY AGREEMENT**

5       288.   In order to execute their unlawful conduct, Shire needed to conceal its
6  illegal conduct from Government oversight, particularly in light of the fact that Shire
7  was and continues to be operating under a Corporate Integrity Agreement ("CIA" or
8  "Agreement").  The Shire CIA was effective starting September 12, 2014 and is due
9  to expire September 12, 2019.

10          **A.  Shire Submitted False Reports to the OIG That Either Materially
                  Misrepresented the Facts Concerning Its Illegal Conduct or
11                Concealed Such Conduct Altogether**

12      289.   Shire is a serial offender of the FCA.  On September 24, 2014, DOJ
13  announced at $56.5 million settlement with Shire related to alleged FCA violations
14  related to Shire's promotional efforts for several of its ADHD and ulcerative colitis
15  drugs, including Adderall XR®, Vyvanse®, Daytrana®, Pentasa®, and Lialda®.
16  The Government alleged that Shire made false promotional and fraudulent claims
17  for each of these drugs and/or marketed them for unapproved and unsafe uses.  Shire
18  entered into the CIA as part of the settlement of these claims.

19      290.   With regard to Vyvanse, the Settlement Agreement "covered conduct"
20  alleged that between February 2007 and September 2010, Shire Sales Specialists and
21  other agents allegedly made false and misleading statements about the efficacy and
22  "abuseability" of Vyvanse to state Medicaid formulary committees and to individual
23  physicians.  For example, one Shire medical science liaison allegedly told a state
24  formulary board that Vyvanse "provides less abuse liability" than "every other long-
25  acting release mechanism" on the market.  However, the government contended that
26  no study Shire conducted had concluded that Vyvanse was not abuseable, and, as an

27
28                                         88
          COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  amphetamine product, the Vyvanse label included an FDA-mandated black box
2  warning for its potential for misuse and abuse.   Shire also made allegedly
3  unsupported claims that treatment with Vyvanse would prevent car accidents,
4  divorce, arrests and unemployment.[106]

5      291.   Shire has a demonstrated history of utterly disregarding its CIA
6  obligations. On January 11, 2017, DOJ issued a press release stating that it had again
7  settled FCA claims with Shire, this time for $350 million related to Shire's alleged
8  use of kickbacks to induce use of its product Dermagraft®, which is a bioengineered
9  human skin substitute. The allegations were that "Dermagraft salespersons
10 unlawfully induced clinics and physicians with lavish dinners, drinks, entertainment
11 and travel; medical equipment and supplies; unwarranted payments for purported
12 speaking engagements and bogus case studies; and cash, credits and rebates, to
13 induce the use of Dermagraft."[107]

14     292.   Shire's motives here are the same as in the prior two violations.   Shire
15 is a recidivist that has been willing to do whatever was necessary to increase sales
16 of its products, even if it meant knowingly engaging in illegal conduct.

17 **B.    The Corporate Integrity Agreement Signed by Shire in 2014
       Required That Shire Establish Policies and Procedures for
18     Conducting Promotion in Compliance with the FCA**

19     293.   The CIA required that Shire's Compliance Officer, Board of Directors,
20 and Management make annual accountability certifications and "annually certify
21 that the applicable Shire business unit is compliant with applicable Federal health

22

23 [106] Shire Pharmaceuticals LLC to Pay $56.5 Million to Resolve False Claims Act
24 Allegations Relating to Drug Marketing and Promotion Practices, U.S. Dep't of
   Justice (Sept. 24, 2014), https://www.justice.gov/opa/pr/shire-pharmaceuticals-llc-
25 pay-565-million-resolve-false-claims-act-allegations-relating-drug.

26 [107] *Shire PLC Subsidiaries to Pay $350 Million to Settle False Claims Act
   Allegations*, U.S. Dep't of Justice (Jan. 11, 2017), https://www.justice.gov/opa/
   pr/shire-plc-subsidiaries-pay-350-million-settle-false-claims-act-allegations.
27

28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 | care program requirements and FDA requirements and with the obligations of this

2 | CIA." CIA Section III.A.4.

3 | 294.   The CIA also states that Shire was required to implement:

Policies and Procedures [addressing] … compensation (including through salaries, bonuses, contests, or other means) for Relevant Covered Persons who are sales representatives and their managers. These Policies and Procedures shall: (i) be designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in improper promotion, sales, and marketing of Government Reimbursed Products; and (ii) **include mechanisms, where appropriate, that are designed to exclude from incentive compensation sales that Shire know or should reasonably be aware were the result of non-FDA-approved uses of Government Reimbursed Products or other improper promotion.**

10 | CIA Section III.B.3.o (emphasis added).

11 | 295.   Despite these policies and their justifications, Shire has nevertheless

12 | incentivized sales force employees to treat individual patient leads and to provide

13 | lucrative, effectively uncapped bonuses for each new patient.

14 | 296.   Similarly, Shire agreed to implement:

Policies and Procedures [addressing] … appropriate ways to conduct Product Related Functions in compliance with all applicable Federal health care program requirements, including, but not limited to . . . the False Claims Act (codified at 31 U.S.C. §§ 3729-3733), and in compliance with all applicable FDA requirements;

[and]

Policies and Procedures [addressing] … appropriate ways to conduct Payor Related Functions in compliance with all: (i) applicable Federal health care program requirements, including but not limited to the Federal . . . False Claims Act (codified at 31 U.S.C. §§ 3729-3733); (ii) applicable FDA requirements; and (iii) applicable state laws.

24 | CIA Section III.B.3.c & d.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

**C.    The CIA Is an Express Contract between Shire, the United States Department of Health and Human Services, and the United States Government**

297.   Shire and all of its employees were aware of the CIA, as the CIA required a written Code of Ethics be distributed to all Covered Persons, and each Covered Person was required to certify, in writing, that he or she had received, read, understood, and would abide by this Code of Ethics. *See* CIA Section III.B.1 (defining "Code of Ethics").

298.   The Code of Ethics was to specify that all Covered Persons were expected to comply with the requirements of the CIA. *Id.* Per the CIA, a "Covered Person" included Defendant Shire's officers, directors, and United States-based employees. *See* CIA Section II.C.1.

299.   Shire's CIA and Code of Ethics include a commitment "to full compliance with all Federal health care program requirements and FDA requirements, including its commitment to comply with all requirements relating to the Covered Functions[.]" *See* CIA Sections III.B.1.a. *et seq.*

300.   The CIA and Code of Ethics also contained an express contractual agreement "Shire's requirement that all Covered Persons shall be expected to report to the CCRO [Chief Compliance and Risk Officer], or other individual designated by Shire, suspected violations of any Federal health care program requirements, FDA requirements, or of Shire's Policies and Procedures." *See* CIA Section III.B.1.c.

301.   The CIA further required Shire to notify the Government of any "reportable events," defined to include any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program" requirement and any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any FDA requirements relating to the promotion of Government

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  Reimbursed Products[.]" *See* CIA Section III.I.  Shire intentionally ignored this
2  requirement in breach of Shire's CIA obligations.

3  **D.   The CIA Established an Obligation to Pay Stipulated Penalties,**
   **Which Arise from Shire's Contractually-Binding Requirement to**
4  **Report Instances of Fraudulent Conduct**

5     302.  Specifically, the CIA contains a section entitled "Breach and Default
6  Provisions," which provides "Stipulated Penalties" as a contractual remedy for any
7  failure by Shire to comply with their obligations under their respective CIA.  *See*
8  CIA Section X.  These stipulated penalties include, *inter alia*: "A Stipulated Penalty
9  of $2,500 (which shall begin to accrue on the day after the date the obligation became
10  due) for each day Shire fails to establish and implement any of the following
11  obligations described in Section III" (some of which are reproduced *supra*).  *See*
12  CIA Section X.1. Another stipulated penalty includes a $2,500 penalty for failure to
13  establish "a Disclosure Program" as required by Section III.F.  *See* CIA Section
14  X.A.1.i.

15     303.  Another provision requires "A Stipulated Penalty of $50,000 for each
16  false certification submitted by or on behalf of Shire as part of its Implementation
17  Report, Annual Report, additional documentation to a report (as requested by the
18  OIG), or otherwise required by this CIA." *See* CIA Section X.A.6.

19     304.  Another provision includes "A Stipulated Penalty of $1,000 for each
20  day Shire fails to comply fully and adequately with any obligation of this CIA." *See*
21  CIA Section X.A.7.

22     305.  From at least 2015, Shire conducted numerous internal audits of its
23  sales force's activities to determine what, if any, compliance issues existed.  As part
24  of the audits, which were conducted by independent third parties contracted by Shire,
25  various health care providers were contacted and asked about their latest discussions
26  with RBMs.

27
28                                  92

306.   Shire's Compliance Department was thus fully aware that its sales force was carrying out their instructions to inappropriate sales and marketing of these Vyvanse. And yet, Shire elected to keep this issue not only from the OIG, but from their sales forces as well.

307.   Shire intended to keep hidden the issues related to illegal promotion of the Vyvanse.  Shire categorically refused to report to the OIG these CIA violations even when reported by Relator.  When Shire intentionally concealed this unlawful promotion, it violated the terms of the CIA.

308.   The CIA notwithstanding, Shire continued its illegal activities at a considerable cost to Government Health Care Programs and taxpayers.  On that basis, Shire knowingly failed to completely and truthfully certify its compliance with the CIA, and it failed to completely and truthfully report all "reportable events" in compliance with the CIA.  Thus, Shire knowingly, deliberately and without just cause presented or caused to be presented false certifications or claims in violation of 31 U.S.C. § 3729(a)(1)(G).

309.   As a result of Shire's unlawful conduct, the United States has been damaged, and continues to be damaged, by Government Health Care Program payments for illegally promoted prescriptions of the Vyvanse.

## XI.   FRAUD AGAINST CALIFORNIA AND ILLINOIS COMMERCIAL PAYORS

### A.   The California Insurance Frauds Prevention Act (CIFPA)

310.   The California Legislature enacted CIFPA to combat abusive practices aimed at defrauding private insurance providers.  The legislature stated that it was specifically concerned with fraud on health insurance providers: "Health insurance fraud is a particular problem for health insurance policyholders.  Although there are no precise figures, it is believed that fraudulent activities account for billions of

93
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  dollars annually in added health care costs nationally.   Health care fraud causes

2  losses in premium dollars and increases health care costs unnecessarily."[108]

3  311.   Cal. Ins. Code § 1871.7(a) prohibits the knowing employment of

4  "runners, cappers, steerers or other persons to procure clients or patients . . . to

5  perform or obtain services or benefits under a contract of insurance or that will be

6  the basis for a claim against an insured individual or his or her insurer."

7  312.   Pursuant to California Penal Code § 549, it is unlawful for any firm or

8  corporations to "solicit[], accept[], or refer[] any business to or from any individual

9  or entity with the knowledge that, or with reckless disregard for whether" that

10  individual intends to make or cause to be made any false or fraudulent claim for

11  payment of a health care benefit.

12  313.   It is unlawful to "[k]nowingly prepare, make, or subscribe any writing,

13  with the intent to present or use, or to allow it to be presented, in support of any false

14  or fraudulent claim," or to aid, abet, solicit, or conspire with any person to do the

15  same.[109]

16  314.   It is unlawful to "[k]nowingly make or cause to be made any false or

17  fraudulent claim for payment of a health care benefit," or to aid, abet, solicit, or

18  conspire with any person to do the same.[110]

19  315.   It is unlawful to "[p]resent or cause to be presented any written or oral

20  statement as part of, or in support of or opposition to, a claim for payment or other

21  benefit pursuant to an insurance policy, knowing that the statement contains any

22

23

_____

24  [108] Cal. Ins. Code § 1871(h).

25  [109] Cal. Penal Code § 550(a)(5).

26  [110] *Id.* § 550(a)(6).

27

28
                              94

false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.[111]

316.   It is unlawful to "[p]repare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.[112]

317.   Through their fraudulent scheme, Shire and Takeda have violated the preceding provisions, making or causing fraudulent health care claims to be made to California commercial payors.  By doing so, Shire and Takeda have substantially increased California commercial payors' costs and increased the costs of their participants' coverage.

**B.    The Illinois Insurance Claims Fraud Prevention Act (IICFPA)**

318.   The Illinois Legislature enacted the Illinois Insurance Claims Fraud Prevention Act (IICFPA) to combat abusive practices aimed at defrauding private insurance providers.  The legislative findings and declarations make clear that it was specifically concerned with the social costs of fraud on private insurance providers, noting that the penalties in the IICFPA are "remedial" and intended to achieve the "goals of disgorging unlawful profit, restitution, compensating the State for the costs of investigations and prosecution, and alleviating the social costs of increased insurance rates due to fraud."[113]

---

[111] *Id.* § 550(b)(1).

[112] *Id.* § 550(b)(2).

[113] 740 Ill. Comp. Stat. 92/5(c).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

319. Under Illinois law, it is "unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer."[114]

320. Under the Illinois Criminal Code of 2012, a "person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property."[115]

321. The Illinois Criminal Code of 2012 sets forth that a "person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider."[116]

322. The Illinois Criminal Code of 2012 defines "aggravated insurance fraud" as 3 or more offenses within an 18-month period arising out of separate incidents or transactions.[117]

---

[114] 740 Ill. Comp. Stat. 92/5(a).

[115] 720 Ill. Comp. Stat. 5/17-10.5(a)(1).

[116] 720 Ill. Comp. Stat. 5/17-10.5(a)(2).

[117] 720 Ill. Comp. Stat. 5/17-10.5(b)(1).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

323. The Illinois Criminal Code of 2012 further prohibits being an "organizer" of an aggravated insurance fraud, setting forth that a "person commits being an organizer of an aggravated insurance fraud on a private entity conspiracy if aggravated insurance fraud on a private entity forms the basis for a charge of conspiracy under Section 8-2 of this Code and the person occupies a position of organizer, supervisor, financer, or other position of management within the conspiracy."[118]

324. The Illinois Criminal Code of 2012 sets forth that:

> If aggravated insurance fraud on a private entity forms the basis for charges of conspiracy under Section 8-2 of this Code, the person or persons with whom the accused is alleged to have agreed to commit the 3 or more violations of this Section need not be the same person or persons for each violation, as long as the accused was part of the common scheme or plan to engage in each of the 3 or more alleged violations.[119]

325. Article 46 of the Illinois Criminal Code of 1961 set forth that a "person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property."[120]

326. Article 46 of the Illinois Criminal Code of 1961 further prohibited aggravated fraud, setting forth that a "person commits the offense of aggravated

---

[118] 720 Ill. Comp. Stat. 5/17-10.5(b)(2).

[119] 720 Ill. Comp. Stat. 5/17-10.5(c).

[120] 720 Ill. Comp. Stat. 5/46-1(a) (effective January 1, 2006 through June 30, 2011).

97

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 fraud when he or she, within an `8 month period, obtains, attempts to obtain, or
2 causes to be obtained, by deception, control over the property of an insurance
3 company or insurance companies, a self-insured entity or self-insured entities, or any
4 governmental entity or governmental entities by the making of 3 or more false claims
5 or by causing 3 or more false claims to be made arising out of separate incidents or
6 transactions in violation of Section 46-1 or 46-1.1 of this Code."[121]

7     327. Article 46 of the Illinois Criminal Code of 1961 further prohibited
8 conspiracy to commit fraud, setting forth:

9         A person commits conspiracy to commit fraud when, with
the intent that a violation of Section 46-1, 46-1.1, or 46-2
10 of this Code be committed, he agrees with another to
violate Section 46-1, 46-1.1, or 46-2. No person may be
11 convicted of conspiracy to commit fraud unless an overt
act or acts in furtherance of the agreement is alleged and
12 proved to have been committed by him or by a co-
conspirator and the accused is a part of a common scheme
13 or plan to engage in the unlawful activity. Where the
offense agreed to be committed is a violation of Section
14 46-2, the person or persons with whom the accused is
alleged to have agreed to commit the 3 or more violations
15 of Section 46-1 or 46-1.1 need not be the same person or
persons for each violation, as long as the accused was a
16 part of the common scheme or plan to engage in each of
the 3 or more alleged violations.[122]
17

18     328. Article 46 of the Illinois Criminal Code of 1961 further prohibited being
19 an "organizer" of an aggravated fraud conspiracy, setting forth:

20         A person Commits the offense of being an organizer of an
aggravated fraud conspiracy when he: (1) with the intent
21 that a violation of Section 46-2 of this Code be committed,
agrees with another to the commission of that offense; and
22 (2) with respect to other persons within the conspiracy,
occupies a position of organizer, supervisor, financer, or
23 other position of management.

24

25

26 [121] 720 Ill. Comp. Stat. 5/46-2 (effective January 1, 2006 through June 30, 2011).
[122] 720 Ill. Comp. Stat. 5/46-3 (effective January 1, 2006 through June 30, 2011).
27

28
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

No person may be convicted of the offense of being an organizer of an aggravated fraud conspiracy unless an overt act or acts in furtherance of the agreement is alleged and proved to have been committed by him or by a con-conspirator and the accused is part of a common scheme or plan to engage in the unlawful activity. For the purposes of this Section, the person or persons with whom the accused is alleged to have agreed to commit the 3 or more violations of Section 46-1 or 46-1.1 of this Code need not be the same person of persons for each violation, as long as the accused occupied a position of organizer, supervisor, financer, or other position of management in each of the 3 or more alleged violations.[123]

329. Through their various schemes, described *infra*, Shire and Takeda have violated the preceding provisions, making or causing fraudulent health care claims to be made to Illinois commercial payors. By doing so, Shire and Takeda have substantially increased Illinois commercial payors' costs and in turn increased the costs of their participants' coverage.

### C. Shire and Takeda Use Coupons to Induce Patients to Use Vyvanse, Mydayis, and Xiidra

330. Insured individuals typically face three cost-sharing measures: deductibles, which must be paid before services are covered; copayments, fixed dollar amounts which must be paid for a particular product or service; and coinsurance, a percentage of the charge for a product or service.

331. These cost-sharing measures generally achieve their purpose. Studies have shown that if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed, rather than simply because they are free.

332. Sometimes, pharmaceutical manufacturers will eliminate some or all of these cost-sharing measures with what is commonly known as a "copay coupon" or "copay card." Shire and Takeda have offered several copay cards: the Vyvanse

---

[123] 720 Ill. Comp. Stat. 5/46-4 (effective January 1, 2006 through June 30, 2011).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Savings Card, the Mydayis Savings Card, the MVP (Mydayis-Vyvanse Program) Card, and the Xiidra Savings Card.  All of these cards carry the same crucial characteristics:

> a. The cards induce providers to prescribe, and patients to purchase, Shire and Takeda's products instead of competitors' products.
>
> b. The cards operate as an unlicensed secondary insurance program.

333.   These Savings Cards are harmful to private payors for at least two reasons:

- *First*, the Vyvanse Savings Card eliminate patients' price sensitivity and induces them to use Vyvanse, particularly when they do not suffer from BED and merely desire to lose weight, or when their ADHD is or would be well-controlled by a cheaper competitor drug.

- *Second*, the Vyvanse Savings Card misstates the provider's actual charge to the payor.  When cost-sharing amounts are routinely waived, the true cost for the product or service is not the price reported to insurers, but the price after the deduction of the routinely waived cost-sharing amounts.  For example, if a manufacturer claims that its charge for a drug is $100/month, but routinely waives a patient's twenty percent copayment, the actual charge is $80.  The insurance company should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80).  As a result of the manufacturer's misrepresentation, the insurance program is paying $16 more than it should.

### 1.   *The Vyvanse Savings Card*

334.   The Vyvanse Savings Card was introduced by Shire when Vyvanse first came to market in 2007.  At that time, Vyvanse was approved only for the treatment of ADHD.

335.   From 2007 through early 2018, the Vyvanse Savings Card reduced patients' cost-sharing obligations to a minimum of $15 per month.  For example, if a patient would be required to pay a $75 copayment for Vyvanse, the Vyvanse Savings Card would reduce that requirement to $15.

336.   Beginning in early 2018, the minimum out-of-pocket expenditure was raised to $25 per month.  Beginning in 2019, the minimum out-of-pocket

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

expenditure was raised to $30 per month.  The Vyvanse Savings Card has always carried a maximum monthly benefit of $60.

337.   The Vyvanse Savings Card has never carried any income requirements and has always been available to patients regardless of financial need.  Any patient who is covered by private insurance is, and has always been, eligible to use the Vyvanse Savings Card.

338.   The Vyvanse Savings Card mimics an insurance card and is designed to be presented to a pharmacist when filling a prescription for Vyvanse.  The card's current iteration is pictured below, though the design has changed very little since it was first introduced:[124]



339.   When a patient presents the Vyvanse Savings Card to a pharmacist, the patient will be responsible for paying only a portion of his or her cost-sharing obligation.  Shire will fund up to $60 of a patient's cost-sharing obligation per prescription each month, and the patient will be responsible for a minimum of $30.

---

[124] *See* Ex. F2 to Relator's Pre-Filing Disclosure statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

340.   In addition to these monthly savings, Shire distributes free trial coupons that provide patients with the first month's prescription free of charge:[125]



341.   Both of these coupons explicitly act as unlicensed secondary insurance. On the back of each card, Shire and Takeda print instructions to the pharmacist to process the discount.  The back of the Vyvanse Savings Card and the free coupon card states:

**Pharmacist instructions for a patient paying with an Eligible Third Party Payer:** Submit the claim to the primary Third Party Payer first, then submit the balance due to CHANGE HEALTHCARE as a Secondary Payer COB [coordination of benefits] with patient responsibility amount and a valid Other Coverage Code (e.g., 8).

342.   The Vyvanse Savings Card is very attractive to patients, paying for the entirety of the first month's prescription and up to two-thirds of the patients' cost-sharing obligations thereafter. Without the Vyvanse Savings Card, many patients—especially patients with questionable or false BED diagnoses, or who desire merely to lose weight—would not take Vyvanse.  In addition, the Vyvanse Savings Card has induced and continues to induce many patients whose ADHD was or would be well-controlled by a lower-cost drug, such as generic Adderall XR, to choose the more expensive Vyvanse instead, because the patients' cost-sharing obligations are substantially reduced.

---

[125] *See* Ex. F1 to Relator's Pre-Filing Disclosure Statement.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

343.   Although Government Health Care Program patients are ineligible to use the Vyvanse Savings Card, privately insured patients, including those in California and Illinois, are eligible.

344.   The Vyvanse Savings Card has been an integral part of Shire and Takeda's marketing scheme.   The Vyvanse Savings Card has been extremely popular among patients and providers, who are sensitive to their patients' cost-sharing obligations.   Under the guise of magnanimity, Shire and Takeda have leveraged this savings program to convince doctors to prescribe and patients to take Vyvanse for the unsafe and unapproved use of weight loss, as well as to convince doctors to prescribe and patients to take Vyvanse instead of cheaper alternative ADHD medications.

345.   Shire and Takeda's Sales Specialists are provided with tablets that are loaded with sales presentation software.   Shire's Sales Specialists are instructed to, and do, use this software while selling Vyvanse to providers.

346.   Among the software's functionality is a price-comparison tool that permits a Sales Specialist to show a provider the formulary status of Vyvanse and a patient's cost-sharing obligation for various insurance plans, as well as to compare these figures to those for competitor ADHD drugs.   The price-comparison tool displays only the patient's out-of-pocket costs, not the (much higher) cost for the drug that the insurance company must bear.

347.   Shire and Takeda's price-comparison tool permits comparisons between Vyvanse and generic Adderall XR, generic Adderall IR, and Concerta.

348.   The following screenshots contain data for Illinois commercial plans:[126]

---

[126] *See* Exs. F9-F11 to Relator's Pre-Filing Disclosure Statement.

103

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

## Generic Adderall IR

2

| STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|
| Formulary status on select plans in Illinois¹ | | | **VYVANSE** | M.A.S. IR |
| LIST / EDIT LIST / KEY | UnitedHealthcare Advantage 3-Tier | | Preferred $10 - $45 | Preferred $5 - $20 |
| | VA Priority Group 2 - 8 | | Preferred $11 | Preferred $8 |
| | Cigna Standard 3-Tier (National) | | Preferred $35 | Preferred $5 |
| | CVS Caremark Performance Standard Control | | Preferred $10 - $40 | Preferred $4 - $35 |
| | Health Alliance | | Non-Preferred $50 - $80 | Preferred $7 - $20 |

| STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|
| Formulary status on select plans in Illinois¹ | | | **VYVANSE** | M.A.S. IR |
| LIST / EDIT LIST / KEY | BlueCross BlueShield Illinois Enhanced | | Non-Preferred $35 - $60 | Preferred $0 - $15 |
| | Humana Rx4 Traditional | | Preferred $20 - $45 | Preferred $20 - $45 |
| | Caterpillar (Management/Salaried/Active Hourly Employees) | | Not Covered | Preferred $0 - $5 |
| | VA National Formulary Priority Group 1 | | Preferred $0 | Preferred $0 |
| | UnitedHealthcare Traditional | | Preferred $10 - $40 | Preferred $5 - $20 |

| STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|
| Formulary status on select plans in Illinois¹ | | | **VYVANSE** | M.A.S. IR |
| LIST / EDIT LIST / KEY | UnitedHealthcare Advantage 4-Tier | | Preferred $10 - $65 | Preferred $5 - $20 |
| | CVS Caremark Advanced Control Specialty Opt Out | | Preferred N/A | Preferred N/A |
| | State of Illinois | | Preferred $26 - $30 | Preferred $8 - $10 |
| | Express Scripts High Performance | | Preferred $10 - $80 | Preferred $0 - $15 |
| | CVS Caremark Advanced Control | | Preferred N/A | Preferred N/A |

104

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

| Formulary status on select plans in Illinois' | VYVANSE | M.A.S. IR |
|---|---|---|
| STATE · CUSTOM LIST · STATUS BY PLAN | | |
| Aetna Premier | Preferred $25 - $100 | Preferred $5 - $25 |
| UnitedHealthcare SignatureValue 3 Tier California | Preferred $10 - $45 | Preferred $5 - $20 |
| Meridian Health Medicaid | Preferred $0 | Preferred $0 |
| Blue Cross Community Health Plan | Not Covered | Preferred $0 |
| IlliniCare | Preferred $0 | Preferred $0 |

## Generic Adderall XR

| Formulary status on select plans in Illinois' | VYVANSE | M.A.S. XR |
|---|---|---|
| STATE · CUSTOM LIST · STATUS BY PLAN | | |
| BlueCross BlueShield Illinois | Preferred $30 - $40 | Preferred $10 - $15 |
| Express Scripts National Preferred | Preferred $10 - $80 | Preferred $0 - $15 |
| CVS Caremark Advanced Control Specialty | Preferred N/A | Preferred N/A |
| UnitedHealthcare Advantage 3-Tier | Preferred $10 - $45 | Not Covered |
| VA Priority Group 2 - 8 | Preferred $11 | Preferred $8 |

| Formulary status on select plans in Illinois' | VYVANSE | M.A.S. XR |
|---|---|---|
| STATE · CUSTOM LIST · STATUS BY PLAN | | |
| Cigna Standard 3-Tier (National) | Preferred $35 | Preferred $5 |
| CVS Caremark Performance Standard Control | Preferred $10 - $40 | Preferred $4 - $35 |
| Health Alliance | Non-Preferred $50 - $80 | Preferred $7 - $20 |
| Express Scripts Basic | Preferred N/A | Preferred N/A |
| Aetna Self Insured | Preferred N/A | Preferred N/A |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

## Concerta

2

| | STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|---|
| Formulary status on select plans in Illinois[1] | | | | VYVANSE | methylphenidate OROS |
| LIST / EDIT LIST / KEY | CVS Caremark Performance Standard Control | | | Preferred $10 - $40 | Preferred $4 - $35 |
| | Health Alliance | | | Non-Preferred $50 - $80 | Preferred $7 - $20 |
| | Express Scripts Basic | | | Preferred N/A | Preferred N/A |
| | Aetna Self Insured | | | Preferred N/A | Preferred N/A |
| | CVS Caremark Performance Standard Opt Out | | | Preferred N/A | Preferred N/A |

| | STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|---|
| Formulary status on select plans in Illinois[1] | | | | VYVANSE | methylphenidate OROS |
| LIST / EDIT LIST / KEY | Humana Rx4 Traditional | | | Preferred $20 - $45 | Non-Preferred $40 - $90 |
| | Caterpillar (Management/Salaried/Active Hourly Employees) | | | Not Covered | Preferred $0 - $5 |
| | VA National Formulary Priority Group 1 | | | Preferred $0 | Preferred $0 |
| | UnitedHealthcare Traditional | | | Preferred $10 - $40 | Not Covered |
| | UnitedHealthcare Advantage 4-Tier | | | Preferred $10 - $65 | Not Covered |

| | STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|---|
| Formulary status on select plans in Illinois[1] | | | | VYVANSE | methylphenidate OROS |
| LIST / EDIT LIST / KEY | Aetna Premier | | | Preferred $25 - $100 | Preferred $5 - $25 |
| | UnitedHealthcare SignatureValue 3 Tier California | | | Preferred $10 - $45 | Non-Preferred $25 - $85 |
| | Meridian Health Medicaid | | | Preferred $0 | Preferred $0 |
| | Blue Cross Community Health Plan | | | Not Covered | Preferred $0 |
| | IlliniCare | | | Preferred $0 | Preferred $0 |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

349.   The following screenshots contain data for California commercial plans:[127]

## Generic Adderall IR

| STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|
| Formulary status on select plans in California¹ | | | VYVANSE | M.A.S. IR |
| UnitedHealthcare SignatureValue 3 Tier California | | | Preferred $10 - $45 | Preferred $5 - $20 |
| VA Priority Group 2 - 8 | | | Preferred $11 | Preferred $8 |
| CVS Caremark Performance Standard Control | | | Preferred $10 - $40 | Preferred $4 - $35 |
| Cigna Standard 3-Tier (National) | | | Preferred $35 | Preferred $5 |
| Anthem BlueCross California 4 Tier | | | Preferred $9 - $50 | Preferred $9 - $15 |

| STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|
| Formulary status on select plans in California¹ | | | VYVANSE | M.A.S. IR |
| UnitedHealthcare Advantage 3-Tier | | | Preferred $10 - $45 | Preferred $5 - $20 |
| Kaiser Permanente Southern California FEHB | | | Preferred N/A | Preferred N/A |
| Federal Employee Program Basic | | | Preferred $50 | Preferred $10 |
| Federal Employee Program Standard | | | Preferred N/A | Preferred N/A |
| Kaiser Permanente Marketplace Bronze (CA) | | | Preferred N/A | Preferred N/A |

---

[127] *See* Exs. F6-F8 to Relator's Pre-Filing Disclosure Statement.

107

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

| | VYVANSE | M.A.S. IR |
|---|---|---|
| **STATE** **CUSTOM LIST** **STATUS BY PLAN** | | |
| Formulary status on select plans in California¹ | | |
| LIST / EDIT LIST / KEY — Aetna Premier | Preferred $25 - $100 | Preferred $5 - $25 |
| Western Health Advantage w/Specialty | Non-Preferred $50 - $75 | Preferred $10 - $15 |
| Health Net 3-Tier with Specialty (CA) | Preferred $0 - $50 | Preferred $0 - $15 |
| Medi-Cal | Preferred $1 | Preferred $1 |
| L.A. Care Medi-Cal | Preferred $0 | Preferred $0 |

## Generic Adderall XR

| | VYVANSE | M.A.S. XR |
|---|---|---|
| **STATE** **CUSTOM LIST** **STATUS BY PLAN** | | |
| Formulary status on select plans in California¹ | | |
| LIST / EDIT LIST / KEY — Aetna Premier | Preferred $25 - $100 | Preferred $5 - $25 |
| Western Health Advantage w/Specialty | Non-Preferred $50 - $75 | Preferred $10 - $15 |
| Health Net 3-Tier with Specialty (CA) | Preferred $0 - $50 | Preferred $0 - $15 |
| Medi-Cal | Preferred $1 | Non-Preferred $1 |
| L.A. Care Medi-Cal | Preferred $0 | Preferred $0 |

| | VYVANSE | M.A.S. XR |
|---|---|---|
| **STATE** **CUSTOM LIST** **STATUS BY PLAN** | | |
| Formulary status on select plans in California¹ | | |
| LIST / EDIT LIST / KEY — UnitedHealthcare SignatureValue 3 Tier California | Preferred $10 - $45 | Non-Preferred $25 - $85 |
| VA Priority Group 2 - 8 | Preferred $11 | Preferred $8 |
| CVS Caremark Performance Standard Control | Preferred $10 - $40 | Preferred $4 - $35 |
| Cigna Standard 3-Tier (National) | Preferred $35 | Preferred $5 |
| Anthem BlueCross California 4 Tier | Preferred $9 - $50 | Preferred $9 - $15 |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## Concerta

| | STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|---|
| **Formulary status on select plans in California'** | | | | **VYVANSE** | methylphenidate OROS |
| LIST / EDIT LIST / KEY | UnitedHealthcare SignatureValue 3 Tier California | | | Preferred $10 - $45 | Non-Preferred $25 - $85 |
| | VA Priority Group 2 - 8 | | | Preferred $11 | Preferred $8 |
| | CVS Caremark Performance Standard Control | | | Preferred $10 - $40 | Preferred $4 - $35 |
| | Cigna Standard 3-Tier (National) | | | Preferred $35 | Preferred $5 |
| | Anthem BlueCross California 4 Tier | | | Preferred $9 - $50 | Preferred $9 - $15 |

| | STATE | CUSTOM LIST | STATUS BY PLAN | | |
|---|---|---|---|---|---|
| **Formulary status on select plans in California'** | | | | **VYVANSE** | methylphenidate OROS |
| LIST / EDIT LIST / KEY | Aetna Premier | | | Preferred $25 - $100 | Preferred $5 - $25 |
| | Western Health Advantage w/Specialty | | | Non-Preferred $50 - $75 | Non-Preferred $50 - $75 |
| | Health Net 3-Tier with Specialty (CA) | | | Preferred $0 - $50 | Preferred $0 - $15 |
| | Medi-Cal | | | Preferred $1 | Preferred $1 |
| | L.A. Care Medi-Cal | | | Preferred $0 | Preferred $0 |

350.    The screenshots above display only the patient's out-of-pocket costs for the drugs at issue.  When considering the total cost of each drug—most of which must be borne by commercial payors—the harm of Shire and Takeda's scheme become immediately apparent:

| Drug | Approximate Price |
|---|---|
| Vyvanse | $330/month |
| Generic Adderall XR | $120/month |
| Generic Adderall IR | $100/month |
| Concerta | $300/month |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

351.   Vyvanse is rarely the cheapest treatment for ADHD, for patients or payors.  However, with the Vyvanse Savings Card, patients would realize significant out-of-pocket savings by switching to Vyvanse—especially at the $15/month level that prevailed from 2007 through early 2018.

352.   Even after the Vyvanse Savings Card increased the minimum out-of-pocket expenditure to $25 and then $30, the savings offered by Shire have been sufficient to convince many patients to take Vyvanse instead of a cheaper competitor.  Moreover, many patients who were originally induced to take Vyvanse because of its lower price and who might realize some savings by switching to a competitor, nonetheless were induced by the coupon to continue taking Vyvanse because the slightly more expensive price for Vyvanse is insufficient to convince them to switch treatments.

353.   Shire and Takeda's Sales Specialists are provided with approximately 200-250 free trial coupons and 300 ordinary Vyvanse Savings Cards per quarter. Sales specialists are instructed to, and do, use these coupons to aggressively market Vyvanse.

354.   The free trial coupons, which are not available online and must be distributed by Shire, are particularly valuable.  Shire and Takeda's Sales Specialists are trained to leave several free trial coupons with health care providers, to be distributed to patients.  Typically, Sales Specialists leave five coupons with a provider, but may leave more if the provider is perceived to be promotionally responsive.  Shire and Takeda's sales representatives will deliver a message to the health care provider along the following lines:

> *I can't keep these coupons here forever.  Can you commit to distributing them within the next two weeks?*

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

355.   If the provider has not distributed the coupons to patients—and written the accompanying Vyvanse prescriptions—Shire and Takeda's Sales Specialists are trained to, and do, return to the provider's office and take back the coupons.

356.   Following Vyvanse's new indication for BED, and especially following the "Change in Mindset" initiative, Shire and Takeda's Sales Specialists have used the Vyvanse Savings Card program throughout California and Illinois to target weight-loss clinics and market Vyvanse for the unapproved and unsafe treatment of obesity.

357.   Faced with a competitive ADHD market and pressure from Shire management to find "new-to-brand" patients, many Sales Specialists distribute coupons only to weight-loss clinics.   These coupons have induced patients in California and Illinois, who would otherwise be unable to afford or unwilling to pay for Vyvanse for weight loss, to purchase Vyvanse for that unapproved and unsafe use.

### 2.   *The Mydayis Savings Card*

358.   In 2017, Shire received approval for a new ADHD medication, Mydayis.  Faced with a competitive ADHD market rife with generic competition, Shire sought to induce patients to take Mydayis instead of cheaper competitor drugs by substantially reducing their out-of-pocket costs and leaving commercial insurers responsible for paying for Shire's more expensive product.

359.   Shire called its scheme the "Go Early Program."  Under the Go Early program, active during July and August 2017, Shire instructed its Sales Specialists to get five physicians to commit to prescribe Mydayis to five patients each—for a total of twenty-five patients per representative.  In pitching Mydayis to physicians, Shire's sales representatives were instructed to, and did, emphasize that under the Go Early Program, patients would pay very little out of pocket for Mydayis.

111

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

360. The Go Early Program provided coupons whereby patients would pay $3 per month for the first three months of treatment with Mydayis and $15 per month for the next nine months. Although the Go Early Program ended after August 2017, the Mydayis Savings Card program continued to offer these discounts through the end of 2018. In January 2019, the minimum out-of-pocket cost guaranteed by the Mydayis Savings Card increased to $25. In June 2019, the minimum increased to $30. As described above, patients' out-of-pocket costs for competitor drugs are substantially higher.

361. The retail price for a one-month supply of Mydayis—most of which a commercial payor must pay—is approximately $330. The retail price for competitor drugs such as Adderall XR and Adderall IR is significantly lower.

362. The Mydayis Savings Card has never carried any income requirements and has always been available to patients regardless of financial need. Any patient who is covered by private insurance is, and has always been, eligible to use the Mydayis Savings Card.

363. The Mydayis Savings Card mimics an insurance card and is designed to be presented to a pharmacist when filling a prescription for Mydayis. The card has had several iterations, and was once co-branded as the MVP (Mydayis/Vyvanse Program) Card, which provided a discount for Mydayis or Vyvanse.

364. The card's current iteration is pictured below:



112

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   365.   When a patient presents the Mydayis Savings Card to a pharmacist, the
2   patient will be responsible for paying only a portion of his or her cost-sharing
3   obligation.   Shire and Takeda will fund up to $60 of a patient's cost-sharing
4   obligation per prescription each month, and the patient will be responsible for a
5   minimum of $30.

6   366.   The Mydayis Savings Card is very attractive to patients and was
7   especially attractive in its first iteration, paying for all but $3/month for the first three
8   months and $15/month for the next nine months.   The Mydayis Savings Card has
9   induced and continues to induce many patients whose ADHD was or would be well-
10  controlled by a lower-cost drug, such as generic Adderall XR, to choose the more
11  expensive Mydayis instead, because the patients' cost-sharing obligations are
12  substantially reduced.

13  367.   Although Government Health Care Program patients are ineligible to
14  use the Mydayis Savings Card, privately insured patients, including those in
15  California and Illinois, are eligible.

16  368.   The Mydayis Savings Card is an integral part of Shire and Takeda's
17  marketing scheme.  The Mydayis Savings Card is extremely popular among patients
18  and providers, who are sensitive to their patients' cost-sharing obligations.  Under
19  the guise of magnanimity, Shire and Takeda leverage this savings program to
20  convince doctors to prescribe and patients to take Mydayis instead of cheaper
21  alternative ADHD medications.

22  369.   The Mydayis Savings Card explicitly acts as unlicensed secondary
23  insurance.   On the back of each card, Shire and Takeda print instructions to the
24  pharmacist to process the discount.   The back of the Mydayis Savings Card states:

25  **Pharmacist instructions for a patient paying with an Eligible Third
    Party Payer:** Submit the claim to the primary Third Party Payer first, then
26  submit the balance due to CHANGE HEALTHCARE as a Secondary Payer

27

28                                    113

COB [coordination of benefits] with patient responsibility amount and a valid Other Coverage Code (e.g., 8).

370. Additionally, Shire distributes a Pharmacy Reference Guide specific to the Mydayis Savings Card. This two-page guide includes pharmacy-specific instructions for Walgreens, Rite Aid, CVS, Safeway, and Walmart, all instructing pharmacists how to process the Mydayis Savings Card as secondary insurance. For instance, for CVS pharmacists, the Pharmacy Reference Guide instructs:[128]

## CVS

Pharmacist should enter both the Primary and Secondary Insurance simultaneously. If Primary Insurance returns a Managed Care Restriction* (e.g., NDC Block):

• Submit insurance and discount card together
• When primary rejects, click Bypass (Target/CVS has it as "BP" in their systems)
• Submit
• The pharmacy would take steps to resolve the primary issue. If unable to resolve issue, then pharmacy should contact the CVS help desk/insurance company and the secondary insurance can be applied

371. Shire and Takeda have induced numerous doctors to prescribe and patients to take Mydayis instead of cheaper alternative ADHD medications, and have induced numerous pharmacists to process the Mydayis Savings Card as secondary insurance.

### 3. *The Xiidra Iinsider Card*

372. In 2016, Shire received approval for a new medication to treat dry eye, Xiidra. Shire sought to induce patients to take Xiidra instead of cheaper competitor drugs by substantially reducing their out-of-pocket costs and leaving commercial insurers responsible for paying for Shire's more expensive product. Shire's scheme was successful; after just six months on the market, Shire boasted that Xiidra had captured a 20% market share and over $50 million in sales. On July 1, 2019, Takeda

---

[128] *See* Ex. F4 to Relator's Pre-Filing Disclosure statement

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

sold Xiidra to Novartis for $3.4 billion upfront, with the potential for $5.3 billion total.

373.   The Xiidra Iinsider Card provides patients with their first month's prescription at no charge, and subsequent prescriptions at $5 per month, with a maximum discount of $250 per month.   Patients' out-of-pocket costs for many competitor drugs are substantially higher.

374.   The retail price for a one-month supply of Xiidra—most of which a commercial payor must pay—is approximately $500.   The retail price for many competitor drugs is significantly lower.

375.   The Xiidra Iinsider Card has never carried any income requirements and has always been available to patients regardless of financial need.   Any patient who is covered by private insurance is, and has always been, eligible to use the Xiidra Iinsider Card.

376.   The Xiidra Iinsider mimics an insurance card and is designed to be presented to a pharmacist when filling a prescription for Xiidra.   An iteration of the Xiidra Iinsider Card from 2017 is pictured below:



COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

377.   When a patient presents the Xiidra Iinsider Card to a pharmacist, the patient will be responsible for paying only a portion of his or her cost-sharing obligation.   Shire will fund up to $250 of a patient's cost-sharing obligation per prescription each month, and the patient will be responsible for a minimum of $5.

378.   The Xiidra Iinsider Card is very attractive to patients.   The Xiidra Iinsider Card has induced and continues to induce many patients whose dry eye was or would be well-controlled by a lower-cost drug to choose the more expensive Xiidra instead, because the patients' cost-sharing obligations are substantially reduced.

379.   Although Government Health Care Program patients are ineligible to use the Xiidra Iinsider Card, privately insured patients, including those in California and Illinois, are eligible.

380.   The Xiidra Iinsider Card was an integral part of Shire and Takeda's marketing scheme.   The Xiidra Iinsider Card was extremely popular among patients and providers, who are sensitive to their patients' cost-sharing obligations.   Under the guise of magnanimity, Shire and Takeda leveraged this savings program to convince doctors to prescribe and patients to take Xiidra instead of cheaper alternative dry eye medications.

381.   The Xiidra Iinsider Card explicitly acts as unlicensed secondary insurance.   On the back of each card, Shire and Takeda print instructions to the pharmacist to process the discount.   The back of the Xiidra Iinsider Card states:

> **Pharmacist instructions for a patient with an Eligible Third Party** [*sic*]: Submit the claim to the primary Third Party Payer first, then submit the balance due to CHANGE HEALTHCARE as a Secondary Payer COB [coordination of benefits] with patient responsibility amount and a valid Other Coverage Code (e.g., 8).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

382.   Shire and Takeda have induced numerous doctors to prescribe and patients to take Xiidra instead of cheaper alternative medications, and have induced numerous pharmacists to process the Xiidra Iinsider Card as secondary insurance.

**D.    DEFENDANTS CAUSED THE PRESENTATION OF FALSE CLAIMS TO CALIFORNIA AND ILLINOIS INSURANCE PROVIDERS**

383.   The Vyvanse Savings Card program constitutes an illegal kickback scheme whereby Shire provided patients with something of value (in the form of Vyvanse at no cost or substantially reduced cost), in return for or to induce purchasing, ordering, arranging for or recommending purchasing or ordering of goods or items for which payment was made by California and Illinois commercial payors.

384.   These kickbacks caused physicians to prescribe Vyvanse for ADHD rather than cheaper competitor drugs.  These kickbacks also caused physicians to prescribe Vyvanse for the unsafe and unapproved use of weight loss.

385.   These actions, in turn, caused health care providers to submit false or fraudulent claims for reimbursement to California and Illinois commercial payors.

386.   Claims submitted to California commercial payors where a kickback is involved in the underlying transaction are false within the meaning of the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

387.   Claims that were submitted to California and Illinois commercial payors as a result, in part or in whole, based on kickbacks provided by Shire were therefore false within the meaning of the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

388.  Shire's payment of kickbacks therefore caused the submission of claims that were false and not eligible for reimbursement to California and Illinois commercial payors.

389.  Shire's payment and offers of payment of kickbacks were made knowingly and with the intent to cause the submission of false claims to California and Illinois commercial payors.

390.  California and Illinois commercial payors paid reimbursements for those false claims, and, as a result, have incurred and continue to incur significant damages due to Shire's illegal payment of kickbacks.

## XII.   CAUSES OF ACTION

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

391.  Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

392.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval of Vyvanse, in violation of 31 U.S.C. § 3729(a)(1)(A).

393.  Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

### COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

394.  Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

118

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

395.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

396.   The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to be paying or reimbursing for Vyvanse prescribed to patients enrolled in Federal Programs.

397.   Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

**COUNT III**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))**

398.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

399.   Defendants knowingly conspired, and are still conspiring, with the various health care professionals identified and described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

400.   Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

**COUNT IV**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))**

401.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

119
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

402. Defendants knowingly avoided or decreased its obligation to pay or transmit money to the Government. Specifically, Defendants: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) Shire knew that the records or statements were false.

403. Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

## COUNT V
## (Violation of California False Claims Act)

404. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

405. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

406. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

407. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal,

1    avoid or decrease an obligation to pay or transmit money to the State of California
2    or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

3         408.   The State of California, or its political subdivisions, unaware of the
4    falsity of the claims and/or statements made by Defendants, and in reliance on the
5    accuracy of these claims and/or statements, paid, and continues to pay, for Vyvanse
6    prescriptions for recipients of state and state subdivision funded health insurance
7    programs.

8         409.   Because of Defendants' actions, the State of California, including its
9    political subdivisions, has been and continues to be severely damaged.

10                          **COUNT VI**
11            **(Violation of Colorado Medicaid False Claims Act)**

12        410.   Relator incorporates herein by reference the preceding paragraphs of
13   this Complaint as though fully set forth herein.

14        411.   Defendants, in reckless disregard or deliberate ignorance of the truth or
15   falsity of the information involved, or with actual knowledge of the falsity of the
16   information, knowingly presented, or caused to be presented, and are still presenting
17   or causing to be presented, to an officer or employee of the State of Colorado, or its
18   political subdivisions, false or fraudulent claims for payment or approval, in
19   violation of Colo. Rev. Stat. § 25.5-4-305(a).

20        412.   Defendants, in reckless disregard or deliberate ignorance of the truth or
21   falsity of the information involved, or with actual knowledge of the falsity of the
22   information, knowingly made, used, or caused to be made or used, and are still
23   making, using, or causing to be made or used, false records or statements material
24   to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

25        413.   Defendants, in reckless disregard or deliberate ignorance of the truth or
26   falsity of the information involved, or with actual knowledge of the falsity of the

27

28                                    121

information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

414.   The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for Vyvanse prescriptions for recipients of state and state subdivision funded health insurance programs.

415.   Because of Defendants' actions, the State of Colorado and/or its political subdivisions have been and continues to be severely damaged.

**COUNT VII**
**(Violation of Connecticut False Claims Act for Medical Assistance Programs)**

416.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

417.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and are still presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 4-275(a)(1).

418.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Gen. Stat. § 4-275(a)(2).

122
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

419.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Gen. Stat. § 4-275(a)(7).

420.   The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of state and state subdivision funded health insurance programs.

421.   Because of Defendants' actions, the State of Connecticut and/or its political subdivisions have been and continue to be severely damaged.

**COUNT VIII**
**(Violation of Delaware False Claims and Reporting Act)**

422.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

423.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

424.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

425.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

426.   The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of health care programs funded by the State of Delaware.

427.   Because of Defendants' actions, the State of Delaware and/or its political subdivisions have been and continue to be severely damaged.

## COUNT IX
### (Violation of District of Columbia False Claims Act)

428.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

429.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the District, or its political

124
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   subdivisions, false or fraudulent claims for payment or approval, in violation of D.C.
2   Code § 2-381.02(a)(l).

3       430.    Defendants, in reckless disregard or deliberate ignorance of the truth or
4   falsity of the information involved, or with actual knowledge of the falsity of the
5   information, knowingly made, used, or caused to be used, and are still making, using,
6   or causing to be made or used, false records or statements to get false claims paid or
7   approved by the District, or its political subdivisions, in violation of D.C. Code § 2-
8   381.02(a)(2).

9       431.    Defendants, in reckless disregard or deliberate ignorance of the truth or
10  falsity of the information involved, or with actual knowledge of the falsity of the
11  information, knowingly made, used, or caused to be made or used, and are still
12  making, using, or causing to be made or used, false records or statements to conceal,
13  avoid, or decrease an obligation to pay or transmit money to the District, or its
14  political subdivisions, in violation of D.C. Code § 2-381.02(a)(6).

15      432.    The District of Columbia, or its political subdivisions, unaware of the
16  falsity of the claims and/or statements made by Defendants, and in reliance upon the
17  accuracy of these claims and/or statements, paid and continue to pay for Vyvanse
18  and Mydayis prescriptions for recipients of health insurance programs funded by the
19  District.

20      433.    Because of Defendants' actions, the District of Columbia and/or its
21  political subdivisions have been and continue to be severely damaged.

22                              **COUNT X**
                **(Violation of Florida False Claims Act)**
23

24      434.    Relator incorporates herein by reference the preceding paragraphs of
25  this Complaint as though fully set forth herein.

26

27

28                                  125

435.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

436.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

437.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

438.   The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

439.   Because of Defendants' actions, the State of Florida and/or its agencies have been and continue to be severely damaged.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## COUNT XI
### (Violation of Georgia False Medicaid Claims Act)

440.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

441.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

442.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

443.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

444.   The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of Medicaid.

445.   Because of Defendants' actions, the State of Georgia and/or political subdivisions have been and continue to be severely damaged.

127

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

**COUNT XII**
**(Violation of Hawaii False Claims Act)**

446.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

447.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

448.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made and used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

449.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

450.   The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of state funded health insurance programs.

128
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 | 451.   Because of Defendants' actions, the State of Hawaii and/or its political
2 | subdivisions have been and continue to be severely damaged.

3 | **COUNT XIII**
**(Violation of Illinois False Claims Act)**
4 |

5 | 452.   Relator incorporates herein by reference the preceding paragraphs of
6 | this Complaint as though fully set forth herein.

7 | 453.   Defendants, in reckless disregard or deliberate ignorance of the truth or
8 | falsity of the information involved, or with actual knowledge of the falsity of the
9 | information, knowingly presented or caused to be presented, and are still presenting
10 | or causing to be presented, false or fraudulent claims for payment or approval, in
11 | violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

12 | 454.   Defendants, in reckless disregard or deliberate ignorance of the truth or
13 | falsity of the information involved, or with actual knowledge of the falsity of the
14 | information, knowingly made, used, or caused to be made or used, and are still
15 | making, using, or causing to be made or used, false records or statements material
16 | to get false or fraudulent claims paid or approved by the State of Illinois, or its
17 | political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

18 | 455.   Defendants, in reckless disregard or deliberate ignorance of the truth or
19 | falsity of the information involved, or with actual knowledge of the falsity of the
20 | information, knowingly made, used, or caused to be made or used, and are still
21 | making, using, or causing to be made or used, false records or statements material
22 | to conceal, avoid or decrease an obligation to pay or transmit money to the State of
23 | Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat.
24 | 175/3(a)(1)(G).

25 | 456.   The State of Illinois, or its political subdivisions, unaware of the falsity
26 | of the claims and/or statements made by Defendants, and in reliance on the accuracy

27 |
28 |

129
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  of those claims and/or statements, paid and continue to pay for Vyvanse and
2  Mydayis prescriptions for recipients of state funded health insurance programs.

3        457.   Because of Defendants' actions, the State of Illinois and/or its political
4  subdivisions have been and continue to be severely damaged.

5                                    **COUNT XIV**
6        **(Violation of Indiana False Claims and Whistleblower Protection Act)**

7        458.   Relator incorporates herein by reference the preceding paragraphs of
8  this Complaint as though fully set forth herein.

9        459.   Defendants, in reckless disregard or deliberate ignorance of the truth or
10 falsity of the information involved, or with actual knowledge of the falsity of the
11 information, knowingly or intentionally presented, or caused to be presented, and
12 are still presenting or causing to be presented, false claims to the State of Indiana, or
13 its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-
14 5.5-2(b)(l).

15       460.   Defendants, in reckless disregard or deliberate ignorance of the truth or
16 falsity of the information involved, or with actual knowledge of the falsity of the
17 information, knowingly or intentionally made, used, or caused to be made or used,
18 and are still making, using, or causing to be made or used, false records or statements
19 to obtain payment or approval of false claims from the State of Indiana, or its
20 political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

21       461.   Defendants, in reckless disregard or deliberate ignorance of the truth or
22 falsity of the information involved, or with actual knowledge of the falsity of the
23 information, knowingly or intentionally made, used, or caused to be made or used,
24 and are still making, using, or causing to be made or used, false records or statements
25 to avoid an obligation to pay or transmit money to the State of Indiana, or its political
26 subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

27

28                                      130
       COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

462.   The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of state funded health insurance programs.

463.   Because of Defendants' actions, the State of Indiana and/or its political subdivisions have been and continue to be severely damaged.

### COUNT XV
### (Violation of Iowa False Claims Act)

464.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

465.   Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

466.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

467.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    468.   The State of Iowa, or its political subdivisions, unaware of the falsity

2  of the claims and/or statements made by Defendants, and in reliance on the accuracy

3  of these claims and/or statements, paid for Vyvanse prescriptions for recipients of

4  health insurance programs funded by the state or its political subdivisions.

5    469.   Because of Defendants' actions, the State of Iowa and/or its political

6  subdivisions have been and continue to be severely damaged.

7                                **COUNT XVI**
   **(Violation of Louisiana Medical Assistance Programs Integrity Law)**
8

9    470.   Relator incorporates herein by reference the preceding paragraphs of

10  this Complaint as though fully set forth herein.

11    471.   Defendants, in reckless disregard or deliberate ignorance of the truth or

12  falsity of the information involved, or with actual knowledge of the falsity of the

13  information, knowingly presented, or caused to be presented, and are still presenting

14  or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat.

15  Ann. § 46:438.3(A).

16    472.   Defendants, in reckless disregard or deliberate ignorance of the truth or

17  falsity of the information involved, or with actual knowledge of the falsity of the

18  information, knowingly engaged in misrepresentation, and are still engaging in

19  misrepresentation, to obtain, or attempt to obtain, payment from medical assistance

20  programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

21    473.   Defendants, in reckless disregard or deliberate ignorance of the truth or

22  falsity of the information involved, or with actual knowledge of the falsity of the

23  information, knowingly submitted, and may continue to submit, claims for goods,

24  services or supplies which were medically unnecessary or which were of

25  substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

26

27

28
                                    132
   COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

474.   The State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for Vyvanse prescriptions for medical assistance program recipients.

475.   Because of Defendants' actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department have been and continue to be severely damaged.

## COUNT XVII
### (Violation of Maryland False Health Claims Act)

476.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

477.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

478.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

479.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

480.   The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for Vyvanse prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

481.   Because of Defendants' actions, the State of Maryland and/or its political subdivisions have been and continue to be severely damaged.

**COUNT XVIII**
**(Violation of Massachusetts False Claims Act)**

482.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

483.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

484.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  payment or approval of claims by the Commonwealth of Massachusetts, or its
2  political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

3  485.  Defendants, in reckless disregard or deliberate ignorance of the truth or
4  falsity of the information involved, or with actual knowledge of the falsity of the
5  information, knowingly made, used, or caused to be made or used, and are still
6  making, using, or causing to be made or used, false records or statements to conceal,
7  avoid, or decrease an obligation to pay or transmit money to the Commonwealth of
8  Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12
9  § 5B(8).

10  486.  The Commonwealth of Massachusetts, or its political subdivisions,
11  unaware of the falsity of the claims and/or statements made by Defendants, and in
12  reliance on the accuracy of these claims and/or statements, paid and continue to pay
13  for Vyvanse and Mydayis prescriptions for recipients of health insurance programs
14  funded by the state or its political subdivisions.

15  487.  Because of Defendants' actions, the Commonwealth of Massachusetts
16  and/or its political subdivisions have been and continue to be severely damaged.

17
18  ### COUNT XIX
   ### (Violation of Michigan Medicaid False Claims Act)

19  488.  Relator incorporates herein by reference the preceding paragraphs of
20  this Complaint as though fully set forth herein.

21  489.  Defendants, in reckless disregard or deliberate ignorance of the truth or
22  falsity of the information involved, or with actual knowledge of the falsity of the
23  information, knowingly made or caused to be made, and are still making or causing
24  to be made, false statements or false representations of material facts in an
25  application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

26
27
28
                                    135
   COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

490.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

491.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and are still concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants were not entitled or in an amount greater than that to which Defendants were entitled, in violation of Mich. Comp. Laws § 400.603(3).

492.   Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented, or caused to be made or presented, and are still making, presenting, or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

493.   The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of Medicaid.

494.   Because of Defendants' actions, the State of Michigan and/or its political subdivisions have been and continue to be severely damaged.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT XX**
**(Violation of Minnesota False Claims Act)**

495.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

496.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

497.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

498.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

499.   The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of state and state subdivision funded health insurance programs.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    500.  Because of Defendants' actions, the State of Minnesota and/or its
2  political subdivisions have been and continue to be severely damaged.

**COUNT XXI**
**(Violation of Montana False Claims Act)**

5    501.  Relator incorporates herein by reference the preceding paragraphs of
6  this Complaint as though fully set forth herein.

7    502.  Defendants, in reckless disregard or deliberate ignorance of the truth or
8  falsity of the information involved, or with actual knowledge of the falsity of the
9  information, knowingly presented or caused to be presented, and are still presenting
10  or causing to be presented, to an officer or employee of the State of Montana, or its
11  political subdivisions, false or fraudulent claims for payment or approval, in
12  violation of Mont. Code Ann. § 17-8-403(1)(a).

13    503.  Defendants, in reckless disregard or deliberate ignorance of the truth or
14  falsity of the information involved, or with actual knowledge of the falsity of the
15  information, knowingly made, used, or caused to be made or used, and are still
16  making, using, or causing to be made or used, false records or statements to get false
17  or fraudulent claims paid or approved by the State of Montana, or its political
18  subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

19    504.  Defendants, in reckless disregard or deliberate ignorance of the truth or
20  falsity of the information involved, or with actual knowledge of the falsity of the
21  information, knowingly made, used, or caused to be made or used, and are still
22  making, using, or causing to be made or used, false records or statements to conceal,
23  avoid, or decrease an obligation to pay or transmit money to the State of Montana,
24  or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

25    505.  The State of Montana, or its political subdivisions, unaware of the
26  falsity of the claims and/or statements made by Defendants, and in reliance on the

138

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   accuracy of these claims and/or statements, paid and continue to pay for Vyvanse
2   and Mydayis prescriptions for recipients of health insurance programs funded by the
3   state or its political subdivisions.

4       506.  Because of Defendants' actions, the State of Montana and/or its
5   political subdivisions have been and continue to be severely damaged.

**COUNT XXII**
**(Violation of Nevada False Claims Act)**

8       507.  Relator incorporates herein by reference the preceding paragraphs of
9   this Complaint as though fully set forth herein.

10      508.  Defendants, in reckless disregard or deliberate ignorance of the truth or
11  falsity of the information involved, or with actual knowledge of the falsity of the
12  information, knowingly presented or caused to be presented, and are still presenting
13  or causing to be presented, false claims for payment or approval, in violation of Nev.
14  Rev. Stat. § 357.040(1)(a).

15      509.  Defendants, in reckless disregard or deliberate ignorance of the truth or
16  falsity of the information involved, or with actual knowledge of the falsity of the
17  information, knowingly made, used, or caused to be made or used, and are still
18  making, using, or causing to be made or used, false records or statements to obtain
19  payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

20      510.  Defendants, in reckless disregard or deliberate ignorance of the truth or
21  falsity of the information involved, or with actual knowledge of the falsity of the
22  information, knowingly made, used, or caused to be made or used, and are still
23  making, using, or causing to be made or used, false records or statements to conceal,
24  avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or
25  its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    511.   The State of Nevada, or its political subdivisions, unaware of the falsity
2  of the claims and/or statements made by Defendants, and in reliance on the accuracy
3  of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis
4  prescriptions for recipients of health insurance programs funded by the state or its
5  political subdivisions.

6    512.   Because of Defendants' actions, the State of Nevada and/or its political
7  subdivisions have been and continue to be severely damaged.

8                            **COUNT XXIII**
9                **(Violation of New Jersey False Claims Act)**

10   513.   Relator incorporates herein by reference the preceding paragraphs of
11  this Complaint as though fully set forth herein.

12   514.   Defendants, in reckless disregard or deliberate ignorance of the truth or
13  falsity of the information involved, or with actual knowledge of the falsity of the
14  information, knowingly or intentionally presented or caused to be presented, and are
15  still presenting or causing to be presented, to an employee, officer, or agent of the
16  State of New Jersey, or to any contractor, grantee, or other recipient of State funds,
17  false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann.
18  § 2A:32C-3(a).

19   515.   Defendants, in reckless disregard or deliberate ignorance of the truth or
20  falsity of the information involved, or with actual knowledge of the falsity of the
21  information, knowingly made, used, or caused to made or used, and are still making,
22  using, or causing to be made or used, false records or statements to get false or
23  fraudulent claims paid or approved by the State of New Jersey, or its political
24  subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

25   516.   Defendants, in reckless disregard or deliberate ignorance of the truth or
26  falsity of the information involved, or with actual knowledge of the falsity of the

27

28                                  140

1   information, knowingly made, used, or caused to be made or used, and are still
2   making, using, or causing to be made or used, false records or statements to conceal,
3   avoid, or decrease an obligation to pay or transmit money to the State of New Jersey,
4   or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

5       517.  The State of New Jersey, or its political subdivisions, unaware of the
6   falsity of the claims and/or statements made by Defendants, and in reliance on the
7   accuracy of these claims and/or statements, paid and continue to pay for Vyvanse
8   and Mydayis prescriptions for recipients of Medicaid.

9       518.  Because of Defendants' actions, as set forth above, the State of New
10  Jersey and/or its political subdivisions have been and continue to be severely
11  damaged.

12
                              **COUNT XXIV**
                 **(Violation of New Mexico Medicaid False Claims Act and
13                      Fraud Against Taxpayers Act)**

14      519.  Relator incorporates herein by reference the preceding paragraphs of
15  the Complaint as though fully set forth herein.

16      520.  Defendants, in reckless disregard or deliberate ignorance of the truth or
17  falsity of the information involved, or with actual knowledge of the falsity of the
18  information, knowingly presented or caused to be presented, and are still presenting
19  or causing to be presented, to the State of New Mexico, or its political subdivisions,
20  false or fraudulent claims for payment under the Medicaid program, in violation of
21  N.M. Stat. Ann. § 27-14-4(A) and N.M. Stat. Ann. § 44-9-3(A)(1).

22      521.  Defendants, in reckless disregard or deliberate ignorance of the truth or
23  falsity of the information involved, or with actual knowledge of the falsity of the
24  information, knowingly made, used, or caused to be made or used, and are still
25  making, using, or causing to be made or used, false records or statements to obtain
26  false or fraudulent claims under the Medicaid program paid for or approved by the

27
28
                                   141

1  State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann.
2  § 27-14-4(C) and N.M. Stat. Ann. § 44-9-3(A)(2).

3  522.  Defendants, in reckless disregard or deliberate ignorance of the truth or
4  falsity of the information involved, or with actual knowledge of the falsity of the
5  information, knowingly made, used, or caused to be made or used, and are still
6  making, using, or causing to be made or used, false records or statements to conceal,
7  avoid, or decrease an obligation to pay or transmit money to the State of New
8  Mexico, or its political subdivisions, relative to the Medicaid program, in violation
9  of N.M. Stat. Ann. § 27-14-4(E) and N.M. Stat. Ann. § 44-9-3(A)(8).

10  523.  The State of New Mexico, or its political subdivisions, unaware of the
11  falsity of the claims and/or statements made by Defendants, and in reliance on the
12  accuracy of these claims and/or statements, paid, and may continue to pay, for
13  prescription drugs for recipients of health insurance programs funded by the state or
14  its political subdivisions.

15  524.  Because of Defendants' actions, as set forth above, the State of New
16  Mexico and/or its political subdivisions have been and continue to be severely
17  damaged.

18
19  **COUNT XXV**
**(Violation of New York False Claim Act)**

20  525.  Relator incorporates herein by reference the preceding paragraphs of
21  this Complaint as though fully set forth herein.

22  526.  Defendants, in reckless disregard or deliberate ignorance of the truth or
23  falsity of the information involved, or with actual knowledge of the falsity of the
24  information, knowingly presented or caused to be presented, and are still presenting
25  or causing to be presented, false or fraudulent claims for payment or approval, in
26  violation of N.Y. State Fin. Law § 189(1)(a).

27
28
142
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

527.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

528.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

529.   The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

530.   Because of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been and continue to be severely damaged.

### COUNT XXVI
### (Violation of North Carolina False Claims Act)

531.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

532.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting

143

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1 | or causing to be presented, false or fraudulent claims for payment or approval, in
2 | violation of N.C. Gen. Stat. § 1-607(a)(1).

3 | 533.   Defendants, in reckless disregard or deliberate ignorance of the truth or
4 | falsity of the information involved, or with actual knowledge of the falsity of the
5 | information, knowingly made, used, or caused to be made or used, and are still
6 | making, using, or causing to be made or used, false records or statements material
7 | to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

8 | 534.   Defendants, in reckless disregard or deliberate ignorance of the truth or
9 | falsity of the information involved, or with actual knowledge of the falsity of the
10 | information, knowingly made, used, or caused to be made or used, and are still
11 | making, using, or causing to be made or used, false records or statements to conceal,
12 | avoid, or decrease an obligation to pay or transmit money to the State of North
13 | Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

14 | 535.   The State of North Carolina, or its political subdivisions, unaware of
15 | the falsity of the claims and/or statements made by Defendants, and in reliance on
16 | the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse
17 | and Mydayis prescriptions for recipients of health insurance programs funded by the
18 | state or its political subdivisions.

19 | 536.   Because of Defendants' actions, as set forth above, the State of North
20 | Carolina and/or its political subdivisions have been and continue to be severely
21 | damaged.

**COUNT XXVII**
**(Violation of Oklahoma Medicaid False Claims Act)**

537.   Relator incorporates herein by reference the preceding paragraphs of
this Complaint as though fully set forth herein.

144
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

538.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

539.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and are still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

540.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

541.   The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of Medicaid.

542.   Because of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been and continue to be severely damaged.

145

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1
2
3
4

### COUNT XXVIII
### (Violation of Rhode Island False Claims Act)

543.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

544.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

545.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and are still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

546.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

547.   The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of Medicaid.

146

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

548.    Because of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXIX
### (Violation of Tennessee Medicaid False Claims Act)

549.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

550.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

551.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

552.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

553.   The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of the Medicaid program.

554.   Because of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been and continue to be severely damaged.

### COUNT XXX
### (Violation of Texas Medical Assistance Program, Damages, and Penalties Act)

555.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

556.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and are still making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

557.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and are still concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

558.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and are still making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

559.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and are still making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

560.   The State of Texas, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

561.   Because of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been and continue to be severely damaged.

### COUNT XXXI
### (Violation of Vermont False Claims Act)

562.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

563.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

information, knowingly made or caused to be made, and are still making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1)-(2).

564.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and are still concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

565.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and are still making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

566.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and are still making, claims under the Medicaid program for products that were inappropriate, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

567.   The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

568.   Because of Defendants' actions, as set forth above, the State of Vermont and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXXII
**(Violation of Virginia Fraud Against Taxpayers Act)**

569.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

570.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

571.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

572.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and are still

151
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  making, using, or causing to be made or used, false records or statements to conceal,

2  avoid, or decrease an obligation to pay or transmit money to the Commonwealth of

3  Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-

4  216.3(A)(7).

5  573.   The Commonwealth of Virginia, or its political subdivisions, unaware

6  of the falsity of the claims and/or statements made by Defendants, and in reliance

7  upon the accuracy of these claims and/or statements, paid and continue to pay for

8  Vyvanse and Mydayis prescriptions for recipients of state funded health insurance

9  programs.

10  574.   Because of Defendants' actions, as set forth above, the Commonwealth

11  of Virginia and/or its political subdivisions have been and continue to be severely

12  damaged.

**COUNT XXXIII**
**(Violation of Washington Medicaid False Claims Act)**

15  575.   Relator incorporates herein by reference the preceding paragraphs of

16  this Complaint as though fully set forth herein.

17  576.   Defendants, in reckless disregard or deliberate ignorance of the truth or

18  falsity of the information involved, or with actual knowledge of the falsity of the

19  information, knowingly presented or caused to be presented, and are still presenting

20  or causing to be presented, false or fraudulent claims for payment of approval, in

21  violation of Wash. Rev. Code § 74.66.020(1)(a).

22  577.   Defendants, in reckless disregard or deliberate ignorance of the truth or

23  falsity of the information involved, or with actual knowledge of the falsity of the

24  information, knowingly made, used, or caused to be made or used, and are still

25  making, using, or causing to be made or used, false records or statements material

26  to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

152
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

578.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Washington, or its political subdivisions, in violation of Wash. Rev. Code § 74.66.020(1)(g).

579.   The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for Vyvanse and Mydayis prescriptions for recipients of state funded health insurance programs.

580.   Because of Defendants' actions, as set forth above, the State of Washington and/or its political subdivisions have been and continue to be severely damaged.

**COUNT XXXIV**
**(Violation of Puerto Rico False Claims Act)**

581.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

582.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of 2018 P.R. Act 154 (H.B. 1627), § 3.07(A)(1).

583.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material

to false or fraudulent claims, in violation of 2018 P.R. Act 154 (H.B. 1627), § 3.07(A)(2).

584.   The Commonwealth of Puerto Rico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and continues to pay, for Vyvanse and Mydayis prescriptions for recipients of Commonwealth-funded health insurance programs.

585.   Because of Defendants' actions, as set forth above, the Commonwealth of Puerto Rico and/or its political subdivisions have been and continue to be severely damaged.

**COUNT XXXV**
**(Violation of Chicago False Claims Ordinance)**

586.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

587.   By virtue of the above-described acts, Defendants knowingly and willfully promoted Vyvanse for unapproved and unsafe uses.

588.   By virtue of the above-described acts, Defendants knowingly and willfully promoted Mydayis for adolescents at unapproved and unsafe doses.

589.   By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Chicago City Government.

590.   By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Chicago City Government to approve and pay such false and fraudulent claims.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

591.    The Chicago City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

592.    By reason of the Defendants' unlawful acts, the City of Chicago has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**COUNT XXXVI**
**(Violation of Hallandale Beach False Claims Ordinance)**

593.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

594.    By virtue of the above-described acts, Defendants knowingly and willfully promoted Vyvanse for unapproved and unsafe uses.

595.    By virtue of the above-described acts, Defendants knowingly and willfully promoted Mydayis for adolescents at unapproved and unsafe doses.

596.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Hallandale Beach City Government.

597.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hallandale Beach City Government to approve and pay such false and fraudulent claims.

598.    The Hallandale Beach City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    599.  By reason of the Defendants' unlawful acts, the City of Hallandale
2    Beach has been damaged, and continues to be damaged, in substantial amount to be
3    determined at trial.

4                                **COUNT XXXVII**
                  **(Violation of Broward County False Claims Ordinance)**
5

6    600.  Relator incorporates herein by reference the preceding paragraphs of
7    this Complaint as though fully set forth herein.

8    601.  By virtue of the above-described acts, Defendants knowingly and
9    willfully promoted Vyvanse for unapproved and unsafe uses.

10   602.  By virtue of the above-described acts, Defendants knowingly and
11   willfully promoted Mydayis for adolescents at unapproved and unsafe doses.

12   603.  By virtue of the above-described acts, Defendants knowingly made or
13   caused to be made false claims for Defendants' drugs to the Broward County
14   Government.

15   604.  By virtue of the above-described acts, Defendants knowingly made,
16   used, or caused to be made or used false records and statements, and omitted material
17   facts, to induce the Broward County Government to approve and pay such false and
18   fraudulent claims.

19   605.  The Broward County Government, unaware of the falsity of the
20   records, statements and claims made, used, presented or caused to be made, used or
21   presented by Defendants, paid and continues to pay the claims that would not be
22   paid but for Defendants' illegal inducements and/or business practices.

23   606.  By reason of the Defendants' unlawful acts, Broward County has been
24   damaged, and continues to be damaged, in substantial amount to be determined at
25   trial.

26

27

28                                    156
           COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

2

### COUNT XXXVIII
### (Violation of Miami-Dade False Claims Ordinance)

3     607.   Relator incorporates herein by reference the preceding paragraphs of

4     this Complaint as though fully set forth herein.

5     608.   By virtue of the above-described acts, Defendants knowingly and

6     willfully promoted Vyvanse for unapproved and unsafe uses.

7     609.   By virtue of the above-described acts, Defendants knowingly and

8     willfully promoted Mydayis for adolescents at unapproved and unsafe doses.

9     610.   By virtue of the above-described acts, Defendants knowingly made or

10    caused to be made false claims for Defendants' drugs to the Miami-Dade County

11    Government.

12    611.   By virtue of the above-described acts, Defendants knowingly made,

13    used, or caused to be made or used false records and statements, and omitted material

14    facts, to induce the Miami-Dade County Government to approve and pay such false

15    and fraudulent claims.

16    612.   The Miami-Dade County Government, unaware of the falsity of the

17    records, statements and claims made, used, presented or caused to be made, used or

18    presented by Defendants, paid and continues to pay the claims that would not be

19    paid but for Defendants' illegal inducements and/or business practices.

20    613.   By reason of the Defendants' unlawful acts, Miami-Dade County has

21    been damaged, and continues to be damaged, in substantial amount to be determined

22    at trial.

23

24

### COUNT XXXIX
### (Violation of CIFPA)

25    614.   Relator incorporates herein by reference the preceding paragraphs of

26    this Complaint as though fully set forth herein.

27

28

157

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1    615. Defendants knowingly employed physicians as "runners, cappers,
2    steerers, or other persons" by paying them kickbacks to "procure clients or patients
3    to perform or obtain services or benefits under a contract of insurance," in violation
4    of Cal. Ins. Code § 1871.7(a) and Cal. Bus. & Prof. Code § 650(a).

5    616. Defendants also knowingly employed its sales representatives as
6    "runners, cappers, steerers, or other persons" to cause health care professionals and
7    their staff to be paid kickbacks, and/or to falsify or cause said professionals and staff
8    to falsify health care claims, all to "procure clients or patients to perform or obtain
9    services or benefits under a contract of insurance," and all in violation of Cal. Ins.
10   Code § 1871.7(a) and Cal. Bus. & Prof. Code § 650(a).

11   617. Through their payment of kickbacks, Defendants knowingly prepared,
12   made, and/or subscribed a writing, with the intent to present or use it, or to allow it
13   to be presented, in support of false and/or fraudulent claims, in violation of Cal. Ins.
14   Code § 1871.7(b) and Cal. Penal Code § 550(a)(5).

15   618. Through their payment and receipts of kickbacks, Defendants
16   knowingly made or caused to be made false or fraudulent claims for the payment of
17   a health care benefit, in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code
18   § 550(a)(6).

19   619. Through their payment and/or receipt of kickbacks, Defendants
20   presented or caused to be presented written and/or oral statements as part of, or in
21   support of, claims for payment or other benefit pursuant to an insurance policy,
22   knowing that the statements contained false and/or misleading information
23   concerning one or more material facts, in violation of Cal. Ins. Code § 1871.7(b) and
24   Cal. Penal Code § 550(b)(1).

25   620. Through their payment and/or receipt of kickbacks, Defendants
26   prepared or made written and/or oral statements that were intended to be represented

27

28                                      158
                 COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1   to an insurer or insurance claimant in connection with, or in support of, claims for
2   payment or other benefits pursuant to an insurance policy, knowing that the
3   statements contained false or misleading information concerning one or more
4   material facts, in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code
5   § 550(b)(2).

6       621.   The payment and/or receipt of kickbacks as described herein has had
7   the direct effect of significantly increasing the number of claims submitted to and
8   paid by California insurers for Vyvanse prescriptions, thereby increasing the amount
9   of money spent by California insurers for this drug.

10      622.  Defendants' payments of kickbacks induced the cooperation of
11  physicians to evade California insurers' cost containment programs, and thereby
12  aided and/or abetted Defendants' scheme to induce the dispensing of Vyvanse. This
13  use of kickbacks has had the direct effect of significantly increasing the number of
14  Vyvanse prescriptions, thereby increasing the price of said prescriptions, which were
15  then paid for or reimbursed by California insurers.

**COUNT XXXX**
**(Violation of IICFPA)**

18      623.   Relator incorporates herein by reference the preceding paragraphs of
19  this Complaint as though fully set forth herein.

20      624.   Defendants violated the Illinois Criminal Code and the IICFPA by
21  committing "insurance fraud" through payment of kickbacks and/or falsification of,
22  or causing the falsification of, prior authorization requests and/or health care claims,
23  and/or presenting or causing to be presented written and/or oral statements as part
24  of, or in support of, claims for payment or other benefit pursuant to an insurance
25  policy, knowing that the claims and/or statements contained false and/or misleading
26  information concerning one or more material facts. Defendants knowingly prepared,

1   made, and/or subscribed a writing, with the intent to present or use it, or to allow it
2   to be presented, in support of false and/or fraudulent claims. The foregoing actions
3   were all in violation of 740 Ill. Comp. Stat. 92/5(a)-(b), the Illinois Criminal Code
4   of 2012 (720 Ill. Comp. Stat. 17-8.10.5(a)(1)), and the Illinois Criminal Code of
5   1961 (720 Ill. Comp. Stat. 5/46-1(a)) (effective January 1, 2006 through June 30,
6   2011).

7       625. Defendants further violated the Illinois Criminal Code and the IICFPA
8   by committing "health care benefits fraud" through payment of kickbacks and/or
9   falsification of, or causing the falsification of, prior authorization requests and/or
10  health care claims, and/or presenting or causing to be presented written and/or oral
11  statements as part of, or in support of, claims for payment or other benefit pursuant
12  to an insurance policy, knowing that the claims and/or statements contained false
13  and/or misleading information concerning one or more material facts. Defendants
14  also knowingly made or caused to be made false or fraudulent claims for the payment
15  of a health care benefit. The foregoing actions were all in violation of 740 Ill. Comp.
16  Stat. 92/5(b) and the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-
17  8.10.5(a)(2)).

18      626. Defendants' violations of the IICFPA were "aggravated" offenses
19  because Defendants caused 3 or more violations within 18 months, all in violation
20  of 740 Ill. Comp. Stat. § 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp.
21  Stat. 5/17-8.10.5(b)(1)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat.
22  5/46-2) (effective January 1, 2006 through June 30, 2011).

23      627. Defendants' violations of the IICFPA were in the nature of a
24  "conspiracy" or "conspiracies" with other persons and/or entities, all in violation of
25  740 Ill. Comp. Stat. 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat.

26
27
28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

5/17-8.10.5(c)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-3) (effective January 1, 2006 through June 30, 2011).

628.   Defendants were the "organizer[s]" of the conspiracy or conspiracies with other persons and/or entities, all in violation of 740 Ill. Comp. Stat. 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-8.10.5(b)(2)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-4) (effective January 1, 2006 through June 30, 2011).

629.   Defendants' payments of kickbacks induced the cooperation of health care providers to evade Illinois insurers' cost containment programs, and thereby aided and/or abetted Avanir's scheme to induce the dispensing of Vyvanse, Mydayis, and Xiidra.

630.   The payment and/or receipt of kickbacks as described herein has had the direct effect of greatly increasing the number of claims submitted to and paid by Illinois commercial payors for Vyvanse, Mydayis, and Xiidra, thereby increasing the amount of money spent by these entities for these drugs.

## XIII. PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

A.   That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; Conn. Gen. Stat. §§ 4-274 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; Haw. Rev. Stat. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Md. Code Ann., Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12,

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

§§ 5A *et seq.*; Mich. Comp. Laws §§ 400.601 *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 27-14-1 *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; Wash Rev. Code §§ 74.66.005 *et seq.*; 2018 P.R. Act 154 (H.B. 1627); Chicago Mun. Code §§ 1-21-010 *et seq.*; Hallandale Beach Code of Ordinances §§ 8-201 *et seq.*; Broward Cnty. Code of Ordinances §§ 1-276 *et seq.*; Miami-Dade Cty. Code §§ 21-255 *et seq.*; Cal. Ins. Code § 1871.7; and 740 Ill. Comp. Stat. §§ 92/1 *et seq.*;

B.   That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[129] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[129] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

162

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a),[130] to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut

---

[130] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1
2
3
4
5
6
7
8

      multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Conn. Gen. Stat. § 4-275(b)(1),[131] to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

9
10
11
12
13
14
15
16
17
18

F.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

19
20
21
22
23
24

G.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages,

25
26
27

---

[131] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

J.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  schemes undertaken by Defendants, together with penalties for specific

2  claims to be identified at trial after full discovery;

3  M.  That judgment be entered in Relator's favor and against Defendants in

4  the amount of the damages sustained by the State of Iowa, multiplied

5  as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less

6  than eleven thousand four hundred sixty-three dollars ($11,463) or

7  more than twenty-two thousand nine hundred twenty-seven dollars

8  ($22,927) per false claim,[132] as provided by Iowa Code § 685.2(1), to

9  the extent such multiplied penalties shall fairly compensate the State of

10  Iowa or its political subdivisions for losses resulting from the various

11  schemes undertaken by Defendants, together with penalties for specific

12  claims to be identified at trial after full discovery;

13  N.  That judgment be entered in Relator's favor and against Defendants in

14  the amount of the damages sustained by Louisiana's medical assistance

15  programs, multiplied as provided for in La. Rev. Stat. Ann.

16  § 46:438.6(B)(2), plus a civil penalty of no less than five thousand five

17  hundred dollars ($5,500) and no more than eleven thousand dollars

18  ($11,000) per false claim, plus payment of interest as provided for in

19  La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied

20  fines and penalties shall fairly compensate the State of Louisiana's

21  medical assistance programs for losses resulting from the various

22  schemes undertaken by Defendants, together with penalties for specific

23  claims to be identified at trial after full discovery;

24

25  _____

[132] These figures are subject to change pursuant to the Federal Civil Penalties
26  Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as
amended.

27

28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

O.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) per false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.     That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B,[133] to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together

---

[133] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

with penalties for specific claims to be identified at trial after full discovery;

Q.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants,

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1      together with penalties for specific claims to be identified at trial after
2      full discovery;

3   S.   That judgment be entered in Relator's favor and against Defendants for
4        restitution to the State of Montana or its political subdivisions for the
5        value of payments or benefits provided, directly or indirectly, as a result
6        of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-
7        8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2),
8        plus a civil penalty of not less than five thousand dollars ($5,000) or
9        more than ten thousand dollars ($10,000) per false claim, pursuant to
10       Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties
11       shall fairly compensate the State of Montana or its political
12       subdivisions for losses resulting from the various schemes undertaken
13       by Defendants, together with penalties for specific claims to be
14       identified at trial after full discovery;

15  T.   That judgment be entered in Relator's favor and against Defendants for
16       restitution to the State of Nevada for the value of payments or benefits
17       provided, directly or indirectly, as a result of Defendants' unlawful acts,
18       as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for
19       in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than
20       eleven thousand four hundred sixty-three dollars ($11,463) or more
21       than twenty-two thousand nine hundred twenty-seven dollars ($22,927)
22       per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c),[134] to the
23       extent such multiplied penalties shall fairly compensate the State of
24       Nevada for losses resulting from the various schemes undertaken by

---

[134] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

170

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 27-14-4 and N.M. Stat. Ann. § 44-9-3(C), multiplied as provided for in N.M. Stat. Ann. § 27-14-4 and N.M. Stat. Ann. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. Ann. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1     action and reasonable attorney fees as provided by N.M. Stat. Ann.

2     § 44-9-3(C)(3)-(4);

3  W.  That judgment be entered in Relator's favor and against Defendants for

4     restitution to the State of New York or its political subdivisions for the

5     value of payments or benefits provided, directly or indirectly, as a result

6     of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law

7     § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1),

8     plus a civil penalty of not less than six thousand dollars ($6,000) or

9     more than twelve thousand dollars ($12,000) per false claim, pursuant

10    to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties

11    shall fairly compensate the State of New York or its political

12    subdivisions for losses resulting from the various schemes undertaken

13    by Defendants, together with penalties for specific claims to be

14    identified at trial after full discovery;

15 X.  That judgment be entered in Relator's favor and against Defendants for

16    restitution to the State of North Carolina for the value of payments or

17    benefits provided, directly or indirectly, as a result of Defendants'

18    unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as

19    provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not

20    less than five thousand five hundred dollars ($5,500) or more than

21    eleven thousand dollars ($11,000) per false claim, as provided by N.C.

22    Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly

23    compensate the State of North Carolina for losses resulting from the

24    various schemes undertaken by Defendants, together with penalties for

25    specific claims to be identified at trial after full discovery;

26

27

28

172

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Y.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code Ann. § 71-5-182(a)(l),[135] to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB.   That judgment be entered in Relator's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a) and Tex. Hum. Res. Code Ann. § 32.039, multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus an administrative penalty not to exceed twice the amount paid, as provided by Tex. Hum. Res. Code. Ann. § 32.039(c)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Tex. Hum. Res. Code Ann. § 36.052(a)(3)(A) & (B), plus an administrative penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each

---

[135] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

174

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1  unlawful act, pursuant to Tex. Hum. Res. Code. Ann. § 32.039(c)(2)(A)
2  & (B), to the extent such multiplied penalties shall fairly compensate
3  the State of Texas for losses resulting from the various schemes
4  undertaken by Defendants, together with penalties for specific claims
5  to be identified at trial after full discovery;

6  CC.  That judgment be entered in Relator's favor and against Defendants in
7  the amount of the damages sustained by the State of Vermont or its
8  political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit.
9  32, § 631(b)(2), plus a civil penalty of not less than five thousand five
10  hundred dollars ($5,500) and not more than eleven thousand dollars
11  ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32,
12  § 631(b)(1), as well as the costs incurred by the State of Vermont, as
13  provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly
14  compensate the State of Vermont or its political subdivisions for losses
15  resulting from the various schemes undertaken by Defendants, together
16  with penalties for specific claims to be identified at trial after full
17  discovery;

18  DD.  That judgment be entered in Relator's favor and against Defendants in
19  the amount of the damages sustained by the Commonwealth of
20  Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A),
21  plus a civil penalty of not less than five thousand five hundred dollars
22  ($5,500) or more than eleven thousand dollars ($11,000) per false
23  claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent
24  such multiplied penalties shall fairly compensate the Commonwealth
25  of Virginia for losses resulting from the various schemes undertaken by

26
27
28

175
COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020 (1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Wash. Rev. Code § 74.66.020(1) and Wash. Admin. Code § 44-02-010,[136] to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF.   That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d),[137] as well as the costs incurred by Relator and the

---

[136] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

[137] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1          Commonwealth of Puerto Rico, as provided by 2018 P.R. Act 154

2          (H.B. 1627), § 4.01(3), in order to fairly compensate the

3          Commonwealth of Puerto Rico or its political subdivisions for losses

4          resulting from the various schemes undertaken by Defendants, together

5          with penalties for specific claims to be identified at trial after full

6          discovery;

7   GG.   That judgment be entered in Relator's favor and against Defendants in

8          the amount of the damages sustained by the City of Chicago, multiplied

9          as provided for in Chicago Mun. Code § 1-22-020, plus a civil penalty

10         of not less than five thousand dollars ($5,000) or more than ten

11         thousand dollars ($10,000) per false claim, as provided by Chicago

12         Mun. Code § 1-22-020, as well as the costs incurred by Relator and the

13         City of Chicago, as provided by Chicago Mun. Code § 1-22-020, in

14         order to fairly compensate the City of Chicago for losses resulting from

15         the various schemes undertaken by Defendants, together with penalties

16         for specific claims to be identified at trial after full discovery;

17   HH.   That judgment be entered in Relator's favor and against Defendants in

18         the amount of the damages sustained by the City of Hallandale Beach,

19         multiplied as provided for in Hallandale Beach Code of Ordinances §

20         8-204(c)(1), plus civil penalties, as provided by Hallandale Beach Code

21         of Ordinances § 8-204(c)(5), as well as the costs incurred by Relator

22         and the City of Hallandale Beach, as provided by Hallandale Beach

23         Code of Ordinances § 8-207(a), in order to fairly compensate the City

24         of Hallandale Beach for losses resulting from the various schemes

25         undertaken by Defendants, together with penalties for specific claims

26         to be identified at trial after full discovery;

27

28

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

II.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Broward County, multiplied as provided for in Broward Cty. Code of Ordinances § 1-279(c)(1), as well as the costs incurred by Relator and Broward County, as provided by Broward Cty. Code of Ordinances § 1-283(a)-(b), in order to fairly compensate Broward County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

JJ.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Miami-Dade County, multiplied as provided for in Miami-Dade Cty. Code § 21-258(3)(a), as well as the costs incurred by Relator and Broward County, as provided by Miami-Dade Cty. Code §§ 21-258(3)(c), -262(1)-(2), in order to fairly compensate Miami-Dade County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

KK.    That judgment be entered in Relator's favor and against Defendants in the amount of each false claim for compensation that Defendants presented or caused to be presented to a California insurance company, multiplied as provided for in Cal. Ins. Code § 1871.7(b), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided for in Cal. Ins. Code § 1871.7(b), as well as the reasonable attorney's fees and costs incurred by Relator and the California Department of Insurance, as provided for in Cal. Ins. Code § 1871.7(g)(1)(A)(ii)-(iii);

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

LL.    That the Court, pursuant to Cal. Ins. Code § 1871.7(b) and 740 Ill. Comp. Stat. § 92/5(b), issue an order preventing the Defendants from transferring, concealing, or dissipating the proceeds of its illegal conduct;

MM.    That judgment be entered in Relator's favor and against Defendants in the amount of each false claim for compensation that Defendants presented or caused to be presented to an Illinois insurance company, multiplied as provided for in 740 Ill. Comp. Stat. § 92/5(b), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided for in 740 Ill. Comp. Stat. § 92/5(b), as well as the reasonable attorney's fees and costs incurred by Relator, as provided for in 740 Ill. Comp. Stat. § 92/25(e);

NN.    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

OO.    That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

PP.    That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

QQ.    That this Court award such further relief as it deems just and proper.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

1

**JURY DEMAND**

2

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

3

Dated:  July 31, 2019

**BARON & BUDD, P.C.**

4

By: /s/ Mark Pifko

5

Roland Tellis (SBN 186269)
rtellis@baronbudd.com

6

Mark Pifko (SBN 228412)
mpifko@baronbudd.com

7

**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600

8

Encino, California 91436
Telephone: 818.839.2333

9

Facsimile: 214.520.1181

10

W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com

11

Noah M. Rich (*pro hac vice* pending)
nrich@baronbudd.com

12

**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor

13

Washington, DC 20037
Telephone:  202.333.7352

14

Facsimile:  202.337.1039

15

*Attorneys for Relator*

16

17

18

19

20

21

22

23

24

25

26

27

28

180

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT